# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

WAPP TECH LIMITED PARTNERSHIP
and WAPP TECH CORP.,

          Plaintiffs,

    v.

MICRO FOCUS INTERNATIONAL PLC,

       Defendant.

Case No. 4:18-cv-00469-ALM

**JURY TRIAL DEMANDED**

## <u>DECLARATION OF PHILIP D. HORNER</u>

I, Philip David Horner, hereby declare as follows:

1.      I am employed by Micro Focus Limited, an indirect, wholly-owned subsidiary of Micro Focus International plc.  I am Company Secretarial Manager, and I have worked for the company for approximately ten years.  My position involves the day-to-day running of the company secretariat and statutory compliance for the group of companies for which Micro Focus International plc is the corporate parent.

2.      Micro Focus International plc is a public limited company organized under the laws of England and Wales, United Kingdom.  The principal place of business for Micro Focus International plc is in Berkshire, England, United Kingdom.  The board of directors for Micro Focus International plc consists of nine individuals.  Micro Focus International plc has no more than approximately a dozen employees.

3.      Micro Focus International plc is a holding company.  Thus, Micro Focus International plc generally does not carry out business operations.  For example, Micro Focus International plc does not develop, manufacture, market, sell, or distribute any product or service of any nature.  As a result, Micro Focus International plc does not manufacture or distribute any product or service that could find its way through the stream of commerce into the U.S. state of Texas.  Any business operations bearing the Micro Focus name are carried out by various wholly-owned subsidiaries of Micro Focus International plc.

4.      I understand that the plaintiffs in this lawsuit accuse the following products and functionalities:  "LoadRunner, Performance Center, StormRunner and Mobile Center software products"; "StormRunner Load"; "Network Virtualization"; "Network Virtualization for Mobile"; "VuGEN"; "TruClient"; "Micro Focus Network Capture"; "Micro Focus Network Virtualization Library"; "HP LoadRunner, HP Performance Center, Shunra Network

Virtualization, HP Network Virtualization engine, HP Network Virtualization for Mobile, HP Network Capture, and/or any Micro Focus products related to any of the foregoing"; "Micro Focus TruClient Native Mobile"; and "Micro Focus Mobile Center."  To the extent Micro Focus International plc understands these products and functionalities to exist or have existed within Micro Focus International plc or any of its subsidiaries, they are or were within a line of business referred to by Micro Focus International plc and its subsidiaries as Application Delivery Management ("ADM").

5.      Micro Focus International plc does not have any operations, anywhere in the world, relating to the ADM line of business (including the aforementioned software products and features), nor does Micro Focus International plc have direct ownership of the ADM line of business.  Micro Focus International plc has no employees who are involved with the operation of the ADM business including any products in the ADM business.  Micro Focus International plc, including its board of directors, does not direct the operations or strategic planning (such as with respect to product features, product roadmap, distribution strategy, and marketing strategy) for any products in the ADM business.  The operations and ownership for the ADM line of business—including all research and development, marketing, and sales—are by certain wholly-owned subsidiaries of Micro Focus International plc.

6.      Micro Focus International plc does not own, lease, or rent any office space, real property, residence, or place of business in the U.S. state of Texas.  Micro Focus International plc is not registered to operate any business in Texas.  Micro Focus International plc does not have a registered agent in Texas.  Micro Focus International plc does not conduct business in the state of Texas.  None of the employees or individuals on the board of directors of Micro Focus International plc resides or is based in the state of Texas.

7.      Micro Focus International plc is separate and distinct from its subsidiaries.  Micro Focus International plc and its subsidiaries maintain their own independent corporate, partnership, or limited liability company statuses, identities, and structures.  Micro Focus International plc and its subsidiaries observe the proper corporate formalities and operate as separate entities.  Micro Focus International plc regularly maintains its corporate records separate from the corporate records of its subsidiaries.  None of the individuals on the board of directors of Micro Focus International plc sits on the board or serves as an officer or other employee of any of Micro Focus International plc's subsidiaries that are responsible for operations relating to the ADM line of business.  Micro Focus International plc files a separate tax return from its subsidiaries.

8.      Micro Focus International plc maintains its own funds and bank accounts, separate from the funds and bank accounts of its subsidiaries.  When financial transactions occur between Micro Focus International plc and its subsidiaries, such transactions are memorialized with formal documentation and reflected in the corresponding entities' financial and accounting records as bona fide transactions.

9.      EntIT Software LLC is a wholly-owned subsidiary of Seattle SpinCo, Inc. Both EntIT Software LLC and Seattle SpinCo, Inc. are indirect, wholly-owned subsidiaries of Micro Focus International plc.  EntIT Software LLC leases a portion of a facility in Plano, Texas.

10.      ISS Facilities Services, Inc. ("ISS") is not a corporate affiliate of (*i.e.*, is not under common ownership with) Micro Focus International plc or any of Micro Focus International plc's subsidiaries.  There is no person who works at the Plano facility named Charles Parker or Charlie Parker, or any employee of ISS, who is authorized to accept service of process on behalf

of Micro Focus International plc or any of its direct or indirect subsidiaries including EntIT

Software LLC and Seattle SpinCo, Inc.

       I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on October 17, 2018, in England

 

 

_____

                    Philip D. Horner

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

WAPP TECH LIMITED PARTNERSHIP
and WAPP TECH CORP.,

               Plaintiffs,

      v.

HEWLETT PACKARD
ENTERPRISE CO.,

               Defendant.

Case No. 4:18-cv-00468-ALM

**JURY TRIAL DEMANDED**

## <u>DECLARATION OF SERGIO LETELIER</u>

I, Sergio Letelier, hereby declare as follows:

1.      I am Vice President, Deputy General Counsel – Corporate, Securities and M&A at Hewlett Packard Enterprise Co. ("HPE").  The facts set forth herein are true and correct, and are based on my own personal knowledge.  If called upon to testify as a witness, I could and would competently testify thereto.

2.      As Vice President, Deputy General Counsel – Corporate, Securities and M&A, my role at HPE is oversee all acquisitions, divestitures, equity investments, restructurings and joint ventures undertaken by the Hewlett-Packard Enterprise Group on a worldwide basis.  I have worked at HPE for approximately three years.  Prior to working for HPE, I was employed by Hewlett-Packard Company for over eleven years.

3.      Prior to September 1, 2017, HPE made and sold various software products and functionalities as part of its Software business segment.  *See* Ex. A (10-K Form of Hewlett Packard Enterprise Co. dated Dec. 15, 2016) at 2–3.  These software products and functionalities included, among other things, a group of software products and functionalities called "Application Testing and Delivery Management" ("ADM").  *See id.* at 4.  The ADM software products and functionalities included various products relating generally to computer hardware and/or software performance and/or functional testing, including products known as LoadRunner, Performance Center, StormRunner Load, StormRunner Functional, Mobile Center, and Network Virtualization (collectively, the "HPE Former Software").

4.      On September 1, 2017, HPE engaged in a series of transactions that that spun off the Software business segment (including the HPE Former Software) from HPE and merged it with a company unaffiliated with HPE (the "Seattle Transaction").  More specifically, HPE transferred its Software business segment (which the agreements refer to as the "Seattle

Business"), including the assets and liabilities of the Software business segment (subject to certain exceptions), to a newly formed subsidiary of HPE called Seattle SpinCo, Inc. ("Seattle SpinCo"). Seattle SpinCo then separated from HPE, such that Seattle SpinCo was no longer a subsidiary of HPE, and HPE no longer had any ownership of Seattle SpinCo. *See* Ex. A (10-K Form of Hewlett Packard Enterprise Co. dated Dec. 15, 2017) at 2; Ex. B (8-K Form of Hewlett Packard Enterprise Co. dated Sept. 7, 2016) at 1-2, 22.

<u>**Transfer of Assets to Seattle SpinCo**</u>

5.      The Seattle Transaction was governed by various agreements, including a "Separation and Distribution Agreement" ("SDA") between HPE and Seattle SpinCo. *See* Ex. B (8-K Form of HPE dated Sept. 7, 2016) at 2.   The SDA states that HPE "intends to separate the Seattle Business from the Houston Business and to cause the Seattle Assets to be transferred to Seattle." Ex. C (Exhibit 2.2 (SDA) to 8-K Form of Hewlett Packard Enterprise Co. dated Sept. 7, 2016) at 1.  The SDA defined the "Seattle Business" as follows:

> "Seattle Business" means the software business of Houston, which as of the date hereof is conducted by the **"Software" reporting segment of Houston**, as such software business has been conducted and will be conducted in accordance with the Merger Agreement prior to the Distribution Time.

*Id.* at 8 (emphasis added).[1]

6.      As a consequence of the Seattle Transaction, HPE would no longer be involved in the operation of what was HPE's Software business segment; after the completion of the Seattle Transaction HPE has not been involved in the operation of what was HPE's Software business segment.  For example, HPE has not had any ownership of the HPE Former Software, nor has it had any role in making, importing, selling, or offering to sell the HPE Former Software.  To the

---

[1] The "Merger Agreement" refers to the "Agreement and Plan of Merger" dated September 7, 2016, by and among HPE, Seattle SpinCo, and other entities.

extent HPE has used the HPE Former Software after the completion of the Seattle Transaction, such use has been "off-the-shelf." HPE has not had any input into the design, development, or maintenance of the HPE Former Software. HPE also has not had any ability to modify the HPE Former Software.

### Transfer of Liabilities to Seattle SpinCo

7. Also as a result of the Seattle Transaction, since September 1, 2017, HPE divested itself of any liability arising from allegations of past, present, or future patent infringement that may be brought by third parties with respect to the HPE Former Software. HPE transferred any such liabilities to Seattle SpinCo (and/or one of its subsidiaries) as part of the Seattle Transaction.

8. The SDA "provides for the transfer of certain assets by Hewlett Packard Enterprise to Seattle [SpinCo] and the assumption of certain liabilities by Seattle [SpinCo] from Hewlett Packard Enterprise." *See* Ex. B (8-K Form of Hewlett Packard Enterprise Co. dated Sept. 7, 2016) at 2. Under the SDA, Seattle SpinCo (and/or one its subsidiaries) assumed all liabilities (past, present, and future) arising out of the operation of what was HPE's Software business segment (including the HPE Former Software) (referred to as the "Seattle Liabilities"). It was further the understanding of the parties that the Seattle Liabilities included any liability arising from allegations of past, present, or future patent infringement that may be brought by third parties with respect to the HPE Former Software.

9. The SDA did, in fact, transfer such liability to Seattle SpinCo. The SDA states that HPE intends "to cause the Seattle Liabilities to be assumed by Seattle [SpinCo] and other members of the Seattle Group." Ex. C (Exhibit 2.2 (SDA) to 8-K Form of Hewlett Packard Enterprise Co. dated Sept. 7, 2016) at 1. Specifically, under the SDA, Seattle SpinCo (and/or of its subsidiaries) assumed the "Seattle Liabilities," and HPE assumed the "Excluded Liabilities":

(ii) <u>Seattle Liabilities</u>. **Seattle and/or one or more of its Subsidiaries designated by Seattle shall accept, assume and agree faithfully to perform, discharge and fulfill the Seattle Liabilities** in accordance with their respective terms. Seattle and such Subsidiaries shall be responsible for all Seattle Liabilities, **regardless of when or where such Seattle Liabilities arose or arise**, or the legal entity that incurred or holds the Seattle Liability (provided, however, that nothing contained herein shall preclude or inhibit Seattle from asserting against third parties any defenses available to the legal entity that incurred or holds such Seattle Liability), or whether the facts on which they are based occurred prior to, at or subsequent to the Distribution Time, regardless of where or against whom such Seattle Liabilities are asserted or determined or whether asserted or determined prior to the date of this Agreement.

\*                    \*                    \*

(iv) <u>Excluded Liabilities</u>. **Houston and/or its Subsidiaries designated by Houston** (other than Seattle or its Subsidiaries) **shall accept and assume from Seattle or one or more of its Subsidiaries and agree faithfully to perform, discharge and fulfill the Excluded Liabilities** of such other Subsidiaries designated by Houston, and Houston and/or its applicable Subsidiaries shall be responsible for all Excluded Liabilities, regardless of when or where such Excluded Liabilities arose or arise, or the legal entity that incurred or holds the Excluded Liability (provided, however, that nothing contained herein shall preclude or inhibit Houston from asserting against third parties any defenses available to the legal entity that incurred or holds such Excluded Liability), or whether the facts on which they are based occurred prior to, at or subsequent to the Distribution Time, regardless of where or against whom such Excluded Liabilities are asserted or determined or whether asserted or determined prior to the date of this Agreement.

*Id.* at 13 (emphases added).

10.     The SDA further defines the "Seattle Liabilities" as including "Liabilities to the extent relating to, arising out of or resulting from" the "operation of the Seattle Business":

(A) **the operation of the Seattle Business, as conducted at any time before** (by Houston or any of its Affiliates, any member of the Seattle Group or any of their respective predecessors), **at or after the Distribution Time** (including (1) any Liability relating to, arising out of or resulting from any act or failure to act by any Person, whether or not such act or failure to act is or was within such Person's authority, with respect to the Seattle Business . . . .

*Id.* at 17 (emphases added).    Thus, the Seattle Liabilities include all liability arising out of the operation of what was HPE's Software business segment, which includes patent infringement liability arising out of that business segment.

11.    In addition, patent infringement liability is not included in the "Excluded Liabilities." The "Excluded Liabilities" are defined as including the following four sets of liabilities:

> (i) the Liabilities listed or described on Schedule 2.3(b)(i);
>
> (ii) the Liabilities of Houston or its Affiliates to the extent relating to, arising out of or resulting from any Excluded Assets or the Houston Business;
>
> (iii) Liabilities, if any, arising out of or resulting from any amounts that would constitute indebtedness of any member of the Houston Group under GAAP; and
>
> (iv) all other Liabilities that are expressly contemplated by this Agreement or any other Transaction Document as Liabilities to be retained or assumed by Houston or any other member of the Houston Group, and all agreements, obligations and other Liabilities of Houston or any member of the Houston Group under this Agreement or any of the other Transaction Documents.

*Id.* at 19.

12.    None of four categories of liabilities include patent infringement liability arising from the operation of what was HPE's Software business segment.  Category (i) relates to liabilities arising from specific, non-patent-related litigations.  *See* Ex. D (Schedules to the Separation and Distribution Agreement by and between Hewlett Packard Enterprise Company and Seattle SpinCo, Inc. dated as of September 7, 2016) at 42–44.  Category (ii) relates to liabilities arising from the "Excluded Assets" and the "Houston Business," neither of which relate to the HPE Software Segment. Ex. C (Exhibit 2.2 (SDA) to 8-K Form of Hewlett Packard Enterprise Co. dated Sept. 7, 2016) at 5 (defining the "Houston Business), 17 (defining the "Excluded Assets").  Category (iii) relates to "any amounts that would constitute indebtedness of any member of the Houston Group."  *See id.* at 5 (defining the "Houston Group").  Category (iv) is a catch-all that does not

relate to patent infringement liability arising from the operation of what was HPE's Software business segment.

13.    Thus, neither HPE nor any affiliate of HPE bears any liability for patent infringement arising from the HPE Former Software.  That liability was assumed by Seattle SpinCo as part of the Seattle Transaction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 16, 2018.

Sergio Letelier

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., | Case No. 4:18-cv-00469-ALM |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| MICRO FOCUS INTERNATIONAL PLC, | |
| Defendant. | |

**<u>DEFENDANT MICRO FOCUS INTERNATIONAL PLC'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, FAILURE TO SERVE AND IMPROPER SERVICE OF THE COMPLAINT</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF ISSUES TO BE DECIDED .................................................2

III.    STATEMENT OF FACTS ....................................................................................3

        A.    Micro Focus International Plc .................................................................3

        B.    Wapp's Purported Service of the Complaint...........................................5

IV.     LEGAL STANDARDS .........................................................................................6

        A.    Personal Jurisdiction...............................................................................6

        B.    Service of Process ...................................................................................8

V.      ARGUMENT .........................................................................................................9

        A.    This Court Lacks Personal Jurisdiction Over Micro Focus International Plc ..........9

        B.    The Purported Service of Process on Micro Focus International Plc Was
              Deficient ................................................................................................12

              1.    Wapp Did Not Directly Serve Micro Focus International Plc ........................12

              2.    Wapp Did Not Indirectly Serve Micro Focus International Plc ....................12

              3.    Dismissal Is Proper in View of Wapp's Delay and Lack of Diligence in
                    Serving the Summons ....................................................................13

VI.     CONCLUSION....................................................................................................14

**<u>TABLE OF AUTHORITIES</u>**

<u>Page(s)</u>

**Cases**

*Alpine View Co. v. Atlas Copco AB*,
    205 F.3d 208 (5th Cir. 2000) ..................................................................................6

*Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*,
    566 F.3d 1012 (Fed. Cir. 2009)..........................................................................7, 10

*Blue Spike, LLC v. Texas Instruments, Inc.*,
    12-CV-499-MHS, 2014 WL 11829323 (E.D. Tex. Mar. 31, 2014) ........................6

*Blue Spike, LLC v. ASUS Computer Int'l, Inc.*,
    No. 6:16-CV-1384-RWS, 2018 WL 3301705 (E.D. Tex. Feb. 20, 2018)......................8, 9, 12

*Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*,
    444 F.3d 1356 (Fed. Cir. 2006)......................................................................6, 7, 10

*Brockmeyer v. May*, 361 F.3d 1222 (9th Cir. 2004) ..................................................11

*Carimi v. Royal Caribbean Cruise Line, Inc.*,
    959 F.2d 1344 (5th Cir. 1992) ..............................................................................8

*Celgard, LLC v. SK Innovation Co., Ltd.*,
    792 F.3d 1373 (Fed. Cir. 2015).............................................................................7

*Daimler–Benz Aktiengesellschaft v. Olson*,
    21 S.W.3d 707 (Tex. App. 2000)..........................................................................11

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)..........................................................................................6, 9

*Dalton v. R & W Marine, Inc.*,
    897 F.2d 1359 (5th Cir. 1990) .............................................................................10

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011).............................................................................................7

*Green Ice Tech., LLC v. Ice Cold 2, LLC*,
    Civil Action No. 4:17-CV-00341, 2018 WL 3207434 (E.D. Tex. June 29,
    2018) ...................................................................................................................7

*Johnston v. Multidata Systems Int'l Corp.*,
    523 F.3d 602 (5th Cir. 2008) ................................................................................7

*Lozano v. Bosdet*,
    693 F.3d 485 (5th Cir. 2012) ....................................................................9, 11, 13

## TABLE OF AUTHORITIES

*Manville Sales Corp. v. Paramount Sys., Inc.*,
    917 F.2d 544 (Fed. Cir. 1990) ................................................................10

*Med. Sols., Inc. v. C Change Surgical LLC*,
    541 F.3d 1136 (Fed. Cir. 2008) ..............................................................6

*Moncrief Oil Int'l Inc. v. OAO Gazprom*,
    481 F.3d 309 (5th Cir. 2007) ..................................................................7

*Murphy Bros. v. Michetti Pipe Stringing*,
    526 U.S. 344 (1999) ................................................................................8

*New World Int'l, Inc. v. Ford Glob. Techs., LLC*,
    859 F.3d 1032 (Fed. Cir. 2017) ..............................................................6

*NexLearn, LLC v. Allen Interactions, Inc.*,
    859 F.3d 1371 (Fed. Cir. 2017) ..............................................................6

*Nutrition Physiology Corp. v. Enviros Ltd.*,
    87 F. Supp. 2d 648 (N.D. Tex. 2000) ....................................................10

*Phonometrics, Inc. v. N. Telecom Inc.*,
    133 F.3d 1459 (Fed. Cir. 1998) ............................................................10

*Wyatt v. Kaplan*,
    686 F.2d 276 (5th Cir. 1982) ..................................................................7

**Statutes**

Tex. Bus. Orgs. Code Ann. § 5.201 ..............................................................8

Tex. Bus. Orgs. Code Ann. § 5.251 ..............................................................8

Tex. Bus. Orgs. Code Ann. § 5.255(1) ..........................................................8

**Rules**

Fed. R. Civ. P. 4(f)(1) ....................................................................................11

Fed. R. Civ. P. 4(h)(1) ....................................................................................8

Fed. R. Civ. P. 4(h)(2) ................................................................................8, 11

Fed. R. Civ. P. 4(m) ........................................................................................9

Fed. R. Civ. P. 12(b)(5) ..................................................................................8

Tex. R. Civ. P. 106 ........................................................................................12

iii

## I.    INTRODUCTION

Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp. (together, "Wapp") brought this alleged patent infringement action against a corporate entity that has no connection to Texas and thus is not subject to personal jurisdiction in this Court.  The only defendant named by Wapp—Micro Focus International plc ("MF plc")—is a holding company organized and based in the United Kingdom.  MF plc has no employees or directors, assets, place of business, or operations in Texas.  As such, MF plc is not registered to operate any business in Texas, does not have a registered agent in Texas, and does not conduct business in Texas.  Moreover, as a holding company, MF plc does not develop, manufacture, market, sell, or distribute products or services of any kind; hence, it places nothing, including the accused products and functionalities, in the stream of commerce.  While certain subsidiaries of MF plc conduct business in Texas, those subsidiaries are wholly separate and distinct from MF plc, and their contacts with Texas cannot be imputed to MF plc.  As a result, the Court should dismiss this case for lack of personal jurisdiction.

The Court should also dismiss this case on the independent ground of improper service of process.  Even though MF plc, through its counsel, offered to waive service, Wapp attempted service anyway.  Rather than properly serving MF plc under the Hague Convention—Wapp knows MF plc is a United Kingdom entity (*see* Compl. (Dkt. No. 1) ¶ 6)—Wapp, through its process server, simply left the summons with an individual (Charlie Parker) walking *outside* of a facility in Plano, Texas, which multiple companies share, including a *subsidiary* of MF plc.  But MF plc has no office in that facility.  Based on this exchange, Wapp filed a Proof of Service, which stated, under penalty of perjury, that the summons had been served on "Charlie Parker, Office Services, who is designated by law to accept service of process on behalf of Micro Focus International Plc . . ."  Summons Returned Executed (Dkt. No. 9) at 2.  But Mr. Parker does not work for MF

plc or any of its subsidiaries, and certainly was not authorized to accept service of process on behalf of MF plc. Wapp's service of process was improper. Wapp, moreover, has failed to take reasonable steps to serve MF plc in the proper timeframe under Federal Rule of Civil Procedure 4(m) and within the time allotted by this Court. *See* Notice of Impending Dismissal (Dkt. No. 7). Because Wapp failed properly to serve the Complaint, and, to date, has yet to serve the Complaint, respectfully, this Court should dismiss this case.

## II.    STATEMENT OF ISSUES TO BE DECIDED

1.    Does this Court have personal jurisdiction over Defendant Micro Focus International plc, a foreign holding company based in the United Kingdom that has no presence in the state of Texas, has no operations relating to and does not own the products and functionalities accused of infringement in this case, and does not manufacture or distribute any product or service that could find its way through the stream of commerce into Texas?

2.    Did Plaintiffs properly serve the summons in this lawsuit on Defendant Micro Focus International plc when a process server handed the summons to an individual walking outside a building, given that the individual is an employee of a third-party contractor who merely performs shipping and receiving duties for multiple companies including an indirect subsidiary of Defendant, was not authorized to accept service on behalf of Defendant or any of Defendant's subsidiaries, and did not tell the process server that he was so authorized?

3.    Have Plaintiffs been reasonably diligent in attempting to serve the summons in this lawsuit on Defendant Micro Focus International plc, given that Plaintiffs have made no known efforts to serve Defendant in accordance with the Hague Convention, and instead purported to effectuate service on an unauthorized individual as set forth above in Issue #2?

## III.   STATEMENT OF FACTS

### A.   Micro Focus International Plc

Wapp filed its Complaint in this action on July 2, 2018, and named a single defendant—Micro Focus International plc.  Compl. (Dkt. No. 1).  MF plc is a holding company organized under the laws of England and Wales, United Kingdom.  Compl. (Dkt. No. 1) ¶ 6; Horner Decl. (Ex. A) ¶¶ 2–3.  MF plc, whose principal place of business is in Berkshire, England, United Kingdom, has no connection with the State of Texas.  Compl. (Dkt. No. 1) ¶ 6; Horner Decl. (Ex. A) ¶¶ 2–3, 6.  MF plc does not own, lease, or rent any office space, real property, residence, or place of business in Texas.  *Id.* ¶ 6.  MF plc is not registered to operate any business in Texas, does not have a registered agent in Texas, and does not conduct business in Texas.  *Id.*

As a holding company, MF plc does not develop, manufacture, market, sell, or distribute any product or service of any nature.  Horner Decl. (Ex. A) ¶ 3.  MF plc, therefore, does not manufacture or distribute any product or service that could find its way through the stream of commerce into Texas.  *Id.*  Any business operations bearing the Micro Focus name are carried out by various wholly-owned subsidiaries of MF plc.  *Id.*

LoadRunner, Performance Center, StormRunner Load, Mobile Center, and Network Virtualization are software products and functionalities that exist within a line of business referred to by MF plc and its subsidiaries as Application Delivery Management ("ADM").  Horner Decl. (Ex. A) ¶ 5.  MF plc does not have any operations, anywhere in the world, relating to the ADM line of business (including the aforementioned software products and functionalities), nor does MF plc own the ADM line of business.  *Id.*  MF plc has no employees who are involved with the operation of the ADM business, including any products or functionalities in the ADM business.  *Id.*  MF plc, including its board of directors, does not direct the operations or strategic planning (such as with respect to product features, product roadmap, distribution strategy, and marketing

strategy) for any products or functionalities in the ADM business.  *Id.*  The operations and ownership for the ADM line of business—including all research and development, marketing, and sales—are directed by certain indirect, wholly-owned subsidiaries of MF plc.[1]  *Id.*

MF plc has a nine-member board of directors and no more than a dozen employees.  Horner Decl. (Ex. A) ¶ 2.  None of MF plc's board members or employees is based in Texas.  *Id.* ¶ 6.  No member of MF plc's board sits on the board or serves as an officer or other employee of any of MF plc's subsidiaries that are responsible for operations relating to the ADM line of business.  *Id.* ¶ 7.

MF plc is a separate and distinct entity from its subsidiaries.  Horner Decl. (Ex. A) ¶ 7.  MF plc and its subsidiaries maintain their own corporate, partnership, or limited liability company statuses, identities, and structures.  *Id.*  MF plc and its subsidiaries observe the proper corporate formalities and operate as separate entities.  *Id.*  MF plc maintains its corporate records separate from the corporate records of its subsidiaries.  *Id.*  MF plc files a separate tax return from its subsidiaries.  *Id.*

MF plc maintains its own funds and bank accounts, separate from the funds and bank accounts of its subsidiaries.  Horner Decl. (Ex. A) ¶ 8.  When financial transactions occur between MF plc and its subsidiaries, such transactions are memorialized with formal documentation and reflected in the corresponding entities' financial and accounting records as bona fide transactions. *Id.*

---

[1] Entities responsible for the ADM business, Seattle SpinCo, Inc. and EntIT Software LLC, have filed a declaratory judgment action in the District of Delaware, seeking declarations that the accused software does not infringe the asserted patents and that the asserted patents are invalid. *Seattle SpinCo, Inc. et al. v. Wapp Tech Ltd. P'ship et al.*, Case No. 1:18-cv-01585 (D. Del. filed Oct. 15, 2018).

**B.     Wapp's Purported Service of the Complaint**

Wapp filed its Complaint on July 2, 2018.  Compl. (Dkt. No. 1).  On September 25, 2018, MF plc, through its counsel, offered to waive service of process under Rule 4(d) of the Federal Rules of Civil Procedure.  Reiter Decl. (Ex. B) ¶ 2.  While Rule 4(d) provides a defendant located outside the United States up to 90 days from a request for waiver to respond to a complaint, MF plc stated it would respond to Wapp's Complaint by October 30, 2018, only 35 days from the date of offered waived service.  *Id.*  In connection with that deadline, MF plc also requested that the other companies that Wapp had separately sued (Bank of America Corporation, Wells Fargo & Company, and Hewlett Packard Enterprise Company) also be permitted to respond to their respective complaints by October 30.  *Id.*  Wapp did not accept MF plc's offer.  *Id.*

Instead, on September 26, 2018, Wapp purported to serve MF plc by leaving the summons with an unauthorized individual found walking outside a multi-company facility in which a subsidiary of MF plc has office space.  *See* Summons Returned Executed (Dkt. No. 9) at 2; Parker Decl. (Ex. C) ¶ 1–3.  Specifically, Wapp's process server, Gean Smith, while inside a car and without identifying himself, handed the summons to an individual, Charlie Parker, who was walking outside from the parking garage, returning to work from his lunch break.  *See* Summons Returned Executed (Dkt. No. 9) at 2; Parker Decl. (Ex. C) ¶ 2–3.  Mr. Parker is not an employee of MF plc or any other Micro Focus entity, nor did he tell Mr. Smith that he was.  *Id.* ¶ 4.  Mr. Parker, who works for a third-party contracting company, ISS Facility Services, Inc. ("ISS"), handles shipping and receiving duties for certain companies located at the facility, including EntIT Software LLC, an indirect subsidiary of MF Plc.  *See id.* ¶ 1; Horner Decl. (Ex. A) ¶ 9.

Mr. Parker was not asked whether, nor did not tell Mr. Smith that, the facility at which he worked had any connection to MF plc.  Parker Decl. (Ex. C) ¶ 4.  Mr. Parker also did not tell Mr. Smith, nor was he asked by Mr. Smith, that he was authorized to accept service of process on

behalf of any entity, including MF plc.  *Id.*  ISS is not a corporate affiliate of (*i.e.*, under common ownership with) MF plc or any of its subsidiaries.  Horner Decl. (Ex. A) ¶ 10.  Neither Mr. Parker nor any other ISS employee is authorized to accept service of process on behalf of MF plc; indeed, MF plc has no registered agent for service of process in the State of Texas.  *Id.* ¶¶ 6, 10.

Nevertheless, Wapp represented to this Court that Mr. Smith's handing of the summons to Mr. Parker in Plano constituted service of process for this case.  Summons Returned Executed (Dkt. No. 9) at 1–2.  Wapp's filing included a declaration by Mr. Smith that Mr. Parker was an "office services" employee who was "designated by law to accept service of process on behalf of Micro Focus International."  *Id.* at 2.

For the reasons explained below, MF plc brings this motion to dismiss on three grounds.  First, MF plc is not subject to personal jurisdiction in this Court.  Second, Wapp's service of process on MF plc was deficient.  Third, Wapp has yet to serve MF plc and the time to do so has expired.

## IV.    LEGAL STANDARDS

### A.      Personal Jurisdiction

Personal jurisdiction in patent cases, which Federal Circuit law governs,[2] is determined by a two-part test:  "First, jurisdiction must exist under the forum state's long-arm statute.  Second, the assertion of personal jurisdiction must be consistent with the limitations of the due process clause."  *Med. Sols., Inc. v. C Change Surgical LLC*, 541 F.3d 1136, 1139 (Fed. Cir. 2008) (citation omitted).  The Texas long-arm statute extends the reach of personal jurisdiction to the limits of the United States Constitution.  *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000).  Therefore, in Texas, the analysis distills to whether the exercise of personal jurisdiction is

---

[2] *New World Int'l, Inc. v. Ford Glob. Techs., LLC*, 859 F.3d 1032, 1037 (Fed. Cir. 2017).

appropriate under the due process clause of the U.S. Constitution.  *New World Int'l*, 859 F.3d at 1037; *Blue Spike, LLC v. Texas Instruments, Inc.*, 12-CV-499-MHS, 2014 WL 11829323, at *1 (E.D. Tex. Mar. 31, 2014).

"The Due Process Clause requires that there exist sufficient 'minimum contacts' such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1361 (Fed. Cir. 2006).  This test can be satisfied if the circumstances warrant either general jurisdiction or specific jurisdiction. *NexLearn, LLC v. Allen Interactions, Inc.*, 859 F.3d 1371, 1375–76 (Fed. Cir. 2017).  For general personal jurisdiction, a corporation's affiliations with the State must be "so 'continuous and systematic' as to render [it] essentially at home in the forum State."  *Daimler AG v. Bauman*, 571 U.S. 117, 138 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  "Random, fortuitous, or attenuated contacts are not sufficient to establish jurisdiction."  *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007).  For specific jurisdiction, the Federal Circuit employs a "three-prong test" that consists of determining whether: "(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal jurisdiction is reasonable and fair."  *Breckenridge Pharm.*, 444 F.3d at 1362–63.

"In the procedural posture of a motion to dismiss, a district court must accept the *uncontroverted* allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor."  *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1017 (Fed. Cir. 2009) (emphasis in original, citation omitted, punctuation omitted).  A defendant can controvert the allegations in a complaint by submitting affidavits or declarations. *Id.*; *see also Wyatt v. Kaplan*, 686 F.2d 276, 282–83 n.13 (5th Cir. 1982); *Green Ice Tech., LLC v.*

*Ice Cold 2, LLC*, Civil Action No. 4:17-CV-00341, 2018 WL 3207434, at *3 (E.D. Tex. June 29, 2018) (granting motion to dismiss for lack of personal jurisdiction in part based on affidavits submitted by defendants).

The burden is on the plaintiff to prove that personal jurisdiction exists. *Celgard, LLC v. SK Innovation Co., Ltd.*, 792 F.3d 1373, 1378 (Fed. Cir. 2015) (plaintiff bears initial burden of proving personal jurisdiction; if plaintiff can make the showing, defendant bears the burden of proving that the exercise of jurisdiction would be unreasonable); *see also Johnston v. Multidata Systems Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) ("[P]laintiff bears the burden of establishing a district court's jurisdiction over a non-resident.").

**B.      Service of Process**

Federal Rule of Civil Procedure 12(b)(5) allows a party to challenge service of process if that service of process does not comply with Federal Rule of Civil Procedure 4.  *See* Fed. R. Civ. P. 12(b)(5).  Absent service, a court "ordinarily may not exercise power over a party the complaint names as defendant." *Murphy Bros. v. Michetti Pipe Stringing*, 526 U.S. 344, 350 (1999).  "[O]nce the validity of service of process has been contested, the plaintiff bears the burden of establishing its validity." *Carimi v. Royal Caribbean Cruise Line, Inc.*, 959 F.2d 1344, 1346 (5th Cir. 1992).

Federal Rule of Civil Procedure 4(h) sets forth the requirements for serving a corporation. The Rule draws a distinction between domestic and foreign service.  Domestic service can be executed "in the manner prescribed by Rule 4(e)(1) for serving an individual," or by delivering a copy of the summons "to an officer, a managing or general agent, or any other agent authorized . . . to receive service of process."  Fed. R. Civ. P. 4(h)(1).  Rule 4(e)(1) authorizes service wherein the plaintiff "follow[s] state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made."  Under Texas law, a corporation may be served through the corporation's registered agent, president, or vice

president, or, if the corporation does business in the state and fails to maintain a registered agent, a plaintiff may serve the Texas Secretary of State instead.  *See* Tex. Bus. Orgs. Code Ann. §§ 5.201, 5.251, 5.255(1).

Service of a corporation outside the United States—for example, if there are no domestic contacts to be served—may be performed "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)."  *See* Fed. R. Civ. P 4(h)(2); *see also Blue Spike*, *LLC v. ASUS Computer Int'l, Inc.*, No. 6:16-CV-1384-RWS, 2018 WL 3301705, at *3 (E.D. Tex. Feb. 20, 2018) (service of a defendant outside the U.S. "is governed by Federal Rule of Civil Procedure 4(h), which allows for the service of a corporation in any manner prescribed by Rule 4(f) except for personal delivery").

Alternatively, in narrow circumstances, a plaintiff may serve a foreign entity indirectly, by serving a domestic subsidiary.  Such service is valid *only if* the foreign defendant has "actually authorized the subsidiary to accept service of process on its behalf," or if "the relationship between the subsidiary and parent is such that they are in reality the same corporation.  Typically, this requires the corporate separation to be fiction."  *Id.* at *4.

For domestic service, if a defendant is not served within ninety days after the complaint is filed, the court ordinarily must dismiss the case.  Fed. R. Civ. P. 4(m).  For foreign service, the case should be dismissed if the plaintiff does not exercise diligence in trying to execute service. *See Lozano v. Bosdet*, 693 F.3d 485, 488–89 (5th Cir. 2012).

## V.      ARGUMENT

### A.      This Court Lacks Personal Jurisdiction Over Micro Focus International Plc

As explained, MF plc has no contacts with Texas.  MF plc is an English and Welsh holding company with its principal place of business in the United Kingdom.  Horner Decl. (Ex. A) ¶¶ 2–3.  MF plc does not own, lease, or rent any office space, real property, residence, or place of

business in Texas.  *Id.* ¶ 5.  MF plc is not registered to operate in Texas, does not have a registered

agent in Texas, and does not conduct business in Texas.  *Id.*  None of its employees work or reside

in Texas.  *Id.*  It does not develop, manufacture, market, sell, or distribute any product or service

of any nature, and it therefore does not manufacture or distribute any product or service that could

find its way through the stream of commerce into Texas.  *Id.* ¶ 3.

Because MF plc has no contacts with Texas, it lacks sufficient "continuous and systematic"

contacts "as to render [it] essentially at home in the forum State" for purposes of general

jurisdiction.  *Daimler AG*, 571 U.S. at 138 (2014) (citation omitted).  MF plc also is not subject to

specific jurisdiction because it does not develop, manufacture, market, sell, or distribute any

product or service, let alone the accused products and functionalities from the ADM line of

business, and thus has not "purposefully directed its activities at residents of the forum, [wherein]

the claim arises out of or relates to those activities."  *See Autogenomics*, 566 F.3d at 1018;

*Breckenridge Pharm.*, 444 F.3d at 1362–63.

MF plc does not lease the space nor conduct business at the Plano, Texas address identified

in Wapp's Complaint.  *See* Compl. (Dkt. No. 1) ¶¶ 8, 10–11; Horner Decl. (Ex. A) ¶ 6.  Instead,

that space is used by EntIT Software LLC, a subsidiary of Seattle SpinCo, Inc.; both Seattle

SpinCo, Inc. and EntIT Software LLC are indirect, wholly-owned subsidiaries of MF plc.  Horner

Decl. (Ex. A) ¶ 9.

EntIT Software LLC's operations in Texas, moreover, cannot be imputed to MF plc.[3]

Indeed, ownership of a subsidiary does not subject a parent company to personal jurisdiction in a

_____

[3] Wapp references a September 7, 2016 "Separation and Distribution Agreement between HPE
and Micro Focus [International Plc]."  Compl. (Dkt. No. 1) ¶ 20.  Wapp misrepresents the parties
to this agreement.  Contrary to Wapp's allegation, MF plc is *not* a party; instead, as the cover and
very first page reveal, the agreement is between Hewlett Packard Enterprise Company and

state in which the subsidiary does business.  *See, e.g.*, *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998); *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1363 (5th Cir. 1990) (affirming dismissal for lack of jurisdiction over a Delaware corporation because "the mere existence of a parent-subsidiary relationship will not support the assertion of jurisdiction over a foreign parent").

In narrow circumstances, a court may gain personal jurisdiction over an entity based on a subsidiary's connection to the state, but only when the corporate veil can be pierced.  *See Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552 (Fed. Cir. 1990); *see also Nutrition Physiology Corp. v. Enviros Ltd.*, 87 F. Supp. 2d 648, 655–57 (N.D. Tex. 2000).  Wapp has not raised any allegation suggesting that MF plc does not respect the corporate form, and any such allegation would be false.  As explained, MF plc and its subsidiaries maintain independent corporate statuses, identities, and structures, observe proper corporate formalities, maintain separate books and records, file separate tax returns, keep separate bank accounts, and formally document financial transfers.  Horner Decl. (Ex. A) ¶¶ 7–8.  Under these facts, veil-piercing is inappropriate.  *Daimler–Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 720–21 (Tex. App. 2000) (enumerating veil-piercing factors).

In short, MF plc itself has no connection to Texas, and therefore this Court lacks personal jurisdiction over MF plc.  On that basis, this case should be dismissed.

---

Seattle SpinCo, Inc.—EntIT Software LLC's parent entity.  *See* Separation Agreement, *available online at* https://www.sec.gov/Archives/edgar/data/1645590/000119312516703457/d251902dex22.htm.

**B.      The Purported Service of Process on Micro Focus International Plc Was Deficient**

Wapp has not complied with Federal Rule of Civil Procedure 4(h), which sets forth rules for service of corporations.

### 1.      Wapp Did Not Directly Serve Micro Focus International Plc

Because MF plc has not been served in the United States, *see* Section II.A, *supra*, direct service on MF plc would have had to occur outside the United States under Rule 4(f).  *See* Fed. R. Civ. P. 4(h)(2).  If the foreign country in which service is to take place is a signatory to the Hague Convention or similar international agreement, that agreement controls.  *See* Fed. R. Civ. P. 4(f)(1).  "[B]oth the United States and the United Kingdom are signatories to the Hague Convention," so service in England or Wales would be governed by the Hague Convention.  *Brockmeyer v. May*, 361 F.3d 1222, 1225 (9th Cir. 2004), *opinion superseded on other grounds*, 383 F.3d 798.  Hague service generally requires the use of a Central Authority or hiring of foreign process servers (in this case, British) to serve in the foreign country.  *See Lozano*, 693 F.3d at 490.  Wapp did not do this, and therefore Wapp did not effectuate direct service on MF plc.  *See* Summons Returned Executed (Dkt. No. 9).

### 2.      Wapp Did Not Indirectly Serve Micro Focus International Plc

As an alternative to direct service, a plaintiff may serve a defendant indirectly in certain circumstances.  *Blue Spike LLC*, 2018 WL 3301705, at *3–4.  To have properly executed indirect service, Wapp must have served a person "actually [] authorized to accept service of process on [MF plc's] behalf," or Wapp must have served the alter ego of MF plc.  *Id.* at *4–5.

Wapp's process server, Mr. Smith, purported to serve the summons by handing it from inside a car to Mr. Parker outside at a facility in Plano, Texas.  Parker Decl. (Ex. C) ¶¶ 2–3.  As explained, however, Mr. Parker was not authorized to accept service on behalf of MF plc (or any

of its subsidiaries).  Horner Decl. (Ex. A) ¶ 10.  Mr. Parker did not tell Mr. Smith that he was so authorized, nor did Mr. Smith ask if he was.  Parker Decl. (Ex. C) ¶ 4.  Mr. Parker, who is employed by a third-party contracting company, not by MF plc or any of its subsidiaries, merely handles shipping and receiving duties for an indirect MF plc subsidiary and other, unrelated companies at the Plano facility.  *Id.* ¶ 1; *see also* Horner Decl. (Ex. A) ¶ 9–10.  As a result, Wapp did not effectuate service by handing the summons to Mr. Parker.

Likewise, given the lack of any allegation, much less evidence, that MF plc's subsidiary in Texas is MF plc's alter ego—the evidence is to the contrary—Wapp has no basis to assert proper service under an alter ego theory.  For the reasons discussed above in the context of lack of personal jurisdiction over MF plc, EntIT Software LLC is not an alter-ego of MF plc such that it could have accepted service on behalf of MF plc.  *See supra* § 4.A.  Moreover, Wapp's purported personal service on Mr. Parker would not have constituted service on EntIT Software LLC for the same reasons it did not constitute service on MF plc; Mr. Parker is not authorized to accept service on behalf of any subsidiary of MF plc.  Horner Decl. (Ex. A) ¶ 10.  Further, under Texas law, even if Wapp had sought to serve EntIT Software LLC in person at the Plano facility, it would have needed advance permission from the Court to do so—which Wapp did not obtain.  *See* Rule 106(b) of the Texas Rules of Civil Procedure.

### 3.    Dismissal Is Proper in View of Wapp's Delay and Lack of Diligence in Serving the Summons

Federal Rule of Civil Procedure 4(m) requires that domestic service be completed within 90 days.  In the absence of a specific time limitation for foreign service, the Fifth Circuit has adopted a "flexible due diligence" standard.  *Lozano*, 693 F.3d at 488–89.  Where a plaintiff cannot demonstrate due diligence in executing foreign service, the complaint should be dismissed.  *Id.*

There is no evidence that Wapp has attempted foreign service, much less done so with diligence.  MF plc's counsel made a reasonable proposal to Wapp that would have allowed service to be waived, but Wapp did not accept that proposal.  Reiter Decl. (Ex. B) ¶ 2.  Instead, Wapp made an attempt at personal service, which was improper for the reasons discussed above.  Moreover, Wapp's makeshift effort to serve MF plc, particularly when contrasted with Wapp's service on Hewlett Packard Enterprise Company, Bank of America Corporation, and Wells Fargo & Company, all of which Wapp has also sued in this Court, demonstrates an understanding by Wapp that MF plc had no available registered agent and, as a foreign company, could not be served directly in United States.  Indeed, Wapp served a registered agent of each of Hewlett Packard Enterprise Company, Bank of America Corporation, and Wells Fargo & Company.[4]  Wapp has not shown proper diligence in serving the Complaint in this case, and this case should be dismissed for that reason as well.

## VI.    CONCLUSION

MF plc respectfully requests that this Court dismiss Wapp's Complaint on three, independent grounds.  First, the Court should dismiss this case because the Court lacks personal jurisdiction over MF plc.  Second, the Court should dismiss this case because Wapp has not properly served MF plc.  Third, the Court should dismiss this case because Wapp has failed to serve MF plc within the time prescribed by Federal Rule of Civil Procedure 4(m), nor has Wapp used reasonably diligent efforts to do so.

---

[4] *See Wapp Tech Ltd. v. Hewlett Packard Enter. Co.*, No. 4:18-cv-00468-ALM (E.D. Tex. filed July 2, 2018) (Dkt. No. 8); *Wapp Tech Ltd. v. Wells Fargo & Co.*, No. 4:18-cv-00501-ALM (E.D. Tex. filed July 16, 2018) (Dkt. No. 6); *Wapp Tech Ltd. v. Bank of Am. Corp.*, No. 4:18-cv-00519-ALM (E.D. Tex. filed July 20, 2018) (Dkt. No. 7).

Dated:  October 17, 2018                      By:   */s/ Mark Reiter*
                                                    _____
                                                    Mark Reiter
                                                    Lead Attorney
                                                    Texas State Bar No. 16759900
                                                    mreiter@gibsondunn.com
                                                    **GIBSON, DUNN & CRUTCHER LLP**
                                                    2100 McKinney Avenue, Suite 1100
                                                    Dallas, TX  75201-6912
                                                    Telephone:  214.698.3360
                                                    Facsimile:  214.571.2907

                                                    Neema Jalali
                                                    njalali@gibsondunn.com
                                                    **GIBSON, DUNN & CRUTCHER LLP**
                                                    555 Mission Street, Suite 3000
                                                    San Francisco, CA  94105
                                                    Telephone:  415.393.8200
                                                    Facsimile:  415.374.8409

                                                    *Attorneys for Defendant Micro Focus*
                                                    *International plc*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2018, the foregoing was electronically filed with the

Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to

CM/ECF participants in this case.

*/s/ Mark Reiter*
Mark Reiter

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., <br><br>                  Plaintiffs <br><br> v. <br><br> HEWLETT PACKARD ENTERPRISE CO., <br><br>                  Defendant | Civil Action No.: 4:18-cv-468 <br><br> JURY TRIAL DEMANDED |

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u>

Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp. ("Plaintiffs") file this Complaint against Defendant Hewlett Packard Enterprise Company ("Defendant" or "HPE" or "HP") seeking damages and other relief for patent infringement, and allege with knowledge of their own acts, and on information and belief as to all other matters, as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1, et seq.

2.      Plaintiffs seek damages and prejudgment and post-judgment interest for Defendant's infringement of the Patents-in-Suit, as defined below.

3.      The Patents-in-Suit and their underlying patent applications have been cited by over 30 issued United States patents and published patent applications.  Moreover, the World Intellectual Property Association (hereafter "WIPO") has also cited Plaintiffs' Patent Portfolio,

see details below, giving it the highest prior art designation, in rejecting Defendant's patent application filing related to mobile application development.

## **PARTIES**

4.      Plaintiff Wapp Tech Limited Partnership is a Delaware limited partnership organized and existing under the laws of the State of Delaware, and its registered agent for service of process in Delaware is Corporations & Companies, Inc. (CorpCo), 910 Foulk Road, Suite 201 Wilmington, Delaware 19803.

5.      Plaintiff Wapp Tech Corp. ("WTC") is a body corporate organized and existing under the laws of the Province of Alberta, Canada, and its registered agent for service of process in Delaware is Corporations & Companies, Inc. (CorpCo), 910 Foulk Road, Suite 201 Wilmington, Delaware 19803.

6.      Defendant Hewlett-Packard Enterprise Company is a corporation organized under the laws of the State of Delaware and maintains its principal place of business in Palo Alto, CA. Defendant's registered agent for service of process in Texas is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

7.      Defendant has an established place of business in the Eastern District of Texas at 5400 Legacy Drive, Plano, Texas 75024.  Defendant does business in Texas, directly or through intermediaries, and offered products or services, including those accused herein of infringement, to customers, and potential customers located in Texas, including in the Eastern District of Texas.

## JURISDICTION AND VENUE

8.      On information and belief, Defendant is registered to do business in the State of Texas.

9.      On information and belief, Defendant conducts business operations throughout the State of Texas, and within the Eastern District of Texas, in facilities in Houston and Plano, Texas.

10.      Defendant lists on its website open jobs at its Plano, TX address.  *See, e.g.,* https://careers.hpe.com/job-location/plano/solution-sales-representative/3545/8503043/60251 (last accessed July 2, 2018).  As of July 2, 2018 at the HPE Careers website, setting the City filtering field to Plano results in 32 job postings having "Plano, TX" as a primary location, including "Storage and Hyper-Converged Subject Matter Expert," "Vice President, 5G Telco North America Sales Leader," "Senior VLSI Design or Verification Engineer," "Inside Solution Architect," "Continuous Integration DevOps Engineer," "Cyber Security Compliance Analyst," "3PAR PEAK Ecosystem Manager," and "Program Manager, Channel Competitive Intelligence." *See* https://careers.hpe.com/search-jobs/Plano?orgIds=3545&alp=6252001-4736286-4682500-4719457&alt=4 (last accessed July 2, 2018).

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). Venue is proper under 28 U.S.C. §§ 1391(a) & (c), and 1400(b).

## INTRODUCTION

12.      The inspiration for the patented innovations described herein originates from Plaintiffs' application development work associated with the 2006 FIFA World Cup sponsored by Adobe and Nokia.  The FIFA World Cup is the largest single-event sporting competition in the world with fans simultaneously accessing the World Cup app from millions of mobile devices around the globe.  Through its development work associated with this international sporting event,

the principal inventor of the Patents-in-Suit developed and created its patented performance engineering platform.  Application performance engineering enables software design and testing before it is published to a consumer by simulating real-world conditions for app developers while in the development phase, including device and network virtualization, virtual user modeling and the ability to virtually perform stress and load tests based on modeling human interaction (hereafter "Performance Engineering Innovations").

13.     Licensed products incorporating the Performance Engineering Innovations have won numerous industry awards for mobile application development, including multiple JOLT Awards and other industry leading awards for market breakout products.

14.     Patents related to the Performance Engineering Innovations have been licensed by a Fortune 500 leader in enterprise software in a multi-million dollar license.

15.     In addition, patents in the Plaintiffs' Patent Portfolio, defined below, have been cited against a number of industry-leading companies as prior art by the United States Patent and Trademark Office (hereafter "USPTO") and WIPO.  These companies include:

- Hewlett-Packard
- Apple
- Samsung
- Microsoft
- Google
- Vodafone
- Intuit
- Avaya
- Intel
- Amazon
- HTC
- Nextbit Systems
- CA
- Facebook
- Barco
- Razor
- Adobe

4

**HPE & MICRO FOCUS**

16.     Certain HPE software products are alleged herein to infringe the Patents-in-Suit.

17.     On information and belief, HPE completed a spin-out merger of its software group with Micro Focus on September 1, 2017.  Following the spin-out merger, the term "HPE" was replaced by the term "Micro Focus" in the names of various software products.  For example, HPE LoadRunner became Micro Focus LoadRunner, HPE Performance Center became Micro Focus Performance Center, etc.

18.     On information and belief, functionality of relevant software products remained consistent following the spin-out merger.  Consequently, where Micro Focus documentation is cited below, it is to be understood that, on information and belief, the referenced functionality existed in the corresponding HPE software products.

**TECHNOLOGY BACKGROUND**

NETWORK VIRTUALIZATION

19.     On information and belief, to simulate mobile networks from any geographic location worldwide for mobile application testing (hereafter "Network Virtualization"), Defendant enabled performance engineers "to virtualize real-world network conditions, analyze test results to detect and remediate performance bottlenecks before deployment and gain custom performance optimization recommendations."[1]   Defendant further states that "integrating [Network Virtualization] with your continuous integration testing process takes your automated CI [continuous integration] tests way beyond traditional functional testing and load testing, delivering to your developers timely actionable analytics and optimization recommendations."[2]  Additionally, Defendant states that "[Network Virtualization] is a vital tool for performance engineers…[and] is

---

[1] https://www.youtube.com/watch?v=lUznCBjocYw (accessed June 25, 2018).
[2] *Id.*

fully integrated with HPE LoadRunner, HPE Performance Center and HPE StormRunner Load…[and] HPE Mobile Center."[3]

NETWORK PROFILES

20.    On information and belief, as part of a HPE Software Suite, Defendant provided a library of real-world mobile and broadband network conditions (hereafter "Network Profiles"), enabling its customers to have access to a library of real-world data points of point-to-point network conditions recorded around the world.   Documents regarding a post spin-out merger version of the HPE Software Suite state that Micro Focus "provides a library of real-world mobile and broadband network conditions."[4]   Further, "Network Virtualization for Mobile allows tests to be managed and results analyzed from any laptop or Wi-Fi-connected mobile device. The software can import real-world mobile network profiles captured by Micro Focus Network Capture or provided by the Micro Focus Network Virtualization Library of mobile and broadband network conditions."[5]   Network Profiles and cloud-enabled technology has been described as bridging "the gap between development and deployment by enabling your mobile application development team to fully and accurately assess the behavior and impact of the network on mobile apps before they are introduced to end users. By virtualizing real-world mobile network conditions within testing environments, your test results are more reliably predictive of how an application will behave for end users."[6]

---

[3] *Id.*
[4] Micro Focus Network Virtualization for Mobile Data Sheet, Page 1 https://www.microfocus.com/media/data-sheet/network_virtualization_for_mobile_ds.pdf (accessed June 27, 2018).
[5] *Id.*
[6] *Id.*

## VuGEN AND THE VIRTUAL EVENT GENERATOR

21.     On information and belief, to simulate virtual users to load test mobile applications (hereafter "Virtual Users" or "Vuser") within the HPE Software Suite, Defendant offered a virtual event generator (hereafter "Virtual Event Generator").  Documents regarding a post spin-out merger version of the HPE Software Suite state that the Virtual Event Generator is the "primary tool for creating testing scripts that emulate the behavior of real users on your system."[7]  A Virtual User is defined as scripts that replace "real users with virtual users…to emulate the actions of a human user"[8] for load testing.  On information and belief, from a single workstation, Defendant offered a controller to distribute "each Vuser in the scenario to a load generator. The load generator is the machine that executes the Vuser script, enabling the Vuser to emulate the actions of a human user."[9]  The Vuser operates as a single thread process, enabling a single server or computer to emulate the actions of several 100 users to create load against a mobile application.

22.     In March of 2014, Defendant migrated its long-standing license model from a standard license to a cloud-based monetization model[10] wherein customers of the HPE Software Suite would be charged on a per Virtual User basis over a 24-hour time period.[11]

## TRUCLIENT AND SCRIPTED USER EVENT MODELING

23.     On information and belief, to create Virtual Users to interact with scripted events to model human interaction with a native mobile application (hereafter "Scripted User Event

---

[7] Micro Focus LoadRunner Help Center, https://admhelp.microfocus.com/lr/en/12.56-12.57/help/WebHelp/Content/VuGen/tocs/toc_MainVuGen.htm (accessed June 27, 2018)
[8] Micro Focus LoadRunner Help Center, https://admhelp.microfocus.com/lr/en/12.56-12.57/help/WebHelp/Content/Controller/c_terms_lr.htm (accessed June 27, 2018)
[9] Micro Focus LoadRunner Help Center, *Id.*
[10] http://www8.hp.com/us/en/hp-news/press-release.html?id=1601722#.WzQUBdVKguV (accessed June 27, 2018)
[11] https://software.microfocus.com/en-us/products/loadrunner-load-testing/pricing; https://software.microfocus.com/en-us/products/performance-center/pricing; https://software.microfocus.com/en-us/products/stormrunner-load-agile-cloud-testing/pricing (accessed June 27, 2018)

7

Modeling") within the HPE Software Suite, Defendant offered TruClient as a native mobile protocol that provided a way "to record and replay native mobile applications on both Android and iOS devices" to enable "the developer or DevOps engineer to record user interactions on the mobile application and create a TruClient script"[12] (hereafter "Scripted User Event Modeling") to simulate "multiple virtual users (Vusers)" during the load test's execution.[13]  Additionally, "the script can be enhanced using standard TruClient functionality including parameterization, transactions and JavaScript coding."[14]  Together with the HPE Virtual User Suite of Products, this "protocol is meant for end-user performance testing…[and] completes the LoadRunner mobile performance testing suite."[15]

STORMRUNNER LOAD

24.     On information and belief, Defendant's StormRunner product provided the ability to create a "real-world scenario by generating load from global cloud regions to emulate real networks during load tests."[16]  "StormRunner Load initializes on demand load generation machines in the private or public cloud"[17] to dynamically "Scale from 1 tester to 2,000,000 or more geographically distributed"[18] Virtual Users (hereafter "Cloud-based Load Server Modeling"). StormRunner provided a cloud-based performance testing solution that enabled Agile development teams to ensure app scalability up to millions of distributed mobile users.[19]

---

[12] https://community.softwaregrp.com/t5/LoadRunner-and-Performance/Introduction-to-LoadRunner-s-new-TruClient-Native-Mobile/ba-p/269441#Wyg06FVKguV
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] https://software.microfocus.com/en-us/products/stormrunner-load-agile-cloud-testing/overview (accessed June 27, 2018)
[17] *Id.*
[18] *Id.*
[19] *Id.*

HPE MOBILE CENTER AND DEVELOPMENT SERVER

25.     On information and belief, Defendant offered HPE Mobile Center as "a standalone server that provides mobile device access to different test applications. HPE Mobile Center supported a distributed architecture where different test clients can all interact with the same Mobile Center server instance."[20]  Defendant enabled performance engineers to gain an "accurate picture of the end-to-end mobile performance" by combining "virtual users and real devices" to run "elastic, and realistic tests from multiple geographies across various real-world network conditions"[21] and "mediate[d] between the testing-tool client calls to mobile devices" by providing "a user interface within the testing tool for recording and running tests on real mobile devices"[22] (hereafter "Cloud-based Mobile Center").

26.     On information and belief, HPE "Mobile Center is a core component of [the] mobile app development lifecycle" and is integrated with "Application Lifecycle Management (ALM), AppPulse Mobile, Business Process Monitoring, Business Process Testing, Fortify On Demand, LoadRunner, Network Virtualization (NV), Performance Center, Sprinter, StormRunner Load, UFT and UFT Pro"[23] (hereafter "HPE Mobile Center Suite of Products").[24]

---

[20] http://mobilecenterhelp.saas.hpe.com/docs/en/2.20/mobilecenter_help/Content/HPMC_architecture.htm (accessed June 27, 2018)
[21] https://software.microfocus.com/en-us/products/mobile-testing/overview (accessed June 27, 2018)
[22] http://mobilecenterhelp.saas.hpe.com/docs/en/2.20/mobilecenter_help/Content/HPMC_architecture.htm (accessed June 27, 2018)
[23] https://community.softwaregrp.com/t5/Quality-and-Testing-Blog/Introducing-Mobile-Center-2-5-improve-your-mobile-testing/ba-p/1593254#.Wyg_71VKguU (accessed June 27, 2018)
[24] https://www.youtube.com/watch?v=6QyrWGSGq-c (accessed June 27, 2018) and https://www.youtube.com/watch?v=FkJkIe1H_rM (accessed June 27, 2018)

## FACTUAL ALLEGATIONS

### PATENTS-IN-SUIT

27.     Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 9,971,678 (the "'678 Patent", attached as Exhibit 1), entitled "Systems including device and network simulation for mobile application development," issued on May 15, 2018.

28.     Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 9,298,864 (the "'864 Patent", attached as Exhibit 2), entitled "System Including Network Simulation for Mobile Application Development," issued on March 29, 2016.

29.     Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 8,924,192 (the "'192 Patent", attached as Exhibit 3), entitled "Systems including network simulation for mobile application development and online marketplaces for mobile application distribution, revenue sharing, content distribution, or combinations thereof," issued on December 30, 2014.

30.     Together, the foregoing patents are referred to as the "Patents-in-Suit".  Plaintiffs are the assignee of the Patents-in-Suit and have all substantial rights to sue for infringement and collect past and future damages for the infringement thereof.

31.     The foregoing patents, and any related patents in the family, are herein referred to collectively and individually as the "Plaintiffs' Patent Portfolio" respectively.

### DEFENDANT'S ACTS

### MOBILE WORLD CONGRESS AND

### WIPO INTELLECTUAL PROPERTY APPLICATION

32.     In a press release dated February 29, 2012, Defendant announced at the GSMA Mobile World Congress (hereafter "Mobile World Congress"), the launch of a software suite to

mobilize Defendant's core offerings, including the mobilization of HP LoadRunner and HP Performance Center for mobile application performance testing (hereafter "HP 2012 Software Suite").[25]

33.     Prior to its announcement at the Mobile World Congress, the world's largest conference for the mobile industry, Defendant filed Patent Application Ser. No. PCT/US2012/024087 with WIPO on February 7, 2012, in an attempt to protect its soon to be released HP 2012 Software Suite.  At the time of filing in a signed declaration, Defendant made a claim of "entitlement, as at the international filing date, to apply for and be granted a patent (Rules 4.17(ii) and 51bis.1(a)(ii))"[26] stating that its disclosures were novel.

34.     Defendant's novelty and non-obvious declarations before WIPO were errant because Defendant's patent application filing was made almost seven years *after* Plaintiffs' 2005 priority date for the Patents-in-Suit involving the same mobile performance engineering technology.  Since Defendant was a late entrant to the mobile application test market,[27] the existence of Plaintiffs' Patents-in-Suit should not have been surprising to Defendant.  Consistent with these facts, Defendant also admitted being a late entrant to the mobile application testing space when a senior product manager for Defendant stated to *eWEEK* that the Defendant's partnership with an outside third party in 2012 brought what Defendant "could not do on its own," further stating that "HP LoadRunner and HP Performance Center and our Shunra partnership

---

[25] http://www.eweek.com/mobile/hp-partners-with-shunra-for-mobile-performance-support (accessed June 27, 2018)

[26] https://patentscope.wipo.int/search//iasr?ia=US2012024087&PAGE=PDF&ACCESS=screen&TOK=NM7x-z_iw3yGR50Mwbk0L0USBCg&psAuth=0c8_i88QJ-YDBlkPkP7W7KeSMfDL6Gkwkkset4IS-c4 (accessed June 27, 2018)

[27] In a press release dated April 28, 2016 Forrester Research stated that "HPE only recently entered the mobile test market with its Mobile Center product" by adding "new mobile testing capabilities to its comprehensive testing suite."
[https://www.forrester.com/report/The+Forrester+Wave+Mobile+FrontEnd+Test+Automation+Tools+Q2+2016/-/E-RES128536] Forrester Research Inc., April 28, 2016 (accessed June 27, 2018).

[completed in February of 2012] delivers the necessary protocols for performance testing both web and native mobile apps."[28]

WIPO PATENT REJECTION

35.     On October 31, 2012, WIPO rejected all of the claims in Defendant's Patent Application Ser. No. PCT/US2012/024087 as being anticipated solely by U.S. Patent No. 7,813,910 ("the '910 Patent," which is a part of Plaintiffs' Patent Portfolio and a parent of the Patents-in-Suit) after conducting a patent search, and in the process awarded the '910 Patent the highest prior art designation (hereafter "WIPO Patent Rejection").  *See* Exhibit H (Written Opinion of the International Searching Authority for International Patent Application Ser. No. PCT/US2012/024087, rejecting all claims over the '910 Patent (which WIPO designated as reference "D1.")).

36.     Further, on October 31, 2012, WIPO provided the following written statements to Defendant under Rule 43bis.1(a)(i) with regard to novelty, inventive step or industrial applicability, stating that Plaintiffs' Patent Portfolio "…which is considered to represent the most relevant state of the art, discloses [HPE's] method and [a] medium or system comprising steps of simulating a cellular network condition for each of a plurality of locations utilizing a network simulation engine, and testing performance of the mobile application for each of the simulated cellular network conditions.  As all of the features of claims 1, 7, 12 are disclosed in [the '910 Patent], these claims are anticipated by [the '910 Patent].  Therefore, claims 1, 7, 12 lack novelty over [the '910 Patent] under PCT Article 33(2)."  *See* Exhibit H.  WIPO further rejected all Independent and all Dependent claims as lacking inventiveness over the '910 Patent under PCT Article (2), (3) and (4).  *See* Exhibit H.

---

[28] http://www.eweek.com/mobile/hp-partners-with-shunra-for-mobile-performance-support (accessed June 27, 2018)

## WIPO WRITTEN NOTICES TO DEFENDANT

37.     On June 12, 2014, WIPO sent an additional supplementary notice under Rule 47.1(c) stating that under Article 22(1) that the communication of the international application will be affected across all 185 member states, including the United States Patent and Trademark Office.[29]

38.     The Intellectual Property Owners Association ("IPO") is an organization whose mission statement is to serve the global intellectual property community,[30] and to help reach judicial decisions and regulatory practices in the United States and abroad to further enhance global intellectual property rights.[31]   On information and belief, Defendant has eight (8) serving members on IPO  Defendant's strong support of IPO, an organization that champions intellectual property rights, underscores that Defendant should have understood the fundamental importance of respecting a third party's patent rights.

## RECKLESS DISREGARD OF WIPO NOTICES

## AND FURTHER PRODUCT RELEASES

39.     Notwithstanding the aforementioned WIPO Patent Rejection of Defendant's patent application based on the '910 Patent, the initial and supplemental WIPO notices and its actual knowledge of Plaintiffs' prior patent rights in the mobile performance engineering space, the Defendant recklessly forged ahead with commercialization and sales of the HP LoadRunner and

---

[29]https://patentscope.wipo.int/search/docservicepdf_pct/id00000025143112/IB308/WO2013119205.pdf?psAuth=m MniZixkvHdFvRyOgxrg3IdDA3uV2jaWveIbtORTsgg (accessed June 27, 2018).
[30] The IPO states that the "Intellectual Property Owner's Association is the premier organization representing the interests of intellectual property owners…and to advocate in favor of intellectual property rights."
[31] https://www.youtube.com/watch?v=mOsnzHRPUkI&feature=youtu.be&t=7 (accessed June 27, 2018).  The IPO further advocates on behalf of IP owners at the U.S. Supreme Court, the Supreme Court of Canada, the World Intellectual Property Organization and for patent holders across 37 countries.

13

HP Performance Center 11.50 offerings in 2012, and with the follow up launch of HP LoadRunner and HP Performance Center 12.0 offerings for "Mobile and Cloud-based Application Testing" in March of 2014[32], including the subsequent release of HP StormRunner Load in September of 2014 as part of the HP Performance Testing Suite[33] and the follow up release of HP Mobile Center in October of 2014[34], among other additional mobile product offerings (hereafter "Mobile Product Offerings").[35]

40.     Based on the global WIPO Patent Rejection of Defendant's patent application filing in October of 2012, and the repeated and supplemental notices from WIPO under Article 22(1) regarding Defendant's rejected WIPO patent application, Defendant has had actual notice of Plaintiffs' Patent Portfolio and continued to make, use sell, and offer to sell the Mobile Product Offerings despite an objectively high likelihood that its actions constituted infringement of Plaintiffs' patent rights.

41.     Notwithstanding this knowledge about Plaintiffs' patents and the importance of the mobile performance engineering innovations therein, Defendant has knowingly or with reckless

---

[32] PALO ALTO, Calif. In a Press Release dated March 18, 2014, the Defendant stated the following: "HP today announced *new offerings to accelerate mobile and cloud-based testing and improve user experience while increasing cost savings and quality for the delivery of business-critical applications and services* [emphasis added]… To help improve continuous performance testing for capacity, scalability and reliability, *HP is introducing HP LoadRunner 12 and HP Performance Center 12 with new cloud testing capabilities designed to help organizations* [emphasis added] increase cost savings…and shrink overhead through an integrated management environment that automates provisioning of load generators in the cloud across geographically dispersed teams while maintaining security and control.." http://www8.hp.com/us/en/hp-news/press-release.html?id=1601722#.WyqeK1VKguU (accessed June 27, 2018).

[33] PALO ALTO, Calif. In a Press Release dated September 15, 2014 the Defendant stated the following: "HP today expanded the HP Performance Testing Suite with a new software solution focused on helping Agile development teams accelerate application quality and delivery via a simple, intuitive and scalable cloud-based platform.

HP StormRunner Load joins HP's existing performance testing solutions, which include HP LoadRunner and HP Performance Center. The modern enterprise faces a perfect storm of changes that are driving the need for a completely new approach to application delivery and testing. Businesses must develop applications that can instantly operate across a wide variety of platforms including thousands, or millions, of mobile devices." Source: http://www8.hp.com/us/en/hp-news/press-release.html?id=1791344#.WyqigFVKguU (accessed June 27, 2018)

[34] http://www8.hp.com/ca/en/hp-news/press-release.html?id=1825600#.Wy0Um1VKguU (accessed June 27, 2018)

[35]      https://web.archive.org/web/20141205174207/http://www8.hp.com/us/en/software-solutions/mobile-testing/ (accessed June 27, 2018)

disregard willfully infringed one or more of the Patents-in-Suit, and, accordingly, Plaintiffs seek enhanced damages from Defendant pursuant to 35 U.S.C. § 284.

DEFENDANT SPINOUT MERGER WITH MICRO FOCUS

42.     On the strength of HPE LoadRunner, HPE Performance Center, HPE StormRunner Load, HPE Mobile Center and its other product offerings, HPE and Micro Focus announced on September 7, 2016 their intent to merge HPE's Software Business Segment into Micro Focus in a transaction valued at approximately $8.8 billion, including a $5.5 billion in cash financing note provided by JPMorgan Chase & Co.  *See also,* ¶¶ 16-18.

43.     On information and belief, under the terms of a Separation and Distribution Agreement entered between Defendant and Micro Focus, dated September 7, 2016 governing the spin-out merger, Defendant has twenty-four (24) months from September 7, 2016 to obtain licenses and sub-licenses for the benefit of Micro Focus International plc.  Plaintiffs would like Defendant to take advantage of this opportunity to obtain a license on behalf of Micro Focus prior to expiration of the 24-month term.

NON-NOTICE INVITATION

AND WRITTEN COMMUNICATION

44.     In light of Defendant's long-standing stature in the software industry and its support of organizations like IPO, in August of 2017, Plaintiffs, through a personal representative, reached out in a written communication to Jane Smithard, Group General Counsel and Company Secretary of Micro Focus, with a courtesy copy to John Schultz, General Counsel of HPE, seeking to enter a non-notice agreement to engage in open and transparent discussions about Defendant's infringement of the Patents-in-Suit.  While Ms. Smithard did apparently instruct her outside counsel at the Aspen Tech Law firm to contact Plaintiffs' representative, the Defendant never

15

acknowledged the communication nor made any attempt to communicate with Plaintiffs, thus necessitating the filing of this present Complaint.

## **DAMAGES, PLAINTIFFS' PORTFOLIO AND THE APP ECONOMY**

45.     Mobile apps and the tools to develop and test mobile apps have become paramount to the U.S. economy.  According to a 2012 white paper released by renowned Dr. Michael Mandel titled the 'App Economy', the App Developer community represented the second largest IT segment in the United States in 2012 with over 466,000 jobs created in the U.S. economy alone, up from nearly zero in 2008 when the App Store was initially launched (hereafter "App Economy").[36]

46.     Plaintiffs' goal has been to democratize app development for a new generation of developers by mitigating performance risks and reducing application development cycles from months down to minutes by virtue of new performance engineering modeling.  At the time of Plaintiffs' provisional patent filing in June of 2005, Apple had not launched the iPhone (June of 2007), there was no App Store (July of 2008), Google's Android platform had not been released (September of 2008), the Samsung Galaxy family of devices had not been released (June of 2009) and the mobile app ecosystem that we know today was still in its infancy.

47.     In Dr. Mandel's App Economy white paper, the renowned economist contributes two driving innovations behind the App Economy: (a) the ease of app development; and (b) the ease of app delivery.  With respect to the former, Plaintiffs' Patent Portfolio describes many of the core innovations in modern application development that accelerate the development of applications and enhances the mobile device consumer experience on the client side.

---

[36] http://business.time.com/2012/02/08/the-app-economy-estimated-to-contribute-nearly-half-a-million-jobs-to-the-u-s/ (accessed June 27, 2018)

48.     In alignment with Dr. Mandel's thesis concerning the importance of facilitating application development, the Plaintiffs' patented technologies, with a focus on accelerating application development for performance engineers, helped to enable a new generation of app developers to lay the foundation for the emerging App Economy (hereafter "App Developers").

49.     App Developers play an integral role in the app ecosystem, and Plaintiffs' patented innovations, with a focus on accelerating application development for performance engineers, have ushered in a new generation of smart developer tools and contributed significantly to the growth of the App Economy.

50.     Application performance and access to data in the cloud are paramount to the user experience for a new generation of data hungry applications.  If a mobile application fails, 48% of users are less likely to ever use the app again. 34% of users will simply switch to a competitor's application and 31% of users will tell friends about their poor experience, which eliminates future customers.[37]  A change in latency from 2ms (broadband) to 400ms (3G network) can cause a mobile page load to go from 1 second to 30 seconds.[38]  Google reported that a mere 0.5 to 1.0-second increase in page load time resulted in a 20% decrease in traffic and revenue.  The average U.S. retail mobile site loaded in 6.9 seconds in July of 2016, and according to the most recent data presented by Google, 40% of consumers will leave a page that takes longer than three seconds to load.[39]

51.     According to Defendant's own studies, *"over 70% of the performance of a mobile app is dependent on the network,"*[40] and in another study Defendant further stated that "80% of

---

[37] https://www.marketingcharts.com/digital-27846 (accessed June 27, 2018)
[38] https://www.slideshare.net/xbosoft/mobile-network-performance-testing (accessed June 27, 2018)
[39] https://www.thinkwithgoogle.com/marketing-resources/experience-design/mobile-page-speed-load-time/ (accessed June 27, 2018)
[40] Exhibit A

the costs associated with application development occur in remediating failed or underperforming applications after deployment, when the ineffective application has already had a negative impact on the end user or customer experience."[41]

52.     In 2018, 52.2 percent of all website traffic worldwide was generated through a mobile device.[42]  In the United States, not even Black Friday was immune from the influence of mobile as nearly 40% of sales on the traditional brick and mortar shopping day came from a mobile device. With 30% of all online shopping happening on mobile phones and with 89% of executives believing that customer experience will be their primary mode of competition, the consumer experience via a company's mobile app has never been so prevalent.[43]

53.     In a recent study released by Micro Focus, over 50 percent of respondents indicated the need to remediate at least four application production incidents per month and the average days required to resolve a production incident was six. [44]  Micro Focus further stated that the average remediation cost per incident was $88,000 USD and the highest reported cost was $500,000 USD per incident. [45]  Micro Focus stated that "it is important to note that this is the remediation cost alone; it is not an accounting of the total impact on the business."[46]  A single security breach of a customer's financial banking information via a mobile app can cause a massive client exodus.

54.     Millennials, in particular, are much less forgiving concerning their application experience and will unapologetically delete an app just because the logo is not appealing.[47]  This

---

[41] http://media.shunra.com/datasheets/Shunra-NetworkCatcher.pdf (accessed June 27, 2018)
[42] https://www.statista.com/statistics/241462/global-mobile-phone-website-traffic-share/ (accessed June 27, 2018)
[43] https://www.outerboxdesign.com/web-design-articles/mobile-ecommerce-statistics (accessed June 27, 2018)
[44] Micro Focus The Value of Proactive Application Performance, http://files.asset.microfocus.com/4aa6-6409/en/4aa6-6409.pdf  (accessed June 27, 2018)
[45] *Id.*
[46] *Id.*
[47] https://www.comscore.com/Insights/Blog/5-Interesting-Facts-About-Millennials-Mobile-App-Usage-from-The-2017-US-Mobile-App-Report (accessed June 27, 2018)

fact suggests a shrinking margin of error for performance issues especially when it is considered that "67% of Millennials now use mobile banking as their primary engagement with their bank compared to 18% for those consumers aged 60 or over.  In a recent study in the UK, Millennials now trust their App more than a teller at a brick and mortar bank, and 27% of Millennials are now completely reliant on a mobile Banking App.[48]  In the next 3-4 years, 33% of Millennials may choose to completely abandon traditional brick and mortar Banking in lieu of a mobile app.[49]  With over 50% of the United States workforce projected to be made up of 'App First Millennials' by 2020,[50] it is clear why Defendant had to move quickly into the Mobile-first product model.  The vast majority of Defendant's downstream clients have also initiated a 'Mobile-First' strategy to 'mobilize' their customer base to engage a new era of app users and as a result, have relied on the mobile testing products offered by Defendant.

55.    As the mobility wave continues to expand, mobile app development is expected to outpace native PC projects by at least 400% in the next several years,[51] and according to TechCrunch, in 2017 over 20,000 petabytes (that's over 20 million gigabytes) were sent using mobile devices.[52]

56.    With the release of the rebuilt mobilized HP 11.50 Software Suite in 2012 and the follow-up release of the HP 12.0 Software Suite in March of 2014, the Defendant as a late entrant was attempting to aggressively gain traction in the market.  Late adopters like the Defendant often face a critical inflexion point-- either pay fair and reasonable licensing fees to secure intellectual

---

[48] https://www.salesforce.com/blog/2016/03/stats-about-millennials-mobile-banking.html (accessed June 27, 2018)
[49] https://www.temenos.com/en/market-insight/universal-insight/33-of-millennials-believe-they-wont-need-a-bank-at-all-in-5-years-we-think-different/ (accessed June 27, 2018)
[50] https://www.forbes.com/workforce-2020/ (accessed June 27, 2018)
[51] http://2014.vertic.com/blog/year_of_the_enterprise_tablet_infographic/ (accessed June 27, 2018)
[52] https://techcrunch.com/2013/07/03/mobile-data-use-to-grow-300-globally-by-2017-led-by-video-web-traffic-says-strategy-analytics/ (accessed June 27, 2018)

property rights from existing stakeholders, or, instead, recklessly forge ahead with indifference to securing the necessary intellectual property rights.

57.     Notwithstanding the WIPO Patent Rejection of Defendant's patent application, the initial and supplemental WIPO notices and Defendant's knowledge of Plaintiffs' prior patent rights in the mobile application development space, Defendant recklessly forged ahead with the launch of its mobile performance offerings.  This recklessness was likely born from Defendant's desire in 2012 to strategically and without delay pivot from desktop offerings to a Mobile-First offering to remain competitive in mobile performance engineering.

<u>ROYALTY DEMAND BY PLAINTIFFS</u>

58.     App Developers play an integral role in the app ecosystem and Plaintiffs' patented innovations have helped to contribute to the foundational growth of the App Economy.[53]  With mobile phone sales expected to reach 2.1 billion units by 2019, or approximately one-third of the world's population, the pace of this unprecedented mobile demand will likely continue.[54]

59.     Having recognized the explosive growth of the mobile application ecosystem, Micro Focus publicly stated that its combined spin-out merger with the Defendant creates "One of the World's Largest Pure-play Software Companies."[55]  Underpinning the growth of the App Economy, as Dr. Mandel noted, is facilitating application development which is a core value proposition of Plaintiffs' inventions.  In light of the collective facts herein, and using a reasonable royalty rate, the patent royalties owed by Defendant to Plaintiffs are in excess of $400 million USD.[56]

---

[53] According to Gartner, by the end of 2017 the market demand for mobile app development services will grow five times faster than internal IT organizations' capacity to deliver them.
https://www.gartner.com/newsroom/id/3076817 (accessed June 27, 2018)
[54] *Id.*
[55] https://www.microfocus.com/about/press-room/article/2017/micro-focus-completes-merger-with-hpe-software/
[56] This estimated royalty does not take into consideration additional factors, including without limitation an award of triple damages for willful infringement.

## WILLFUL INFRINGEMENT

## MOBILE WORLD CONGRESS AND WIPO REJECTION

60.     Plaintiffs allege that Defendant and/or its predecessors-in-interest and/or its affiliates have been made aware of the Plaintiffs' Patent Portfolio as early as October 31, 2012 based on the WIPO Intellectual Property Rejection.

61.     Despite initial and continued notices provided by WIPO beginning in October of 2012, Defendant recklessly forged ahead with the launch of HP LoadRunner and HP Performance Center 11.50 offerings in 2012, and with the follow up release of HP LoadRunner and HP Performance Center 12.0 offerings for Mobile and cloud-based Application Testing in March of 2014 "to accelerate mobile and cloud-based testing and improve user experience while increasing cost savings and quality for the delivery of business-critical applications and services."[57]

62.     In the press release dated March 18, 2014, Defendant further stated that "to help organizations drive quality, performance and velocity into their mobile, cloud, hybrid and traditional applications, Defendant is unveiling **new versions of the products within its HP Application Lifecycle Management portfolio** [emphasis added]."[58]  Furthermore, to capture virtual and cloud-based testing, Defendant introduced HP LoadRunner 12 and HP Performance Center 12 "with new cloud testing capabilities designed to help organizations…increase cost savings with instant access to large-scale load-generation capabilities in the cloud. Enterprises can

---

[57] PALO ALTO, Calif. In a Press Release dated March 18, 2014, the Defendant stated the following: "HP today announced **new offerings to accelerate mobile and cloud-based testing and improve user experience while increasing cost savings and quality for the delivery of business-critical applications and services** [emphasis added]… To help improve continuous performance testing for capacity, scalability and reliability, **HP is introducing HP LoadRunner 12 and HP Performance Center 12 with new cloud testing capabilities designed to help organizations** [emphasis added] increase cost savings…and shrink overhead through an integrated management environment that automates provisioning of load generators in the cloud across geographically dispersed teams while maintaining security and control.." http://www8.hp.com/us/en/hp-news/press-release.html?id=1601722#.WyqeK1VKguU (accessed June 27, 2018)

[58] *Id.*

scale performance-testing resources on flexible cloud platforms based on business and geographic demands."[59]

63.     In addition to the HP 11.5 and 12.0 product offerings, Defendant announced the release of HP StormRunner Load in September of 2014 as part of the HP Performance Testing Suite[60] and the follow-up release of HPE Mobile Center in October of 2014.[61]

64.     Based on the WIPO Patent Rejection in October of 2012 of Defendant's patent application, and the supplemental notices from WIPO under Article 22(1) concerning the status of Defendant's rejected WIPO patent application, Defendant has had actual notice of Plaintiffs' Patent Portfolio and continued to offer, use and sell the Mobile Product Offerings despite an objectively high likelihood that its actions constituted infringement of Plaintiffs' patent rights.

65.     Notwithstanding this knowledge about Plaintiffs' patents and the importance of the mobile application development and testing innovations therein, Defendant has knowingly or with reckless disregard willfully infringed one or more of the Patents-in-Suit, and, accordingly, Plaintiffs seek enhanced damages from Defendant pursuant to 35 U.S.C. § 284.

66.     This objective risk was either known or so obvious that it should have been known to Defendant. Accordingly, Plaintiffs seek enhanced damages from Defendant pursuant to 35 U.S.C. § 284.

---

[59] *Id.*

[60] PALO ALTO, Calif. In a Press Release dated September 15, 2014 the Defendant stated the following: "HP today expanded the HP Performance Testing Suite with a new software solution focused on helping Agile development teams accelerate application quality and delivery via a simple, intuitive and scalable cloud-based platform.
HP StormRunner Load joins HP's existing performance testing solutions, which include HP LoadRunner and HP Performance Center. The modern enterprise faces a perfect storm of changes that are driving the need for a completely new approach to application delivery and testing. Businesses must develop applications that can instantly operate across a wide variety of platforms including thousands, or millions, of mobile devices." http://www8.hp.com/us/en/hp-news/press-release.html?id=1791344#.WyqigFVKguU PCT/US2012/024087

[61]        https://web.archive.org/web/20141205174207/http://www8.hp.com/us/en/software-solutions/mobile-testing/ (accessed June 27, 2018)

## COUNT I

(Infringement of United States Patent No. 9,971,678)

67.     Plaintiffs incorporate the paragraphs above herein by reference.

68.     On May 15, 2018, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 9,971,678 (the "'678 Patent") entitled "Systems Including Device and Network Simulation for Mobile Application Development" on an application filed Dec. 23, 2014, United States Patent Application Ser. No. 14/581,475.  The '678 Patent is a continuation of United States Patent Application Ser. No. 13/673,692, filed Nov. 9, 2012 and issued as United States Pat. No. 8,924,192, on Dec. 30, 2014, which is a continuation of United States Patent Application Ser. No. 12/759,543, filed April 13, 2010 and issued as United States Pat. No. 8,332,203, on Dec. 11, 2012, which is a continuation of United States Patent Application Ser. No. 11/449,958, filed Jun. 9, 2006 and issued as United States Pat. No. 7,813,910, on Oct. 12, 2010, which application claims priority to United States Patent Application Ser. No. 60/689,101 filed Jun. 10, 2005.

69.     The '678 Patent is presumed valid and enforceable.

70.     Plaintiffs are the sole owner of the '678 Patent.

71.     Defendant without authorization has directly infringed at least Claim 1 of the '678 Patent, including making, using (including for testing purposes), selling, and offering for sale systems for testing an application for a mobile device ("Accused System") including and not limited to the LoadRunner, Performance Center, StormRunner and Mobile Center software products ("HPE Software Suite").  *See* attached Claim Chart for the '678 Patent, at Exhibit 4, citing Exhibits A–G.

72.     The '678 Patent describes systems that address technical problems related to simulating network systems to determine performance of the mobile device.  *See, e.g.,* '678 Patent at col. 10, lines 34-44 [simulated network environment] to col. 13, line 47 [includes Figures 8 through 13].

73.     The '678 Patent describes systems that enable a performance engineer to view application performance data to mitigate performance risks.  *See, e.g.,* '678 Patent at col. 7, lines 29-40 and col. 8, lines 45-56 [profile data 110 is stored or displayed to identify performance of the application].

74.     The '678 Patent describes systems that include providing a network model library of real-world mobile network characteristics, *see, e.g.,* '678 Patent at col. 2, lines 5-9 [geographical markets], col. 11, lines 49-59 and col. 12, lines 3-25 [Figure 9 and geographical map] to enable a user to import the network profiles, *see, e.g.,* '678 Patent at col. 12, lines 50-53 [import network profiles] into the testing environment, *see, e.g.,* '678 Patent at col. 10, lines 59-66 to col. 11, lines 1-14 [download network profiles].

75.     Technological improvements described and claimed in the '678 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time.  *See, e.g.*, '678 Patent at col. 2, lines 5-9, col. 11, lines 60-67 and col. 12, line 2.

76.     The written description of the '678 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic,

or routine.  *See, e.g.,* '678 Patent at col. 10, lines 34-44 [simulated network environment] to col. 13, line 47 [includes Figures 8 through 13].

77.    The '678 Patent represents a substantial technical improvement in the area of simulating network systems to determine performance of the mobile device.  As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against Apple, Intel, Google, Adobe and Amazon.  *See* https://patents.google.com/patent/US9971678/en (last accessed June 28, 2018).  A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

78.    Viewed in light of the specification of the '678 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

79.    The '678 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

80.    The '678 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

81.    The '678 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer.

82.    As noted by United States Patents, foreign patent documents, and other publications cited by the '678 Patent, the '678 Patent ***does not*** preempt the field of its invention or preclude use

26

of other methods and systems of simulating network systems to determine performance of the mobile device.

83.     As a result of Defendant's infringement of the '678 Patent, Plaintiffs have suffered damages.

84.     Defendant's infringement has been willful since at least October 31, 2012, when Defendant became aware of the '678 Patent family. *See* Defendant's international patent application, PCT/US2012/024087, which was rejected as anticipated by the '910 Patent; ¶¶ 60-66. The '678 Patent, the '864 Patent and the '192 Patent are the progeny of the '910 Patent.

## COUNT II

(Infringement of United States Patent No. 9,298,864)

85.     Plaintiffs incorporate the paragraphs above herein by reference.

86.     On March 29, 2016, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 9,298,864 (the "'864 Patent") entitled "System Including Network Simulation for Mobile Application Development" on an application filed Nov. 19, 2013, United States Patent Application Ser. No. 14/084,321.  The '864 Patent is a divisional of United States Patent Application Ser. No. 12/705,913, filed Feb. 15, 2010 (now United States Pat. No. 8,589,140), which claims priority to United States Patent Application Ser. No. 61/152,934, filed Feb. 16, 2009, and is a continuation-in-part of United States Patent Application Ser. No. 11/449,958, filed Jun. 9, 2006 (now U.S. Pat. No. 7,813,910), which claims priority to United States Patent Application Ser. No. 60/689,101, filed Jun. 10, 2005.

87.     The '864 Patent is presumed valid and enforceable.

88.     Plaintiffs are the sole owner of the '864 Patent.

89.     Defendant without authorization has directly infringed at least Claim 1 of the '864 Patent, including making, using (including for testing purposes), selling, and offering for sale systems for testing an application for a mobile device Accused System including and not limited to the LoadRunner, Performance Center, StormRunner and Mobile Center software products ("HPE Software Suite").  *See* attached Claim Chart for the '864 Patent at Exhibit 5, citing Exhibits A–G.

90.     The '864 Patent describes systems that address technical problems related to simulating network systems to determine performance of the mobile device.  *See, e.g.,* '864 Patent at col. 9, line 60 through col. 10, line 3 [simulated network environment] to col. 13, line 4 [includes Figures 8 through 13].

91.     The '864 Patent describes systems that simulate virtual users to load test mobile applications by using an event generator to create scripts to emulate and model human behavior to determine performance of either the network or the mobile application.  *See, e.g.,* '864 Patent at col. 10, lines 57-65 [event generator + scripted effects], col 11, lines 7-17 [event generator + bandwidth], col. 11, lines 51-67 [scripted events + human interaction].  The '864 Patent further describes systems that enable the performance engineer to simulate real-world scenarios by generating load from multiple geographies to emulate real networks during load tests.  *See, e.g.,* '864 Patent at col. 11, lines 51-67 [scripted events + consumer events + performance], Figures 9, 10, 11, 12 and 13, col. 12, lines 8-11 [storage 134] and col. 12, lines 18-22 [geographic locations].

92.     The '864 Patent describes systems that enable the performance engineer to interact with the virtual users by providing scripts to record and replay user interactions on the mobile device to emulate real networks during load tests.  *See, e.g.,* '864 Patent at col. 11, lines 51-67

[scripted events + consumer events + performance], Figures 12 [Load Server] and 13, col. 12, lines 8-11 [storage 134] and col. 12, lines 18-22 [geographic locations].

93.     The '864 Patent describes systems that include a developer server that provides a library of mobile devices to enable the performance engineer to combine virtual users and real devices to run tests from multiple geographies across real-world network conditions.  *See, e.g.,* '864 Patent at col. 2, lines 3-7 [mobile devices in geographical markets], col. 3, lines 4-7 [development server + Internet], col. 9, line 60 to col. 10, line 3 [developer server + mobile device, figures 8-13], col. 11, lines 18-27 [developer server + networks worldwide], and col. 12, lines 8-11 [storage 134].

94.     The '864 Patent describes systems that enable a performance engineer to view application performance data to mitigate performance risks.  *See, e.g.,* '864 Patent at col. 6, lines 46-57 [profile data 110 is stored or displayed to identify performance of the application].

95.     Technological improvements described and claimed in the '864 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time.  *See, e.g.,* '864 Patent at col. 2, lines 3-7 and col. 11, lines 18-27.

96.     The written description of the '864 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic, or routine.  *See, e.g.,* '864 Patent at col. col. 9, line 60 to col. 10, line 3 [simulated network environment] to col. 13, line 3 [includes Figures 8 through 13].

97.   The '864 Patent represents a substantial technical improvement in the area of mobile performance engineering.  As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against Apple, Intel, Adobe, Facebook, Ca, Amazon, Vodafone and Telecom Italia S.p.A.  *See* https://patents.google.com/patent/US9298864B2/en (last accessed June 26, 2018).  A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

98.   Viewed in light of the specification of the '864 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

99.   The '864 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

100.   The '864 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

101.   The '864 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer.

102.   As noted by United States Patents, foreign patent documents, and other publications cited by the '864 Patent, the '864 Patent ***does not*** preempt the field of its invention or preclude use of other methods and systems of simulating network systems in the area of mobile performance engineering.

30

103.    As a result of Defendant's infringement of the '864 Patent, Plaintiffs have suffered damages.

104.    Defendant's infringement has been willful since at least October 31, 2012, when Defendant became aware of the '864 Patent family. *See* Defendant's international patent application, PCT/US2012/024087, which was rejected as anticipated by the '910 Patent; ¶¶ 60-66. The'864 Patent, the '678 Patent, and the '192 Patent are the progeny of the '910 Patent.

## COUNT III

(Infringement of United States Patent No. 8,924,192)

105.    Plaintiffs incorporate the paragraphs above herein by reference.

106.    On Dec. 30, 2014 the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 8,924,192 ("the'192 Patent") entitled "Systems Including Network Simulation for Mobile Application Development and Online Marketplaces for Mobile Application Distribution, Revenue Sharing, Content Distribution, or Combinations thereof" on an application filed Nov. 9, 2012, United States Patent Application Ser. No. 13/673,692.  The '192 Patent is a continuation of United States Patent Application Ser. No. 12/759,543, filed Apr. 13, 2010, which is a continuation of United States Patent Application Ser. No. 11/449,958, filed Jun. 9, 2006, and issued as United States Pat. No. 7,813,910, on Oct. 12, 2012, which application claims priority to United States Patent Application Ser. No. 60/689,101 filed Jun. 10, 2005.

107.    The '192 Patent is presumed valid and enforceable.

108.    Plaintiffs are the sole owner of the '192 Patent.

109.    Defendant without authorization has directly infringed at least Claim 1 of the '192 Patent, including making, using (including for testing purposes), selling, and offering for sale the

Accused System including and not limited to the LoadRunner, Performance Center, StormRunner and Mobile Center software products ("HPE Software Suite"). *See* attached Claim Chart for the '192 Patent at Exhibit 6, citing Exhibits A–G.

110.    The '192 Patent describes systems that address technical problems related to simulating network systems to determine performance of the mobile device. *See, e.g.,* '192 Patent at col. 10, lines 15-25 [simulated network environment] to col. 13, line 23 [includes Figures 8 through 13].

111.    The '192 Patent describes systems that enable a performance engineer to view application performance data to mitigate performance risks. *See, e.g.,* '192 Patent at col. 7, lines 14-25 and col. 8, lines 27-38 [profile data 110 is stored or displayed to identify performance of the application].

112.    The '192 Patent describes systems that include providing a network model library of real-world mobile network characteristics, *see, e.g.,* '192 Patent at col. 2, lines 4-8 [geographical markets], col. 11, lines 28-38 and col. 11, line 49 to col. 12, line 2 [Figure 9] to enable a user to import the network profiles, *see, e.g.,* '192 Patent at col. 12, lines 28-31 [import network profiles] into the testing environment, *see, e.g.,* '192 Patent at col. 10, lines 40-47 to col. 10, lines 51-62 [download network profiles].

113.    Technological improvements described and claimed in the '192 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time. *See, e.g.*, '192 Patent at col. 2, lines 4-8 and col. 11, lines 39-48.

114.    The written description of the '192 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the

elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic, or routine.  *See, e.g.,* '192 Patent at col. 10, lines 15-25 [simulated network environment] to col. 13, line 23 [includes Figures 8 through 13].

115.    The '192 Patent represents a substantial technical improvement in the area of simulating network systems to determine performance of the mobile device.  As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against Google,       Apple,       Adobe,       Amazon,       and       Intel.       *See* https://patents.google.com/patent/US8924192B1/en (last accessed June 26, 2018). A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

116.    Viewed in light of the specification of the '192 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

117.    The '192 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

118.    The '192 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

119.    The '192 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer.

33

120.	As noted by United States Patents, foreign patent documents, and other publications cited by the '192 Patent, the '192 Patent **does not** preempt the field of its invention or preclude use of other methods and systems of simulating network systems to determine performance of the mobile device.

121.	As a result of Defendant's infringement of the '192 Patent, Plaintiffs have suffered damages.

122.	Defendant's infringement has been willful since at least October 31, 2012, when Defendant became aware of the '192 Patent family. *See* Defendant's international patent application, PCT/US2012/024087, which was rejected as anticipated by the '910 Patent; ¶¶ 60-66. The '192 Patent, the '678 and the '864 Patent are the progeny of the '910 Patent.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.	Enter judgment that Defendant has infringed one or more claims of the '678 Patent literally or under the doctrine of equivalents;

B.	Enter judgment that Defendant has infringed one or more claims of the '864 Patent literally or under the doctrine of equivalents;

C.	Enter judgment that Defendant has infringed one or more claims of the '192 Patent literally or under the doctrine of equivalents;

D.	Award Plaintiffs damages for willful infringement of the '678 Patent, the '864 Patent and the '192 Patent;

D.	Award Plaintiffs past damages, to be paid by Defendant, in an amount no less than a reasonable royalty and adequate to compensate Plaintiffs for such damages, together with pre-judgment and post-judgment interest for Defendant's infringement of the '678 Patent, the '864

34

Patent and the '192 Patent through the date that such judgment is entered in accordance with 35 U.S.C. §284, and increase such award by up to three times the amount found or assessed in accordance with 35 U.S.C. §284;

      E.      Declare this case exceptional under 35 U.S.C. §285; and

      F.      Award Plaintiffs their costs, disbursements, attorneys' fees, and such further and additional relief as is deemed appropriate by this Court.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  July 2, 2018

Respectfully Submitted,

*/s/ Jeffrey G. Toler*
Jeffrey G. Toler
Texas State Bar No. 24011201
jtoler@tlgiplaw.com
Aakash S. Parekh
Texas State Bar No. 24059133
aparekh@tlgiplaw.com


TOLER LAW GROUP, PC
8500 Bluffstone Cove, Suite A201
Austin, Texas 78759
Tel. (512) 327-5515
Fax (512) 327-5575

**ATTORNEYS FOR PLAINTIFFS**
**WAPP TECH LIMITED PARTNERSHIP AND**
**WAPP TECH CORP.**

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., <br><br> Plaintiffs <br><br> v. <br><br> WELLS FARGO & CO. <br><br> Defendant | Civil Action No.: 4:18-cv-501 <br><br> JURY TRIAL DEMANDED |

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp. ("Plaintiffs") file this Complaint against Defendant Wells Fargo & Co. ("Defendant" or "Wells Fargo") seeking damages and other relief for patent infringement, and allege with knowledge of their own acts, and on information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.     This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1, et seq.

2.     Plaintiffs seek damages for Defendant's infringement of the Patents-in-Suit, as defined below.

3.     The Patents-in-Suit and their underlying patent applications have been cited by over 30 issued United States patents and published patent applications. Moreover, the World Intellectual Property Association (hereafter "WIPO") has also cited Plaintiffs' Patent Portfolio,

see details below, giving it the highest prior art designation, in rejecting Hewlett-Packard Company's ("HPE" or "HP") patent application filing related to mobile application development.

## PARTIES

4.      Plaintiff Wapp Tech Limited Partnership is a Delaware limited partnership organized and existing under the laws of the State of Delaware, and its registered agent for service of process in Delaware is Corporations & Companies, Inc. (CorpCo), 910 Foulk Road, Suite 201 Wilmington, Delaware 19803.

5.      Plaintiff Wapp Tech Corp. ("WTC") is a body corporate organized and existing under the laws of the Province of Alberta, Canada, and its registered agent for service of process in Delaware is Corporations & Companies, Inc. (CorpCo), 910 Foulk Road, Suite 201 Wilmington, Delaware 19803.

6.      Defendant Wells Fargo & Co. is a corporation organized under the laws of the state of Delaware and maintains its principal place of business in San Francisco, California.

7.      Defendant does business in Texas, directly or through intermediaries, and offers products or services to customers and potential customers located in Texas, including in the Eastern District of Texas.

## JURISDICTION AND VENUE

8.      On information and belief, Defendant is registered to do business in the State of Texas, with a Texas Taxpayer Number of 23040778238.

9.      On information and belief, Defendant conducts business operations throughout the State of Texas, and within the Eastern District of Texas.  Defendant has multiple locations through the State of Texas, and within the Eastern District of Texas, including banking facilities located at:

2

- 4000 Legacy Drive, Plano, TX  75024

- 2912 Legacy Drive, Plano, TX  75024

- 1421 N. Central Expressway, Plano, TX  75094

- 2400 E. Plano Parkway, Plano, TX  75074

- 3300 Preston Road, Plano, TX  75093

- 5968 Preston Park Boulevard, Plano, TX  75093

- 5936 W. Park Boulevard, Plano, TX  75093

- 212 Coit Road, Plano, TX  75075

- 1500 Custer Road, Plano, TX  75075

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Venue is proper under 28 U.S.C. §§ 1391(a) & (c), and 1400(b).

## **INTRODUCTION**

11.    The inspiration for the pioneering patented innovations described herein originates from application development work associated with the 2006 FIFA World Cup sponsored by Adobe and Nokia.  The FIFA World Cup is the largest single-event sporting competition in the world with fans simultaneously accessing the World Cup app from millions of mobile devices around the globe.  Through its development work associated with this international sporting event, the principal inventor of the Patents-in-Suit developed and created its patented performance engineering platform.  Application performance engineering enables software design and testing before it is published to a consumer by simulating real-world conditions for app developers while in the development phase, including device and network virtualization, virtual user modeling and the ability to virtually perform stress and load tests based on modeling human interaction (hereafter "Performance Engineering Innovations").

3

12.     Licensed products incorporating the Performance Engineering Innovations have won numerous industry awards for mobile application development, including multiple JOLT Awards and other industry leading awards for market breakout products.

13.     Patents related to the Performance Engineering Innovations have been licensed by a Fortune 500 leader in enterprise software in a multi-million-dollar license.

14.     In addition, patents in the Plaintiffs' Patent Portfolio, defined below, have been cited against a number of industry-leading companies as prior art by the United States Patent and Trademark Office (hereafter "USPTO") and WIPO.  These companies include:

- Hewlett-Packard
- Apple
- Samsung
- Microsoft
- Google
- Vodafone
- Intuit
- Avaya
- Intel
- Amazon
- HTC
- Nextbit Systems
- CA
- Facebook
- Barco
- Razor
- Adobe

## MICRO FOCUS & HPE

15.     Certain Micro Focus software products that are used by Defendant are alleged herein to infringe the Patents-in-Suit.

16.     On information and belief, Micro Focus and HPE completed a spin-out merger of a software group on September 1, 2017.  Following the spin-out merger, the term "Micro Focus" replaced the term "HPE" in the names of various software products.   For example, HPE

LoadRunner became Micro Focus LoadRunner, HPE Performance Center became Micro Focus Performance Center, etc.

17.     On information and belief, functionality of relevant software products remained consistent following the spin-out merger.  Consequently, where HPE documentation is cited below, it is to be understood that, on information and belief, the referenced functionality also exists in the corresponding Micro Focus software products.

18.     HPE filed Patent Application Ser. No. PCT/US2012/024087 with WIPO on February 7, 2012.

19.     HPE filed Patent Application Ser. No. PCT/US2012/024087 with WIPO in an apparent attempt to protect its soon to be released HP 2012 Software Suite.

20.     On October 31, 2012, WIPO rejected all of the claims in HPE's Patent Application Ser. No. PCT/US2012/024087 as being anticipated solely by U.S. Patent No. 7,813,910 ("the '910 Patent," which is a part of Plaintiffs' Patent Portfolio and a parent of the Patents-in-Suit) after conducting a patent search, and in the process awarded the '910 Patent the highest prior art designation (hereafter "WIPO Patent Rejection").  *See* Exhibit H (Written Opinion of the International Searching Authority for International Patent Application Ser. No. PCT/US2012/024087, rejecting all claims over the '910 Patent (which WIPO designated as reference "D1.")).

21.     On June 12, 2014, WIPO sent an additional supplementary notice to HPE under Rule 47.1(c) stating that under Article 22(1) that the communication of the international application will be affected across all 185 member states, including the United States Patent and Trademark Office.[1]

---

[1]https://patentscope.wipo.int/search/docservicepdf_pct/id00000025143112/IB308/WO2013119205.pdf?psAuth=mM niZixkvHdFvRyOgxrg3IdDA3uV2jaWveIbtORTsgg (accessed June 27, 2018).

22.     Based on the global WIPO Patent Rejection of HPE's patent application filing in October of 2012, and the repeated and supplemental notices from WIPO under Article 22(1) regarding HPE's rejected WIPO patent application, HPE has had actual notice of Plaintiffs' Patent Portfolio and continued to make, use, sell, and offer to sell the Mobile Product Offerings.

23.     Notwithstanding the aforementioned WIPO Patent Rejection of HPE's patent application based on the '910 Patent, the initial and supplemental WIPO notices and its actual knowledge of Plaintiffs' prior patent rights in the mobile performance engineering space, HPE proceeded with commercialization and sales of the HP LoadRunner and HP Performance Center 11.50 offerings in 2012, and with the follow up launch of HP LoadRunner and HP Performance Center 12.0 offerings for "Mobile and Cloud-based Application Testing" in March of 2014, including the subsequent release of HP StormRunner Load in September of 2014 as part of the HP Performance Testing Suite[2] and the follow up release of HP Mobile Center in October of 2014[3], among other additional mobile product offerings (hereafter "Micro Focus Software Suite").[4]

24.     On information and belief, Defendant has been and continues to be a customer of HPE and/or Micro Focus.

25.     Defendant has been and continues to use LoadRunner. B2B Signals, "HPE LoadRunner Product Install Base," available at http://www.b2bsignals.com/customer-list/hpe-loadrunner/ (last accessed July 16, 2018), attached hereto as Exhibit I.

---

[2] PALO ALTO, Calif. In a Press Release dated September 15, 2014 the Defendant stated the following: "HP today expanded the HP Performance Testing Suite with a new software solution focused on helping Agile development teams accelerate application quality and delivery via a simple, intuitive and scalable cloud-based platform.
HP StormRunner Load joins HP's existing performance testing solutions, which include HP LoadRunner and HP Performance Center. The modern enterprise faces a perfect storm of changes that are driving the need for a completely new approach to application delivery and testing. Businesses must develop applications that can instantly operate across a wide variety of platforms including thousands, or millions, of mobile devices." Source: http://www8.hp.com/us/en/hp-news/press-release.html?id=1791344#.WyqigFVKguU (accessed June 27, 2018)
[3] http://www8.hp.com/ca/en/hp-news/press-release.html?id=1825600#.Wy0Um1VKguU (accessed June 27, 2018)
[4]     https://web.archive.org/web/20141205174207/http://www8.hp.com/us/en/software-solutions/mobile-testing/ (accessed June 27, 2018)

26.     Defendant has been making and/or using (including for testing purposes) and continues to make and/or use (including for testing purposes) systems for testing an application for a mobile device, the system for testing ("Accused System") including and not limited to the Micro Focus Software Suite and LoadRunner.  *See* attached Claim Chart for the '678 Patent at Exhibit 4, citing Exhibits A–G; attached Claim Chart for the '864 Patent at Exhibit 5, citing Exhibits A–G; attached Claim Chart for the '192 Patent at Exhibit 6, citing Exhibits A–G.

## TECHNOLOGY BACKGROUND

### NETWORK VIRTUALIZATION

27.     On information and belief, to simulate mobile networks from any geographic location worldwide for mobile application testing (hereafter "Network Virtualization"), Defendant's use of the Accused System enables performance engineers "to virtualize real-world network conditions, analyze test results to detect and remediate performance bottlenecks before deployment and gain custom performance optimization recommendations."[5]   Regarding predecessor versions of Micro Focus software product(s), HPE stated that "integrating [Network Virtualization] with your continuous integration testing process takes your automated CI [continuous integration] tests way beyond traditional functional testing and load testing, delivering to your developers timely actionable analytics and optimization recommendations."[6]  Additionally, HPE stated that "[Network Virtualization] is a vital tool for performance engineers…[and] is fully integrated with HPE LoadRunner, HPE Performance Center and HPE StormRunner Load…[and] HPE Mobile Center."[7]

---

[5] https://www.youtube.com/watch?v=lUznCBjocYw (accessed June 25, 2018).
[6] *Id.*
[7] *Id.*

7

NETWORK PROFILES

28.     On information and belief, as part of the Micro Focus Software Suite, Micro Focus provides a library of real-world mobile and broadband network conditions (hereafter "Network Profiles"), enabling its customers (including Defendant) to have access to a library of real-world data points of point-to-point network conditions recorded around the world.    Micro Focus "provides a library of real-world mobile and broadband network conditions."[8]   Further, "Network Virtualization for Mobile allows tests to be managed and results analyzed from any laptop or Wi-Fi-connected mobile device. The software can import real-world mobile network profiles captured by Micro Focus Network Capture or provided by the Micro Focus Network Virtualization Library of mobile and broadband network conditions."[9]   Network Profiles and cloud-enabled technology has been described as bridging "the gap between development and deployment by enabling your mobile application development team to fully and accurately assess the behavior and impact of the network on mobile apps before they are introduced to end users. By virtualizing real-world mobile network conditions within testing environments, your test results are more reliably predictive of how an application will behave for end users."[10]

VuGEN AND THE VIRTUAL EVENT GENERATOR

29.     On information and belief, to simulate virtual users to load test mobile applications (hereafter "Virtual Users" or "Vuser") within the Micro Focus Software Suite, Micro Focus has offered and continues to offer a virtual event generator (hereafter "Virtual Event Generator").  The Virtual Event Generator is the "primary tool for creating testing scripts that emulate the behavior

---

[8] Micro Focus Network Virtualization for Mobile Data Sheet, Page 1 https://www.microfocus.com/media/data-sheet/network_virtualization_for_mobile_ds.pdf (accessed June 27, 2018).
[9] *Id.*
[10] *Id.*

of real users on your system."[11]  A Virtual User is defined as scripts that replace "real users with virtual users…to emulate the actions of a human user"[12] for load testing.  On information and belief, from a single workstation, Micro Focus has offered and continues to offer a controller to distribute "each Vuser in the scenario to a load generator. The load generator is the machine that executes the Vuser script, enabling the Vuser to emulate the actions of a human user."[13]  The Vuser operates as a single thread process, enabling a single server or computer to emulate the actions of several 100 users to create load against a mobile application.

30.     In March of 2014, HPE migrated its long-standing license model from a standard license to a cloud-based monetization model[14] wherein customers (including Defendant) of an HPE Software Suite (and, subsequently, the Micro Focus Software Suite) would be charged on a per Virtual User basis over a 24-hour time period.[15]  The Micro Focus Software Suite has been offered for sale and is offered for sale based on a cloud-based monetization model.

<u>TRUCLIENT AND SCRIPTED USER EVENT MODELING</u>

31.     On information and belief, to create Virtual Users to interact with scripted events to model human interaction with a native mobile application (hereafter "Scripted User Event Modeling") within the Micro Focus Software Suite, Micro Focus has offered and continues to offer TruClient as a native mobile protocol that provided a way "to record and replay native mobile applications on both Android and iOS devices" to enable "the developer or DevOps engineer to

---

[11] Micro Focus LoadRunner Help Center, https://admhelp.microfocus.com/lr/en/12.56-12.57/help/WebHelp/Content/VuGen/tocs/toc_MainVuGen.htm (accessed June 27, 2018)
[12] Micro Focus LoadRunner Help Center, https://admhelp.microfocus.com/lr/en/12.56-12.57/help/WebHelp/Content/Controller/c_terms_lr.htm (accessed June 27, 2018)
[13] Micro Focus LoadRunner Help Center, *Id.*
[14] http://www8.hp.com/us/en/hp-news/press-release.html?id=1601722#.WzQUBdVKguV (accessed June 27, 2018)
[15] https://software.microfocus.com/en-us/products/loadrunner-load-testing/pricing; https://software.microfocus.com/en-us/products/performance-center/pricing; https://software.microfocus.com/en-us/products/stormrunner-load-agile-cloud-testing/pricing (accessed June 27, 2018)

record user interactions on the mobile application and create a TruClient script"[16] (hereafter "Scripted User Event Modeling") to simulate "multiple virtual users (Vusers)" during the load test's execution.[17]   Additionally, "the script can be enhanced using standard TruClient functionality including parameterization, transactions and JavaScript coding."[18] Together with the [Micro Focus] Virtual User Suite of Products, this "protocol is meant for end-user performance testing…[and] completes the LoadRunner mobile performance testing suite."[19]

STORMRUNNER LOAD

32.   On information and belief, Micro Focus's StormRunner product provides the ability to create a "real-world scenario by generating load from global cloud regions to emulate real networks during load tests."[20]  "StormRunner Load initializes on demand load generation machines in the private or public cloud"[21] to dynamically "Scale from 1 tester to 2,000,000 or more geographically distributed"[22] Virtual Users (hereafter "Cloud-based Load Server Modeling"). StormRunner provides a cloud-based performance testing solution that enables Agile development teams to ensure app scalability up to millions of distributed mobile users.[23]

MICRO FOCUS MOBILE CENTER AND DEVELOPMENT SERVER

33.   On information and belief, Defendant has used and continues to use Micro Focus Mobile Center, "a standalone server that provides mobile device access to different test applications. [Micro Focus] Mobile Center supports a distributed architecture where different test

---

[16] https://community.softwaregrp.com/t5/LoadRunner-and-Performance/Introduction-to-LoadRunner-s-new-TruClient-Native-Mobile/ba-p/269441#Wyg06FVKguV
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] https://software.microfocus.com/en-us/products/stormrunner-load-agile-cloud-testing/overview (accessed June 27, 2018)
[21] *Id.*
[22] *Id.*
[23] *Id.*

clients can all interact with the same Mobile Center server instance."[24]  On information and belief, Defendant has used and continues to use Micro Focus Mobile Center to gain an "accurate picture of the end-to-end mobile performance" by combining "virtual users and real devices" to run "elastic, and realistic tests from multiple geographies across various real-world network conditions"[25] and "mediates between the testing-tool client calls to mobile devices" by providing "a user interface within the testing tool for recording and running tests on real mobile devices"[26] (hereafter "Cloud-based Mobile Center").

34.     On information and belief, "Mobile Center is a core component of [the] mobile app development lifecycle" and is integrated with "Application Lifecycle Management (ALM), AppPulse Mobile, Business Process Monitoring, Business Process Testing, Fortify On Demand, LoadRunner, Network Virtualization (NV), Performance Center, Sprinter, StormRunner Load, UFT and UFT Pro"[27] (hereafter "Micro Focus Mobile Center Suite of Products").[28]

## FACTUAL ALLEGATIONS

### PATENTS-IN-SUIT

35.     Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 9,971,678 (the "'678 Patent", attached as Exhibit 1), entitled "Systems including device and network simulation for mobile application development," issued on May 15, 2018.

---

[24] http://mobilecenterhelp.saas.hpe.com/docs/en/2.20/mobilecenter_help/Content/HPMC_architecture.htm (accessed June 27, 2018)
[25] https://software.microfocus.com/en-us/products/mobile-testing/overview (accessed June 27, 2018)
[26] http://mobilecenterhelp.saas.hpe.com/docs/en/2.20/mobilecenter_help/Content/HPMC_architecture.htm (accessed June 27, 2018)
[27] https://community.softwaregrp.com/t5/Quality-and-Testing-Blog/Introducing-Mobile-Center-2-5-improve-your-mobile-testing/ba-p/1593254#.Wyg_71VKguU (accessed June 27, 2018)
[28] https://www.youtube.com/watch?v=6QyrWGSGq-c (accessed June 27, 2018) and
https://www.youtube.com/watch?v=FkJkIe1H_rM (accessed June 27, 2018)

36.    Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 9,298,864 (the "'864 Patent", attached as Exhibit 2), entitled "System Including Network Simulation for Mobile Application Development," issued on March 29, 2016.

37.    Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 8,924,192 (the "'192 Patent", attached as Exhibit 3), entitled "Systems including network simulation for mobile application development and online marketplaces for mobile application distribution, revenue sharing, content distribution, or combinations thereof," issued on December 30, 2014.

38.    Together, the foregoing patents are referred to as the "Patents-in-Suit".  Plaintiffs are the assignee of the Patents-in-Suit and have all substantial rights to sue for infringement and collect past and future damages for the infringement thereof.

39.    The foregoing patents, and any related patents in the family, are herein referred to collectively and individually as the "Plaintiffs' Patent Portfolio" respectively.

## DAMAGES, PLAINTIFFS' PORTFOLIO, AND THE APP ECONOMY

40.    Mobile apps and the tools to develop and test mobile apps have become paramount to the U.S. economy.  According to a 2012 white paper released by renowned Dr. Michael Mandel titled the 'App Economy', the App Developer community represented the second largest IT segment in the United States in 2012 with over 466,000 jobs created in the U.S. economy alone, up from nearly zero in 2008 when the App Store was initially launched (hereafter "App Economy").[29]

41.    Plaintiffs' goal has been to democratize app development for a new generation of developers by mitigating performance risks and reducing application development cycles from

---

[29] http://business.time.com/2012/02/08/the-app-economy-estimated-to-contribute-nearly-half-a-million-jobs-to-the-u-s/ (accessed June 27, 2018)

months down to minutes by virtue of new performance engineering modeling.  At the time of Plaintiffs' provisional patent filing in June of 2005, Apple had not launched the iPhone (June of 2007), there was no App Store (July of 2008), Google's Android platform had not been released (September of 2008), the Samsung Galaxy family of devices had not been released (June of 2009) and the mobile app ecosystem that we know today was still in its infancy.

42.     In Dr. Mandel's App Economy white paper, the renowned economist contributes two driving innovations behind the App Economy: (a) the ease of app development; and (b) the ease of app delivery.  With respect to the former, Plaintiffs' Patent Portfolio describes many of the core innovations in modern application development that accelerate the development of applications and enhances the mobile device consumer experience on the client side.

43.     In alignment with Dr. Mandel's thesis concerning the importance of facilitating application development, the Plaintiffs' patented technologies, with a focus on accelerating application development for performance engineers, helped to enable a new generation of app developers to lay the foundation for the emerging App Economy (hereafter "App Developers").

44.     App Developers play an integral role in the app ecosystem, and Plaintiffs' patented innovations, with a focus on accelerating application development for performance engineers, have ushered in a new generation of smart developer tools and contributed significantly to the growth of the App Economy.

45.     Application performance and access to data in the cloud are paramount to the user experience for a new generation of data hungry applications.  Supporting this premise is a quote from HPE's Paul Whiten, Applications Business Unit Lead, stating that "We now live in a mobile and app-centric world, and the ability to deliver a consistent and enjoyable app experience has

13

never been more important."[30]  If a mobile application fails, 48% of users are less likely to ever use the app again. 34% of users will simply switch to a competitor's application and 31% of users will tell friends about their poor experience, which eliminates future customers.[31]  A change in latency from 2ms (broadband) to 400ms (3G network) can cause a mobile page load to go from 1 second to 30 seconds.[32]  Google reported that a mere 0.5 to 1.0-second increase in page load time resulted in a 20% decrease in traffic and revenue.  The average U.S. retail mobile site loaded in 6.9 seconds in July of 2016, and according to the most recent data presented by Google, 40% of consumers will leave a page that takes longer than three seconds to load.[33]

46.     According to HPE's studies, *"over 70% of the performance of a mobile app is dependent on the network,"[34]* and in another study HPE further stated that "80% of the costs associated with application development occur in remediating failed or underperforming applications after deployment, when the ineffective application has already had a negative impact on the end user or customer experience."[35]

47.     In 2018, 52.2 percent of all website traffic worldwide was generated through a mobile device.[36]  In the United States, not even Black Friday was immune from the influence of mobile as nearly 40% of sales on the traditional brick and mortar shopping day came from a mobile device. With 30% of all online shopping happening on mobile phones and with 89% of executives

---

[30] http://www8.hp.com/ca/en/hp-news/press-release.html?id=1825600#.W0z1-tVKguV (accessed July 16, 2018)
[31] https://www.marketingcharts.com/digital-27846 (accessed June 27, 2018)
[32] https://www.slideshare.net/xbosoft/mobile-network-performance-testing (accessed June 27, 2018)
[33] https://www.thinkwithgoogle.com/marketing-resources/experience-design/mobile-page-speed-load-time/ (accessed June 27, 2018)
[34] Exhibit A
[35] http://media.shunra.com/datasheets/Shunra-NetworkCatcher.pdf (accessed June 27, 2018)
[36] https://www.statista.com/statistics/241462/global-mobile-phone-website-traffic-share/ (accessed June 27, 2018)

believing that customer experience will be their primary mode of competition, the consumer experience via a company's mobile app has never been so prevalent.[37]

48.     In a recent study released by Micro Focus, over 50 percent of respondents indicated the need to remediate at least four application production incidents per month and the average days required to resolve a production incident was six.[38]  Micro Focus further stated that the average remediation cost per incident was $88,000 USD and the highest reported cost was $500,000 USD per incident.[39]  Micro Focus stated that "it is important to note that this is the remediation cost alone; it is not an accounting of the total impact on the business."[40]  A single security breach of a customer's financial banking information via a mobile app can cause a massive client exodus.

49.     Millennials, in particular, are much less forgiving concerning their application experience and will unapologetically delete an app just because the logo is not appealing.[41]  It is safe to assume that a customer's bank finances are much more important to them then a logo. These facts suggests a shrinking margin of error for performance issues especially when it is considered that 67% of Millennials now use mobile banking as their primary engagement with their bank compared to 18% for those consumers aged 60 or over.[42]  In a recent study in the UK, Millennials now trust their App more than a teller at a brick and mortar bank, and 27% of Millennials are now completely reliant on a mobile Banking App.[43]  In the next 3-4 years, 33% of Millennials may choose to completely abandon traditional brick and mortar Banking in lieu of a

---

[37] https://www.outerboxdesign.com/web-design-articles/mobile-ecommerce-statistics (accessed June 27, 2018)
[38] Micro Focus The Value of Proactive Application Performance, http://files.asset.microfocus.com/4aa6-6409/en/4aa6-6409.pdf  (accessed June 27, 2018)
[39] *Id.*
[40] *Id.*
[41] https://www.comscore.com/Insights/Blog/5-Interesting-Facts-About-Millennials-Mobile-App-Usage-from-The-2017-US-Mobile-App-Report (accessed June 27, 2018)
[42] https://www.federalreserve.gov/consumerscommunities/mobile_finance.htm
[43] https://www.salesforce.com/blog/2016/03/stats-about-millennials-mobile-banking.html (accessed June 27, 2018)

mobile app.[44]  With over 50% of the United States workforce projected to be made up of 'App First Millennials' by 2020,[45] it is clear why Micro Focus entered into the spin-out merger with HPE to move into the Mobile-first product model.  The vast majority of Micro Focus's downstream clients (including Defendant) have also initiated a 'Mobile-First' strategy to 'mobilize' their customer base to engage a new era of app users and as a result, have relied on the mobile testing products offered by Micro Focus.

50.     Defendant reported more than 22 million mobile active users in its most recent quarterly earnings statement attached hereto as Exhibit J.[46]  Mobile banking users, therefore represent close to a third of its 70 million customers globally.[47]  With this many users and with up to 90 percent of financial transactions now taking place online or through mobile banking, it is safe to assume that many users access the Defendant's bank app simultaneously (i.e., to check balances, make deposits or use a digital wallet) making stress testing crucial to application performance and to maintain user trust.[48]  For banks, maintenance of trust is especially critical since a recent UK study determined that millennials now trust their banking application more than a teller at a brick and mortar bank, and 27% of Millennials are now completely reliant on a mobile banking App.[49]

---

[44] https://www.temenos.com/en/market-insight/universal-insight/33-of-millennials-believe-they-wont-need-a-bank-at-all-in-5-years-we-think-different/ (accessed June 27, 2018)
[45] https://www.forbes.com/workforce-2020/ (accessed June 27, 2018)
[46] Wells Fargo Quarterly Earnings Statement (2nd Qtr, 2018), https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/earnings/second-quarter-2018-earnings.pdf (accessed July 16, 2018)
[47] https://en.wikipedia.org/wiki/Wells_Fargo, (accessed July 16, 2018)
[48] Millennials Help Accelerate Banking Evolution, https://www.businessnhmagazine.com/article/millennials-help-accelerate-bankingamp39s-evolution, (accessed July 16, 2018), see also https://www.forbes.com/sites/forbestechcouncil/2017/05/16/mobile-banking-exploring-trends-for-market-leadership/#23643afe6962 (accessed July 16, 2018)
[49] https://www.salesforce.com/blog/2016/03/stats-about-millennials-mobile-banking.html, (accessed July 16, 2018)

<u>ROYALTY DEMAND BY PLAINTIFFS</u>

51.     Banks, by the sheer volume and number of active daily users, would appear to have a significant need for virtual user and network virtualization testing now and in the future.   With 72% of millennials now active users of mobile banking,[50] bringing with them their particular sensitivity around application performance, ensuring proper performance through testing to maintain trust is critical.

52.     Further, with mobile phone sales expected to reach 2.1 billion units by 2019, or approximately one-third of the world's population,[51] the pace of the growth in the number of mobile banking users driving this already unprecedented mobile demand will likely continue.

53.     In light of the collective facts herein, specifically the network virtualization testing, the large number of simultaneous active daily users necessitating the virtual user testing that we believe Defendant is executing in violation of Plaintiff's Patent Portfolio, the high growth of overall financial transactions on mobile applications, the high percentage of millennials using mobile applications, and the steady growth of mobile phone sales,  using a reasonable royalty rate, the patent royalties owed by Defendant to Plaintiffs are significant.

## **COUNT I**

(Infringement of United States Patent No. 9,971,678)

54.     Plaintiffs incorporate the paragraphs above herein by reference.

55.     On May 15, 2018, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 9,971,678 (the "'678 Patent") entitled "Systems Including Device and Network Simulation for Mobile Application Development" on an

---

[50] https://www.temenos.com/en/market-insight/universal-insight/33-of-millennials-believe-they-wont-need-a-bank-at-all-in-5-years-we-think-different/ (accessed July 16, 2018)
[51] *Id.*

17

application filed Dec. 23, 2014, United States Patent Application Ser. No. 14/581,475.  The '678

Patent is a continuation of United States Patent Application Ser. No. 13/673,692, filed Nov. 9,

2012 and issued as United States Pat. No. 8,924,192, on Dec. 30, 2014, which is a continuation of

United States Patent Application Ser. No. 12/759,543, filed April 13, 2010 and issued as United

States Pat. No. 8,332,203, on Dec. 11, 2012, which is a continuation of United States Patent

Application Ser. No. 11/449,958, filed Jun. 9, 2006 and issued as United States Pat. No. 7,813,910,

on Oct. 12, 2010, which application claims priority to United States Patent Application Ser. No.

60/689,101 filed Jun. 10, 2005.

56.     The '678 Patent is presumed valid and enforceable.

57.     Plaintiffs are the sole owner of the '678 Patent.

58.     Defendant without authorization has been and is directly infringing at least Claim

1 of the '678 Patent, including making and/or using (including for testing purposes) and continues

to make and/or use (including for testing purposes) the Accused System. *See* attached Claim Chart

for the '678 Patent at Exhibit 4, citing Exhibits A–G.

59.     The '678 Patent describes systems that address technical problems related to

simulating network systems to determine performance of the mobile device.  *See, e.g.,* '678 Patent

at col. 10, lines 34-44 [simulated network environment] to col. 13, line 47 [includes Figures 8

through 13].

60.     The '678 Patent describes systems that enable a performance engineer to view

application performance data to mitigate performance risks.  *See, e.g.,* '678 Patent at col. 7, lines

29-40 and col. 8, lines 45-56 [profile data 110 is stored or displayed to identify performance of the

application].

61.     The '678 Patent describes systems that include providing a network model library of real-world mobile network characteristics, *see, e.g.,* '678 Patent at col. 2, lines 5-9 [geographical markets], col. 11, lines 49-59 and col. 12, lines 3-25 [Figure 9 and geographical map] to enable a user to import the network profiles, *see, e.g.,* '678 Patent at col. 12, lines 50-53 [import network profiles] into the testing environment, *see, e.g.,* '678 Patent at col. 10, lines 59-66 to col. 11, lines 1-14 [download network profiles].

62.     Technological improvements described and claimed in the '678 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time. *See, e.g.*, '678 Patent at col. 2, lines 5-9, col. 11, lines 60-67 and col. 12, line 2.

63.     The written description of the '678 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic, or routine. *See, e.g.,* '678 Patent at col. 10, lines 34-44 [simulated network environment] to col. 13, line 47 [includes Figures 8 through 13].

64.     The '678 Patent represents a substantial technical improvement in the area of simulating network systems to determine performance of the mobile device. As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against Apple, Intel, Google, Adobe and Amazon. *See* https://patents.google.com/patent/US9971678/en

19

(last accessed June 28, 2018). A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

65.     Viewed in light of the specification of the '678 Patent, the claims are **not directed** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

66.     The '678 Patent claims are **not directed** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

67.     The '678 Patent claims are **not directed** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

68.     The '678 Patent **does not** take a well-known or established business method or process and apply it to a general-purpose computer.

69.     As noted by United States Patents, foreign patent documents, and other publications cited by the '678 Patent, the '678 Patent **does not** preempt the field of its invention or preclude use of other methods and systems of simulating network systems to determine performance of the mobile device.

70.     As a result of Defendant's infringement of the '678 Patent, Plaintiffs have suffered and will continue to suffer damages.

71.     Defendant will continue to infringe unless this Court enjoins Defendant and its agents, servants, employees, representatives, and all others acting in active concert with Defendant from infringing the '678 Patent.

**COUNT II**

20

(Infringement of United States Patent No. 9,298,864)

72.     Plaintiffs incorporate the paragraphs above herein by reference.

73.     On March 29, 2016, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 9,298,864 (the "'864 Patent") entitled "System Including Network Simulation for Mobile Application Development" on an application filed Nov. 19, 2013, United States Patent Application Ser. No. 14/084,321.  The '864 Patent is a divisional of United States Application Ser. No. 12/705,913, filed Feb. 15, 2010 (now United States Pat. No. 8,589,140), which claims priority to United States Application Ser. No. 61/152,934, filed Feb. 16, 2009, and is a continuation-in-part of United States Application Ser. No. 11/449,958, filed Jun. 9, 2006 (now U.S. Pat. No. 7,813,910), which claims priority to United States Application Ser. No. 60/689,101, filed Jun. 10, 2005.

74.     The '864 Patent is presumed valid and enforceable.

75.     Plaintiffs are the sole owner of the '864 Patent.

76.     Defendant without authorization has been and is directly infringing at least Claim 1 of the '864 Patent, including making and/or using (including for testing purposes) and continues to make and/or use (including for testing purposes) the Accused System.  *See* attached Claim Chart for the '864 Patent at Exhibit 5, citing Exhibits A–G.

77.     The '864 Patent describes systems that address technical problems related to simulating network systems to determine performance of the mobile device.  *See, e.g.,* '864 Patent at col. 9, line 60 through col. 10, line 3 [simulated network environment] to col. 13, line 4 [includes Figures 8 through 13].

78.     The '864 Patent describes systems that simulate virtual users to load test mobile applications by using an event generator to create scripts to emulate and model human behavior to

determine performance of either the network or the mobile application.  *See, e.g.,* '864 Patent at col. 10, lines 57-65 [event generator + scripted effects], col 11, lines 7-17 [event generator + bandwidth], col. 11, lines 51-67 [scripted events + human interaction].  The '864 Patent further describes systems that enable the performance engineer to simulate real-world scenarios by generating load from multiple geographies to emulate real networks during load tests.  *See, e.g.,* '864 Patent at col. 11, lines 51-67 [scripted events + consumer events + performance], Figures 9, 10, 11, 12 and 13, col. 12, lines 8-11 [storage 134] and col. 12, lines 18-22 [geographic locations].

79.     The '864 Patent describes systems that enable the performance engineer to interact with the virtual users by providing scripts to record and replay user interactions on the mobile device to emulate real networks during load tests.  *See, e.g.,* '864 Patent at col. 11, lines 51-67 [scripted events + consumer events + performance], Figures 12 [Load Server] and 13, col. 12, lines 8-11 [storage 134] and col. 12, lines 18-22 [geographic locations].

80.     The '864 Patent describes systems that include a developer server that provides a library of mobile devices to enable the performance engineer to combine virtual users and real devices to run tests from multiple geographies across real-world network conditions.  *See, e.g.,* '864 Patent at col. 2, lines 3-7 [mobile devices in geographical markets], col. 3, lines 4-7 [development server + Internet], col. 9, line 60 to col. 10, line 3 [developer server + mobile device, figures 8-13], col. 11, lines 18-27 [developer server + networks worldwide], and col. 12, lines 8-11 [storage 134].

81.     The '864 Patent describes systems that enable a performance engineer to view application performance data to mitigate performance risks.  *See, e.g.,* '864 Patent at col. 6, lines 46-57 [profile data 110 is stored or displayed to identify performance of the application].

22

82.     Technological improvements described and claimed in the '864 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time.  *See, e.g.,* '864 Patent at col. 2, lines 3-7 and col. 11, lines 18-27.

83.     The written description of the '864 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic, or routine.  *See, e.g.,* '864 Patent at col. col. 9, line 60 to col. 10, line 3 [simulated network environment] to col. 13, line 3 [includes Figures 8 through 13].

84.     The '864 Patent represents a substantial technical improvement in the area of mobile performance engineering.  As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against Apple, Intel, Adobe, Facebook, Ca, Amazon, Vodafone and Telecom Italia S.p.A.  *See* https://patents.google.com/patent/US9298864B2/en (last accessed June 26, 2018).  A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

85.     Viewed in light of the specification of the '864 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

86.     The '864 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of

23

a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

87.     The '864 Patent claims are **not directed** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

88.     The '864 Patent **does not** take a well-known or established business method or process and apply it to a general-purpose computer.

89.     As noted by United States Patents, foreign patent documents, and other publications cited by the '864 Patent, the '864 Patent **does not** preempt the field of its invention or preclude use of other methods and systems of simulating network systems in the area of mobile performance engineering.

90.     As a result of Defendant's infringement of the '864 Patent, Plaintiffs have suffered and will continue to suffer damages.

91.     Defendant will continue to infringe unless this Court enjoins Defendant and its agents, servants, employees, representatives, and all others acting in active concert with Defendant from infringing the '864 Patent.

## <u>COUNT III</u>

(Infringement of United States Patent No. 8,924,192)

92.     Plaintiffs incorporate the paragraphs above herein by reference.

93.     On Dec. 30, 2014 the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 8,924,192 ("the'192 Patent") entitled "Systems Including Network Simulation for Mobile Application Development and Online Marketplaces for Mobile Application Distribution, Revenue Sharing, Content Distribution, or Combinations thereof" on an application filed Nov. 9, 2012, United States Patent Application Ser. No.

13/673,692.   The '192 Patent is a continuation of United States Patent Application Ser. No. 12/759,543, filed Apr. 13, 2010, which is a continuation of United States Patent Application Ser. No. 11/449,958, filed Jun. 9, 2006, and issued as United States Pat. No. 7,813,910, on Oct. 12, 2012, which application claims priority to United States Patent Application Ser. No. 60/689,101 filed Jun. 10, 2005.

94.     The '192 Patent is presumed valid and enforceable.

95.     Plaintiffs are the sole owner of the '192 Patent.

96.     Defendant Defendant without authorization has been and is directly infringing at least Claim 1 of the '192 Patent, including making and/or using (including for testing purposes) and continues to make and/or use (including for testing purposes) the Accused System.  *See* attached Claim Chart for the '192 Patent at Exhibit 6, citing Exhibits A–G.

97.     The '192 Patent describes systems that address technical problems related to simulating network systems to determine performance of the mobile device.  *See, e.g.,* '192 Patent at col. 10, lines 15-25 [simulated network environment] to col. 13, line 23 [includes Figures 8 through 13].

98.     The '192 Patent describes systems that enable a performance engineer to view application performance data to mitigate performance risks.  *See, e.g.,* '192 Patent at col. 7, lines 14-25 and col. 8, lines 27-38 [profile data 110 is stored or displayed to identify performance of the application].

99.     The '192 Patent describes systems that include providing a network model library of real-world mobile network characteristics, *see, e.g.,* '192 Patent at col. 2, lines 4-8 [geographical markets], col. 11, lines 28-38 and col. 11, line 49 to col. 12, line 2 [Figure 9] to enable a user to import the network profiles, *see, e.g.,* '192 Patent at col. 12, lines 28-31 [import network profiles]

into the testing environment, *see, e.g.,* '192 Patent at col. 10, lines 40-47 to col. 10, lines 51-62 [download network profiles].

100. Technological improvements described and claimed in the '192 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time. *See, e.g.,* '192 Patent at col. 2, lines 4-8 and col. 11, lines 39-48.

101. The written description of the '192 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic, or routine. *See, e.g.,* '192 Patent at col. 10, lines 15-25 [simulated network environment] to col. 13, line 23 [includes Figures 8 through 13].

102. The '192 Patent represents a substantial technical improvement in the area of simulating network systems to determine performance of the mobile device. As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against Google, Apple, Adobe, Amazon, and Intel. *See* https://patents.google.com/patent/US8924192B1/en (last accessed June 26, 2018). A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

103. Viewed in light of the specification of the '192 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

26

104.    The '192 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

105.    The '192 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

106.    The '192 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer.

107.    As noted by United States Patents, foreign patent documents, and other publications cited by the '192 Patent, the '192 Patent ***does not*** preempt the field of its invention or preclude use of other methods and systems of simulating network systems to determine performance of the mobile device.

108.    As a result of Defendant's infringement of the '192 Patent, Plaintiffs have suffered and will continue to suffer damages.

109.    Defendant will continue to infringe unless this Court enjoins Defendant and its agents, servants, employees, representatives, and all others acting in active concert with Defendant from infringing the '192 Patent.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Enter judgment that Defendant has infringed and continues to infringe one or more claims of the '678 Patent literally or under the doctrine of equivalents;

B.      Enter judgment that Defendant has infringed and continues to infringe one or more claims of the '864 Patent literally or under the doctrine of equivalents;

C.      Enter judgment that Defendant has infringed and continues to infringe one or more claims of the '192 Patent literally or under the doctrine of equivalents;

D.      Award Plaintiffs past damages, to be paid by Defendant, in an amount no less than a reasonable royalty and adequate to compensate Plaintiffs for such damages, together with pre-judgment and post-judgment interest for Defendant's infringement of the '678 Patent, the '864 Patent and the '192 Patent through the date that such judgment is entered in accordance with 35 U.S.C. §284, and increase such award by up to three times the amount found or assessed in accordance with 35 U.S.C. §284;

E.      Enjoin Defendant from continuing to infringe the '678 Patent, the '864 Patent, and the '192 Patent;

F.      Declare this case exceptional under 35 U.S.C. §285; and

G.      Award Plaintiffs their costs, disbursements, attorneys' fees, and such further and additional relief as is deemed appropriate by this Court.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  July 16, 2018                          Respectfully Submitted,

                                               /s/ Jeffrey G. Toler
                                               Jeffrey G. Toler
                                               Texas State Bar No. 24011201
                                               jtoler@tlgiplaw.com
                                               Aakash S. Parekh
                                               Texas State Bar No. 24059133
                                               aparekh@tlgiplaw.com
                                               Benjamin R. Johnson
                                               Texas State Bar No. 24065495
                                               bjohnson@tlgiplaw.com


                                               TOLER LAW GROUP, PC
                                               8500 Bluffstone Cove, Suite A201
                                               Austin, Texas 78759
                                               Tel. (512) 327-5515
                                               Fax (512) 327-5575

                                               ATTORNEYS FOR PLAINTIFF
                                               WAPP TECH LIMITED PARTNERSHIP AND
                                               WAPP TECH CORP.

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., <br><br> Plaintiffs <br><br> v. <br><br> BANK OF AMERICA CORP., <br><br> Defendant | Civil Action No.: 4:18-cv-519 <br><br> JURY TRIAL DEMANDED |

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp. ("Plaintiffs") file this Complaint against Defendant Bank of America Corp. ("Defendant" or "Bank of America") seeking damages and other relief for patent infringement, and allege with knowledge of their own acts, and on information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1, et seq.

2.      Plaintiffs seek damages for Defendant's infringement of the Patents-in-Suit, as defined below.

3.      The Patents-in-Suit and their underlying patent applications have been cited by over 30 issued United States patents and published patent applications.  Moreover, the World Intellectual Property Association (hereafter "WIPO") has also cited Plaintiffs' Patent Portfolio,

see details below, giving it the highest prior art designation, in rejecting Hewlett-Packard Company's ("HPE" or "HP") patent application filing related to mobile application development.

## PARTIES

4.      Plaintiff Wapp Tech Limited Partnership is a Delaware limited partnership organized and existing under the laws of the State of Delaware, and its registered agent for service of process in Delaware is Corporations & Companies, Inc. (CorpCo), 910 Foulk Road, Suite 201 Wilmington, Delaware 19803.

5.      Plaintiff Wapp Tech Corp. ("WTC") is a body corporate organized and existing under the laws of the Province of Alberta, Canada, and its registered agent for service of process in Delaware is Corporations & Companies, Inc. (CorpCo), 910 Foulk Road, Suite 201 Wilmington, Delaware 19803.

6.      Defendant Bank of America Corp. is a corporation organized under the laws of the state of Delaware and maintains its principal place of business in Charlotte, North Carolina.

7.      Defendant does business in Texas, directly or through intermediaries, and offers products or services to customers and potential customers located in Texas, including in the Eastern District of Texas.

## JURISDICTION AND VENUE

8.      On information and belief, Defendant is registered to do business in the State of Texas, with a Texas Taxpayer Number of 15609066095.

9.      On information and belief, Defendant conducts business operations throughout the State of Texas, and within the Eastern District of Texas.  Defendant has multiple locations through the State of Texas, and within the Eastern District of Texas, including banking facilities located at:

- 5701 Legacy Drive, Plano, TX  75024

- 5952 West Parker Road, Plano, TX  75093

- 1925 Dallas Parkway, Plano, TX  75093

- 3760 Highway 121, Plano, TX  75025

- 3260 Preston Road, Plano, TX  75093

- 7001 Independence Parkway, Plano, TX  75025

- 2015 Coit Road, Plano, TX  75075

- 2400 North Central Expressway, Plano, TX 75074

- 113 East FM 544, Plano, TX  75094

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Venue is proper under 28 U.S.C. §§ 1391(a) & (c), and 1400(b).

## **INTRODUCTION**

11.     The inspiration for the pioneering patented innovations described herein originates from application development work associated with the 2006 FIFA World Cup sponsored by Adobe and Nokia.  The FIFA World Cup is the largest single-event sporting competition in the world with fans simultaneously accessing the World Cup app from millions of mobile devices around the globe.  Through its development work associated with this international sporting event, the principal inventor of the Patents-in-Suit developed and created its patented performance engineering platform.  Application performance engineering enables software design and testing before it is published to a consumer by simulating real-world conditions for app developers while in the development phase, including device and network virtualization, virtual user modeling and the ability to virtually perform stress and load tests based on modeling human interaction (hereafter "Performance Engineering Innovations").

3

12.     Licensed products incorporating the Performance Engineering Innovations have won numerous industry awards for mobile application development, including multiple JOLT Awards and other industry leading awards for market breakout products.

13.     Patents related to the Performance Engineering Innovations have been licensed by a Fortune 500 leader in enterprise software in a multi-million-dollar license.

14.     In addition, patents in the Plaintiffs' Patent Portfolio, defined below, have been cited against a number of industry-leading companies as prior art by the United States Patent and Trademark Office (hereafter "USPTO") and WIPO.  These companies include:

- Hewlett-Packard
- Apple
- Samsung
- Microsoft
- Google
- Vodafone
- Intuit
- Avaya
- Intel
- Amazon
- HTC
- Nextbit Systems
- CA
- Facebook
- Barco
- Razor
- Adobe

## MICRO FOCUS & HPE

15.     Certain Micro Focus software products that are used by Defendant are alleged herein to infringe the Patents-in-Suit.

16.     On information and belief, Micro Focus and HPE completed a spin-out merger of a software group on September 1, 2017.  Following the spin-out merger, the term "Micro Focus" replaced the term "HPE" in the names of various software products.   For example, HPE

LoadRunner became Micro Focus LoadRunner, HPE Performance Center became Micro Focus Performance Center, etc.

17.    On information and belief, functionality of relevant software products remained consistent following the spin-out merger.  Consequently, where HPE documentation is cited below, it is to be understood that, on information and belief, the referenced functionality also exists in the corresponding Micro Focus software products.

18.    HPE filed Patent Application Ser. No. PCT/US2012/024087 with WIPO on February 7, 2012.

19.    HPE filed Patent Application Ser. No. PCT/US2012/024087 with WIPO in an apparent attempt to protect its soon to be released HP 2012 software suite that included mobile application testing.

20.    On October 31, 2012, WIPO rejected all of the claims in HPE's Patent Application Ser. No. PCT/US2012/024087 as being anticipated solely by U.S. Patent No. 7,813,910 ("the '910 Patent," which is a part of Plaintiffs' Patent Portfolio and a parent of the Patents-in-Suit) after conducting a patent search, and in the process awarded the '910 Patent the highest prior art designation (hereafter "WIPO Patent Rejection").  *See* Exhibit H (Written Opinion of the International Searching Authority for International Patent Application Ser. No. PCT/US2012/024087, rejecting all claims over the '910 Patent (which WIPO designated as reference "D1.")).

21.    On June 12, 2014, WIPO sent an additional supplementary notice to HPE under Rule 47.1(c)) stating that under Article 22(1) that the communication of the international

application will be affected across all 185 member states, including the United States Patent and Trademark Office.[1]

22.     Based on the global WIPO Patent Rejection of HPE's patent application filing in October of 2012, and the repeated and supplemental notices from WIPO under Article 22(1) regarding HPE's rejected WIPO patent application, HPE has had actual notice of Plaintiffs' Patent Portfolio.

23.     Notwithstanding the aforementioned WIPO Patent Rejection of HPE's patent application based on the '910 Patent, the initial and supplemental WIPO notices and its actual knowledge of Plaintiffs' prior patent rights in the mobile performance engineering space, HPE proceeded with commercialization and sales of the HP LoadRunner and HP Performance Center 11.50 offerings in 2012, and with the follow up launch of HP LoadRunner and HP Performance Center 12.0 offerings for "Mobile and Cloud-based Application Testing" in March of 2014, including the subsequent release of HP StormRunner Load in September of 2014 as part of the HP Performance Testing Suite[2] and the follow up release of HP Mobile Center in October of 2014[3], among other additional mobile product offerings.  As noted above, after the HPE-Micro Focus spin-out merger, these product offerings were renamed using the term Micro Focus, and therefore they are hereafter referred to as "Micro Focus Software Suite".[4]

---

[1]https://patentscope.wipo.int/search/docservicepdf_pct/id00000025143112/IB308/WO2013119205.pdf?psAuth=mM niZixkvHdFvRyOgxrg3IdDA3uV2jaWveIbtORTsgg (accessed June 27, 2018)
[2] PALO ALTO, Calif. In a Press Release dated September 15, 2014 the Defendant stated the following: "HP today expanded the HP Performance Testing Suite with a new software solution focused on helping Agile development teams accelerate application quality and delivery via a simple, intuitive and scalable cloud-based platform.
HP StormRunner Load joins HP's existing performance testing solutions, which include HP LoadRunner and HP Performance Center. The modern enterprise faces a perfect storm of changes that are driving the need for a completely new approach to application delivery and testing. Businesses must develop applications that can instantly operate across a wide variety of platforms including thousands, or millions, of mobile devices." Source: http://www8.hp.com/us/en/hp-news/press-release.html?id=1791344#.WyqigFVKguU (accessed June 27, 2018)
[3] http://www8.hp.com/ca/en/hp-news/press-release.html?id=1825600#.Wy0Um1VKguU (accessed June 27, 2018)
[4]      https://web.archive.org/web/20141205174207/http://www8.hp.com/us/en/software-solutions/mobile-testing/ (accessed June 27, 2018)

24.     On information and belief, Defendant has been and continues to be a customer of HPE and/or Micro Focus.

25.     Defendant is currently seeking a "Performance Test Engineer" in Plano, Texas. Among the "Required Skills" for this position is "[s]trong experience in LoadRunner."  Exhibit I.

26.     Defendant has been making and/or using (including for testing purposes) and continues to make and/or use (including for testing purposes) systems for testing an application for a mobile device, the system for testing ("Accused System") including and not limited to the Micro Focus Software Suite, which includes LoadRunner.  *See* attached Claim Chart for the '678 Patent at Exhibit 4, citing Exhibits A–G; attached Claim Chart for the '864 Patent at Exhibit 5, citing Exhibits A–G; attached Claim Chart for the '192 Patent at Exhibit 6, citing Exhibits A–G.

## TECHNOLOGY BACKGROUND

### NETWORK VIRTUALIZATION

27.     On information and belief, to simulate mobile networks from any geographic location worldwide for mobile application testing (hereafter "Network Virtualization"), Defendant's use of the Accused System enables performance engineers "to virtualize real-world network conditions, analyze test results to detect and remediate performance bottlenecks before deployment and gain custom performance optimization recommendations."[5]  Regarding predecessor versions of Micro Focus software product(s), HPE stated that "integrating [Network Virtualization] with your continuous integration testing process takes your automated CI [continuous integration] tests way beyond traditional functional testing and load testing, delivering to your developers timely actionable analytics and optimization recommendations."[6]  Additionally,

---

[5] https://www.youtube.com/watch?v=lUznCBjocYw (accessed June 25, 2018).
[6] *Id.* [7] *Id.* [8] Micro Focus Network Virtualization for Mobile Data Sheet, Page 1
https://www.microfocus.com/media/data-sheet/network_virtualization_for_mobile_ds.pdf (accessed June 27, 2018).

HPE stated that "[Network Virtualization] is a vital tool for performance engineers…[and] is fully integrated with HPE LoadRunner, HPE Performance Center and HPE StormRunner Load…[and] HPE Mobile Center."[7]

## NETWORK PROFILES

28.     On information and belief, as part of the Micro Focus Software Suite, Micro Focus provides a library of real-world mobile and broadband network conditions (hereafter "Network Profiles"), enabling its customers (including Defendant) to have access to a library of real-world data points of point-to-point network conditions recorded around the world.   Micro Focus "provides a library of real-world mobile and broadband network conditions."[8]   Further, "Network Virtualization for Mobile allows tests to be managed and results analyzed from any laptop or Wi-Fi-connected mobile device. The software can import real-world mobile network profiles captured by Micro Focus Network Capture or provided by the Micro Focus Network Virtualization Library of mobile and broadband network conditions."[9]   Network Profiles and cloud-enabled technology has been described as bridging "the gap between development and deployment by enabling your mobile application development team to fully and accurately assess the behavior and impact of the network on mobile apps before they are introduced to end users. By virtualizing real-world mobile network conditions within testing environments, your test results are more reliably predictive of how an application will behave for end users."[10]

---

[7] *Id.*[8] Micro Focus Network Virtualization for Mobile Data Sheet, Page 1 https://www.microfocus.com/media/data-sheet/network_virtualization_for_mobile_ds.pdf (accessed June 27, 2018).
[8] Micro Focus Network Virtualization for Mobile Data Sheet, Page 1 https://www.microfocus.com/media/data-sheet/network_virtualization_for_mobile_ds.pdf (accessed June 27, 2018).
[9] *Id.*
[10] *Id.*

## VuGEN AND THE VIRTUAL EVENT GENERATOR

29.     On information and belief, to simulate virtual users to load test mobile applications (hereafter "Virtual Users" or "Vuser") within the Micro Focus Software Suite, Micro Focus has offered and continues to offer a virtual event generator (hereafter "Virtual Event Generator").  The Virtual Event Generator is the "primary tool for creating testing scripts that emulate the behavior of real users on your system."[11]  A Virtual User is defined as scripts that replace "real users with virtual users…to emulate the actions of a human user"[12] for load testing.  On information and belief, from a single workstation, Micro Focus has offered and continues to offer a controller to distribute "each Vuser in the scenario to a load generator. The load generator is the machine that executes the Vuser script, enabling the Vuser to emulate the actions of a human user."[13]  The Vuser operates as a single thread process, enabling a single server or computer to emulate the actions of several 100 users to create load against a mobile application.

30.     In March of 2014, HPE migrated its long-standing license model from a standard license to a cloud-based monetization model[14] wherein customers (including Defendant) of an HPE Software Suite (and, subsequently, the Micro Focus Software Suite) would be charged on a per Virtual User basis over a 24-hour time period.[15]  The Micro Focus Software Suite has been offered for sale and is offered for sale based on a cloud-based monetization model.

---

[11] Micro Focus LoadRunner Help Center, https://admhelp.microfocus.com/lr/en/12.56-12.57/help/WebHelp/Content/VuGen/tocs/toc_MainVuGen.htm (accessed June 27, 2018)
[12] Micro Focus LoadRunner Help Center, https://admhelp.microfocus.com/lr/en/12.56-12.57/help/WebHelp/Content/Controller/c_terms_lr.htm (accessed June 27, 2018)
[13] Micro Focus LoadRunner Help Center, *Id.*
[14] http://www8.hp.com/us/en/hp-news/press-release.html?id=1601722#.WzQUBdVKguV (accessed June 27, 2018)
[15] https://software.microfocus.com/en-us/products/loadrunner-load-testing/pricing; https://software.microfocus.com/en-us/products/performance-center/pricing; https://software.microfocus.com/en-us/products/stormrunner-load-agile-cloud-testing/pricing (accessed June 27, 2018)

## TRUCLIENT AND SCRIPTED USER EVENT MODELING

31.    On information and belief, to create Virtual Users to interact with scripted events to model human interaction with a native mobile application (hereafter "Scripted User Event Modeling") within the Micro Focus Software Suite, Micro Focus has offered and continues to offer TruClient as a native mobile protocol that provided a way "to record and replay native mobile applications on both Android and iOS devices" to enable "the developer or DevOps engineer to record user interactions on the mobile application and create a TruClient script"[16] (hereafter "Scripted User Event Modeling") to simulate "multiple virtual users (Vusers)" during the load test's execution.[17]    Additionally, "the script can be enhanced using standard TruClient functionality including parameterization, transactions and JavaScript coding."[18]  Together with the [Micro Focus] Virtual User Suite of Products, this "protocol is meant for end-user performance testing…[and] completes the LoadRunner mobile performance testing suite."[19]

## STORMRUNNER LOAD

32.    On information and belief, Micro Focus's StormRunner product provides the ability to create a "real-world scenario by generating load from global cloud regions to emulate real networks during load tests."[20]  "StormRunner Load initializes on demand load generation machines in the private or public cloud"[21] to dynamically "Scale from 1 tester to 2,000,000 or more geographically distributed"[22] Virtual Users (hereafter "Cloud-based Load Server

---

[16] https://community.softwaregrp.com/t5/LoadRunner-and-Performance/Introduction-to-LoadRunner-s-new-TruClient-Native-Mobile/ba-p/269441#Wyg06FVKguV
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] https://software.microfocus.com/en-us/products/stormrunner-load-agile-cloud-testing/overview (accessed June 27, 2018)
[21] *Id.*
[22] *Id.*

Modeling"). StormRunner provides a cloud-based performance testing solution that enables Agile development teams to ensure app scalability up to millions of distributed mobile users.[23]

<u>MICRO FOCUS MOBILE CENTER AND DEVELOPMENT SERVER</u>

33.     On information and belief, Defendant has used and continues to use Micro Focus Mobile Center, "a standalone server that provides mobile device access to different test applications. [Micro Focus] Mobile Center supports a distributed architecture where different test clients can all interact with the same Mobile Center server instance."[24]  On information and belief, Defendant has used and continues to use Micro Focus Mobile Center to gain an "accurate picture of the end-to-end mobile performance" by combining "virtual users and real devices" to run "elastic, and realistic tests from multiple geographies across various real-world network conditions"[25] and "mediates between the testing-tool client calls to mobile devices" by providing "a user interface within the testing tool for recording and running tests on real mobile devices"[26] (hereafter "Cloud-based Mobile Center").

34.     On information and belief, "Mobile Center is a core component of [the] mobile app development lifecycle" and is integrated with "Application Lifecycle Management (ALM), AppPulse Mobile, Business Process Monitoring, Business Process Testing, Fortify On Demand, LoadRunner, Network Virtualization (NV), Performance Center, Sprinter, StormRunner Load, UFT and UFT Pro"[27] (hereafter "Micro Focus Mobile Center Suite of Products").[28]

---

[23] *Id.*
[24] http://mobilecenterhelp.saas.hpe.com/docs/en/2.20/mobilecenter_help/Content/HPMC_architecture.htm (accessed June 27, 2018)
[25] https://software.microfocus.com/en-us/products/mobile-testing/overview (accessed June 27, 2018)
[26] http://mobilecenterhelp.saas.hpe.com/docs/en/2.20/mobilecenter_help/Content/HPMC_architecture.htm (accessed June 27, 2018)
[27] https://community.softwaregrp.com/t5/Quality-and-Testing-Blog/Introducing-Mobile-Center-2-5-improve-your-mobile-testing/ba-p/1593254#.Wyg_71VKguU (accessed June 27, 2018)
[28] https://www.youtube.com/watch?v=6QyrWGSGq-c (accessed June 27, 2018) and https://www.youtube.com/watch?v=FkJkIe1H_rM (accessed June 27, 2018)

**FACTUAL ALLEGATIONS**

PATENTS-IN-SUIT

35.     Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 9,971,678 (the "'678 Patent", attached as Exhibit 1), entitled "Systems including device and network simulation for mobile application development," issued on May 15, 2018.

36.     Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 9,298,864 (the "'864 Patent", attached as Exhibit 2), entitled "System Including Network Simulation for Mobile Application Development," issued on March 29, 2016.

37.     Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 8,924,192 (the "'192 Patent", attached as Exhibit 3), entitled "Systems including network simulation for mobile application development and online marketplaces for mobile application distribution, revenue sharing, content distribution, or combinations thereof," issued on December 30, 2014.

38.     Together, the foregoing patents are referred to as the "Patents-in-Suit".  Plaintiffs are the assignee of the Patents-in-Suit and have all substantial rights to sue for infringement and collect past and future damages for the infringement thereof.

39.     The foregoing patents, and any related patents in the family, are herein referred to collectively and individually as the "Plaintiffs' Patent Portfolio" respectively.

**DAMAGES, PLAINTIFFS' PORTFOLIO, AND THE APP ECONOMY**

40.     Mobile apps and the tools to develop and test mobile apps have become paramount to the U.S. economy.  According to a 2012 white paper released by renowned Dr. Michael Mandel titled the 'App Economy', the App Developer community represented the second largest IT segment in the United States in 2012 with over 466,000 jobs created in the U.S. economy alone,

up from nearly zero in 2008 when the App Store was initially launched (hereafter "App Economy").[29]

41.     Plaintiffs' goal has been to democratize app development for a new generation of developers by mitigating performance risks and reducing application development cycles from months down to minutes by virtue of new performance engineering modeling.  At the time of Plaintiffs' provisional patent filing in June of 2005, Apple had not launched the iPhone (June of 2007), there was no App Store (July of 2008), Google's Android platform had not been released (September of 2008), the Samsung Galaxy family of devices had not been released (June of 2009) and the mobile app ecosystem that we know today was still in its infancy.

42.     In Dr. Mandel's App Economy white paper, the renowned economist contributes two driving innovations behind the App Economy: (a) the ease of app development; and (b) the ease of app delivery.  With respect to the former, Plaintiffs' Patent Portfolio describes many of the core innovations in modern application development that accelerate the development of applications and enhances the mobile device consumer experience on the client side.

43.     In alignment with Dr. Mandel's thesis concerning the importance of facilitating application development, the Plaintiffs' patented technologies, with a focus on accelerating application development for performance engineers, helped to enable a new generation of app developers to lay the foundation for the emerging App Economy (hereafter "App Developers").

44.     App Developers play an integral role in the app ecosystem, and Plaintiffs' patented innovations, with a focus on accelerating application development for performance engineers, have ushered in a new generation of smart developer tools and contributed significantly to the growth of the App Economy.

---

[29] http://business.time.com/2012/02/08/the-app-economy-estimated-to-contribute-nearly-half-a-million-jobs-to-the-u-s/ (accessed June 27, 2018)

45.     Application performance and access to data in the cloud are paramount to the user experience for a new generation of data hungry applications.  Supporting this premise is a quote from HPE's Paul Whiten, Applications Business Unit Lead, stating that "We now live in a mobile and app-centric world, and the ability to deliver a consistent and enjoyable app experience has never been more important."[30]  If a mobile application fails, 48% of users are less likely to ever use the app again. 34% of users will simply switch to a competitor's application and 31% of users will tell friends about their poor experience, which eliminates future customers.[31]  A change in latency from 2ms (broadband) to 400ms (3G network) can cause a mobile page load to go from 1 second to 30 seconds.[32]  Google reported that a mere 0.5 to 1.0-second increase in page load time resulted in a 20% decrease in traffic and revenue.  The average U.S. retail mobile site loaded in 6.9 seconds in July of 2016, and according to the most recent data presented by Google, 40% of consumers will leave a page that takes longer than three seconds to load.[33]

46.     According to HPE's studies, *"over 70% of the performance of a mobile app is dependent on the network,"[34]* and in another study HPE further stated that "80% of the costs associated with application development occur in remediating failed or underperforming applications after deployment, when the ineffective application has already had a negative impact on the end user or customer experience."[35]

47.     In 2018, 52.2 percent of all website traffic worldwide was generated through a mobile device.[36]  In the United States, not even Black Friday was immune from the influence of

---

[30] http://www8.hp.com/ca/en/hp-news/press-release.html?id=1825600#.W0z1-tVKguV (accessed July 16, 2018)
[31] https://www.marketingcharts.com/digital-27846 (accessed June 27, 2018)
[32] https://www.slideshare.net/xbosoft/mobile-network-performance-testing (accessed June 27, 2018)
[33] https://www.thinkwithgoogle.com/marketing-resources/experience-design/mobile-page-speed-load-time/ (accessed June 27, 2018)
[34] Exhibit A
[35] http://media.shunra.com/datasheets/Shunra-NetworkCatcher.pdf (accessed June 27, 2018)
[36] https://www.statista.com/statistics/241462/global-mobile-phone-website-traffic-share/ (accessed June 27, 2018)

mobile as nearly 40% of sales on the traditional brick and mortar shopping day came from a mobile device. With 30% of all online shopping happening on mobile phones and with 89% of executives believing that customer experience will be their primary mode of competition, the consumer experience via a company's mobile app has never been so prevalent.[37]

48.    In a recent study released by Micro Focus, over 50 percent of respondents indicated the need to remediate at least four application production incidents per month and the average days required to resolve a production incident was six.[38]   Micro Focus further stated that the average remediation cost per incident was $88,000 USD and the highest reported cost was $500,000 USD per incident.[39]   Micro Focus stated that "it is important to note that this is the remediation cost alone; it is not an accounting of the total impact on the business."[40]   A single security breach of a customer's financial banking information via a mobile app can cause a massive client exodus.

49.    Millennials, in particular, are much less forgiving concerning their application experience and will unapologetically delete an app just because the logo is not appealing.[41]   It is safe to assume that a customer's bank finances are much more important to them than a logo. These facts suggests a shrinking margin of error for performance issues especially when it is considered that 67% of Millennials now use mobile banking as their primary engagement with their bank compared to 18% for those consumers aged 60 or over.[42]   In a recent study in the UK, Millennials now trust their App more than a teller at a brick and mortar bank, and 27% of

---

[37] https://www.outerboxdesign.com/web-design-articles/mobile-ecommerce-statistics (accessed June 27, 2018)
[38] Micro Focus The Value of Proactive Application Performance, http://files.asset.microfocus.com/4aa6-6409/en/4aa6-6409.pdf  (accessed June 27, 2018)
[39] *Id.*
[40] *Id.*
[41] https://www.comscore.com/Insights/Blog/5-Interesting-Facts-About-Millennials-Mobile-App-Usage-from-The-2017-US-Mobile-App-Report (accessed June 27, 2018)
[42] https://www.federalreserve.gov/consumerscommunities/mobile_finance.htm

Millennials are now completely reliant on a mobile Banking App.[43]  In the next 3-4 years, 33% of Millennials may choose to completely abandon traditional brick and mortar Banking in lieu of a mobile app.[44]  With over 50% of the United States workforce projected to be made up of 'App First Millennials' by 2020,[45] it is clear why Micro Focus entered into the spin-out merger with HPE to move into the Mobile-first product model.  The vast majority of Micro Focus's downstream clients (including Defendant) have also initiated a 'Mobile-First' strategy to 'mobilize' their customer base to engage a new era of app users and as a result, have relied on the mobile testing products offered by Micro Focus.

50.      Defendant reported more than 25 million mobile active users in its most recent quarterly earnings statement attached hereto as Exhibit J.[46]  Mobile banking users therefore represent over half of its approximately 46 million customers globally.[47]  With this many users and with up to 90 percent of financial transactions now taking place online or through mobile banking, it is safe to assume that many users access the Defendant's bank app simultaneously (i.e., to check balances, make deposits or use a digital wallet), making stress testing crucial to application performance and to maintain user trust.[48]  For banks, maintenance of trust is especially critical since a recent UK study determined that millennials now trust their banking application

---

[43] https://www.salesforce.com/blog/2016/03/stats-about-millennials-mobile-banking.html (accessed June 27, 2018)
[44] https://www.temenos.com/en/market-insight/universal-insight/33-of-millennials-believe-they-wont-need-a-bank-at-all-in-5-years-we-think-different/ (accessed June 27, 2018)
[45] https://www.forbes.com/workforce-2020/ (accessed June 27, 2018)
[46] Bank of America Quarterly Earnings Statement (2nd Qtr, 2018),
http://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=irol-
newsArticle&ID=2358330#fbid=GpPC4aTZy7Z (accessed July 18, 2018)
[47]https://en.wikipedia.org/wiki/Bank_of_America, (accessed July 18, 2018)
[48] Millennials Help Accelerate Banking Evolution, https://www.businessnhmagazine.com/article/millennials-help-accelerate-bankingamp39s-evolution, (accessed July 16, 2018), see also
https://www.forbes.com/sites/forbestechcouncil/2017/05/16/mobile-banking-exploring-trends-for-market-leadership/#23643afe6962 (accessed July 16, 2018)

more than a teller at a brick and mortar bank, and 27% of millennials are now completely reliant on a mobile banking app.[49]

<u>ROYALTY DEMAND BY PLAINTIFFS</u>

51.     Banks, by the sheer volume and number of active daily users, would appear to have a significant need for virtual user and network virtualization testing now and in the future.  With 72% of millennials now active users of mobile banking,[50] bringing with them their particular sensitivity around application performance, ensuring proper performance through testing to maintain trust is critical.

52.     Further, with mobile phone sales expected to reach 2.1 billion units by 2019, or approximately one-third of the world's population,[51] the pace of the growth in the number of mobile banking users driving this already unprecedented mobile demand will likely continue.

53.     In light of the collective facts herein, specifically the network virtualization testing, the large number of simultaneous active daily users necessitating the virtual user testing that we believe Defendant is executing in violation of Plaintiff's Patent Portfolio, the high growth of overall financial transactions on mobile applications, the high percentage of millennials using mobile applications, and the steady growth of mobile phone sales, using a reasonable royalty rate, the patent royalties owed by Defendant to Plaintiffs are significant.

## **COUNT I**

(Infringement of United States Patent No. 9,971,678)

54.     Plaintiffs incorporate the paragraphs above herein by reference.

---

[49] https://www.salesforce.com/blog/2016/03/stats-about-millennials-mobile-banking.html, (accessed July 16, 2018)
[50] https://www.temenos.com/en/market-insight/universal-insight/33-of-millennials-believe-they-wont-need-a-bank-at-all-in-5-years-we-think-different/ (accessed July 16, 2018)
[51] *Id.*

55.     On May 15, 2018, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 9,971,678 (the "'678 Patent") entitled "Systems Including Device and Network Simulation for Mobile Application Development" on an application filed Dec. 23, 2014, United States Patent Application Ser. No. 14/581,475.  The '678 Patent is a continuation of United States Patent Application Ser. No. 13/673,692, filed Nov. 9, 2012 and issued as United States Pat. No. 8,924,192, on Dec. 30, 2014, which is a continuation of United States Patent Application Ser. No. 12/759,543, filed April 13, 2010 and issued as United States Pat. No. 8,332,203, on Dec. 11, 2012, which is a continuation of United States Patent Application Ser. No. 11/449,958, filed Jun. 9, 2006 and issued as United States Pat. No. 7,813,910, on Oct. 12, 2010, which application claims priority to United States Patent Application Ser. No. 60/689,101 filed Jun. 10, 2005.

56.     The '678 Patent is presumed valid and enforceable.

57.     Plaintiffs are the sole owner of the '678 Patent.

58.     Defendant without authorization has been and is directly infringing at least Claim 1 of the '678 Patent, including making and/or using (including for testing purposes) and continues to make and/or use (including for testing purposes) the Accused System. *See* attached Claim Chart for the '678 Patent at Exhibit 4, citing Exhibits A–G.

59.     The '678 Patent describes systems that address technical problems related to simulating network systems to determine performance of the mobile device.  *See, e.g.,* '678 Patent at col. 10, lines 34-44 [simulated network environment] to col. 13, line 47 [includes Figures 8 through 13].

60.     The '678 Patent describes systems that enable a performance engineer to view application performance data to mitigate performance risks.  *See, e.g.,* '678 Patent at col. 7, lines

29-40 and col. 8, lines 45-56 [profile data 110 is stored or displayed to identify performance of the application].

61.     The '678 Patent describes systems that include providing a network model library of real-world mobile network characteristics, *see, e.g.,* '678 Patent at col. 2, lines 5-9 [geographical markets], col. 11, lines 49-59 and col. 12, lines 3-25 [Figure 9 and geographical map] to enable a user to import the network profiles, *see, e.g.,* '678 Patent at col. 12, lines 50-53 [import network profiles] into the testing environment, *see, e.g.,* '678 Patent at col. 10, lines 59-66 to col. 11, lines 1-14 [download network profiles].

62.     Technological improvements described and claimed in the '678 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time.  *See, e.g.*, '678 Patent at col. 2, lines 5-9, col. 11, lines 60-67 and col. 12, line 2.

63.     The written description of the '678 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic, or routine.  *See, e.g.,* '678 Patent at col. 10, lines 34-44 [simulated network environment] to col. 13, line 47 [includes Figures 8 through 13].

64.     The '678 Patent represents a substantial technical improvement in the area of simulating network systems to determine performance of the mobile device.  As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against

Apple, Intel, Google, Adobe and Amazon.  *See* https://patents.google.com/patent/US9971678/en (last accessed June 28, 2018).  A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

65.     Viewed in light of the specification of the '678 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

66.     The '678 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

67.     The '678 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

68.     The '678 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer.

69.     As noted by United States Patents, foreign patent documents, and other publications cited by the '678 Patent, the '678 Patent ***does not*** preempt the field of its invention or preclude use of other methods and systems of simulating network systems to determine performance of the mobile device.

70.     As a result of Defendant's infringement of the '678 Patent, Plaintiffs have suffered and will continue to suffer damages.

71.     Defendant will continue to infringe unless this Court enjoins Defendant and its agents, servants, employees, representatives, and all others acting in active concert with Defendant from infringing the '678 Patent.

## COUNT II

(Infringement of United States Patent No. 9,298,864)

72.     Plaintiffs incorporate the paragraphs above herein by reference.

73.     On March 29, 2016, the United States Patent and Trademark Office ("USPTO")
duly and legally issued United States Patent No. 9,298,864 (the "'864 Patent") entitled "System
Including Network Simulation for Mobile Application Development" on an application filed Nov.
19, 2013, United States Patent Application Ser. No. 14/084,321.  The '864 Patent is a divisional
of United States Application Ser. No. 12/705,913, filed Feb. 15, 2010 (now United States Pat. No.
8,589,140), which claims priority to United States Application Ser. No. 61/152,934, filed Feb. 16,
2009, and is a continuation-in-part of United States Application Ser. No. 11/449,958, filed Jun. 9,
2006 (now U.S. Pat. No. 7,813,910), which claims priority to United States Application Ser. No.
60/689,101, filed Jun. 10, 2005.

74.     The '864 Patent is presumed valid and enforceable.

75.     Plaintiffs are the sole owner of the '864 Patent.

76.     Defendant without authorization has been and is directly infringing at least Claim
1 of the '864 Patent, including making and/or using (including for testing purposes) and continues
to make and/or use (including for testing purposes) the Accused System.  *See* attached Claim Chart
for the '864 Patent at Exhibit 5, citing Exhibits A–G.

77.     The '864 Patent describes systems that address technical problems related to
simulating network systems to determine performance of the mobile device.  *See, e.g.,* '864 Patent
at col. 9, line 60 through col. 10, line 3 [simulated network environment] to col. 13, line 4 [includes
Figures 8 through 13].

21

78.     The '864 Patent describes systems that simulate virtual users to load test mobile applications by using an event generator to create scripts to emulate and model human behavior to determine performance of either the network or the mobile application.  *See, e.g.,* '864 Patent at col. 10, lines 57-65 [event generator + scripted effects], col 11, lines 7-17 [event generator + bandwidth], col. 11, lines 51-67 [scripted events + human interaction].  The '864 Patent further describes systems that enable the performance engineer to simulate real-world scenarios by generating load from multiple geographies to emulate real networks during load tests.  *See, e.g.,* '864 Patent at col. 11, lines 51-67 [scripted events + consumer events + performance], Figures 9, 10, 11, 12 and 13, col. 12, lines 8-11 [storage 134] and col. 12, lines 18-22 [geographic locations].

79.     The '864 Patent describes systems that enable the performance engineer to interact with the virtual users by providing scripts to record and replay user interactions on the mobile device to emulate real networks during load tests.  *See, e.g.,* '864 Patent at col. 11, lines 51-67 [scripted events + consumer events + performance], Figures 12 [Load Server] and 13, col. 12, lines 8-11 [storage 134] and col. 12, lines 18-22 [geographic locations].

80.     The '864 Patent describes systems that include a developer server that provides a library of mobile devices to enable the performance engineer to combine virtual users and real devices to run tests from multiple geographies across real-world network conditions.  *See, e.g.,* '864 Patent at col. 2, lines 3-7 [mobile devices in geographical markets], col. 3, lines 4-7 [development server + Internet], col. 9, line 60 to col. 10, line 3 [developer server + mobile device, figures 8-13], col. 11, lines 18-27 [developer server + networks worldwide], and col. 12, lines 8-11 [storage 134].

81.     The '864 Patent describes systems that enable a performance engineer to view application performance data to mitigate performance risks.  *See, e.g.,* '864 Patent at col. 6, lines 46-57 [profile data 110 is stored or displayed to identify performance of the application].

82.     Technological improvements described and claimed in the '864 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time.  *See, e.g.,* '864 Patent at col. 2, lines 3-7 and col. 11, lines 18-27.

83.     The written description of the '864 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic, or routine.  *See, e.g.,* '864 Patent at col. col. 9, line 60 to col. 10, line 3 [simulated network environment] to col. 13, line 3 [includes Figures 8 through 13].

84.     The '864 Patent represents a substantial technical improvement in the area of mobile performance engineering.  As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against Apple, Intel, Adobe, Facebook, Ca, Amazon, Vodafone and Telecom Italia S.p.A.  *See* https://patents.google.com/patent/US9298864B2/en (last accessed June 26, 2018).  A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

85.     Viewed in light of the specification of the '864 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

86.     The '864 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

87.     The '864 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

88.     The '864 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer.

89.     As noted by United States Patents, foreign patent documents, and other publications cited by the '864 Patent, the '864 Patent ***does not*** preempt the field of its invention or preclude use of other methods and systems of simulating network systems in the area of mobile performance engineering.

90.     As a result of Defendant's infringement of the '864 Patent, Plaintiffs have suffered and will continue to suffer damages.

91.     Defendant will continue to infringe unless this Court enjoins Defendant and its agents, servants, employees, representatives, and all others acting in active concert with Defendant from infringing the '864 Patent.

## COUNT III

(Infringement of United States Patent No. 8,924,192)

92.     Plaintiffs incorporate the paragraphs above herein by reference.

93.     On Dec. 30, 2014 the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 8,924,192 ("the'192 Patent") entitled "Systems Including Network Simulation for Mobile Application Development and Online Marketplaces for Mobile Application Distribution, Revenue Sharing, Content Distribution, or Combinations thereof" on an application filed Nov. 9, 2012, United States Patent Application Ser. No. 13/673,692.  The '192 Patent is a continuation of United States Patent Application Ser. No. 12/759,543, filed Apr. 13, 2010, which is a continuation of United States Patent Application Ser. No. 11/449,958, filed Jun. 9, 2006, and issued as United States Pat. No. 7,813,910, on Oct. 12, 2012, which application claims priority to United States Patent Application Ser. No. 60/689,101 filed Jun. 10, 2005.

94.     The '192 Patent is presumed valid and enforceable.

95.     Plaintiffs are the sole owner of the '192 Patent.

96.     Defendant without authorization has been and is directly infringing at least Claim 1 of the '192 Patent, including making and/or using (including for testing purposes) and continues to make and/or use (including for testing purposes) the Accused System.  *See* attached Claim Chart for the '192 Patent at Exhibit 6, citing Exhibits A–G.

97.     The '192 Patent describes systems that address technical problems related to simulating network systems to determine performance of the mobile device.  *See, e.g.,* '192 Patent at col. 10, lines 15-25 [simulated network environment] to col. 13, line 23 [includes Figures 8 through 13].

98.     The '192 Patent describes systems that enable a performance engineer to view application performance data to mitigate performance risks.  *See, e.g.,* '192 Patent at col. 7, lines

14-25 and col. 8, lines 27-38 [profile data 110 is stored or displayed to identify performance of the application].

99.      The '192 Patent describes systems that include providing a network model library of real-world mobile network characteristics, *see, e.g.,* '192 Patent at col. 2, lines 4-8 [geographical markets], col. 11, lines 28-38 and col. 11, line 49 to col. 12, line 2 [Figure 9] to enable a user to import the network profiles, *see, e.g.,* '192 Patent at col. 12, lines 28-31 [import network profiles] into the testing environment, *see, e.g.,* '192 Patent at col. 10, lines 40-47 to col. 10, lines 51-62 [download network profiles].

100.     Technological improvements described and claimed in the '192 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time.  *See, e.g.*, '192 Patent at col. 2, lines 4-8 and col. 11, lines 39-48.

101.     The written description of the '192 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic, or routine.  *See, e.g.,* '192 Patent at col. 10, lines 15-25 [simulated network environment] to col. 13, line 23 [includes Figures 8 through 13].

102.     The '192 Patent represents a substantial technical improvement in the area of simulating network systems to determine performance of the mobile device.  As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against

Google,        Apple,        Adobe,        Amazon,        and        Intel.        *See* https://patents.google.com/patent/US8924192B1/en (last accessed June 26, 2018). A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

103.    Viewed in light of the specification of the '192 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

104.    The '192 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

105.    The '192 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

106.    The '192 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer.

107.    As noted by United States Patents, foreign patent documents, and other publications cited by the '192 Patent, the '192 Patent ***does not*** preempt the field of its invention or preclude use of other methods and systems of simulating network systems to determine performance of the mobile device.

108.    As a result of Defendant's infringement of the '192 Patent, Plaintiffs have suffered and will continue to suffer damages.

109.    Defendant will continue to infringe unless this Court enjoins Defendant and its agents, servants, employees, representatives, and all others acting in active concert with Defendant from infringing the '192 Patent.

27

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Enter judgment that Defendant has infringed and continues to infringe one or more claims of the '678 Patent literally or under the doctrine of equivalents;

B.      Enter judgment that Defendant has infringed and continues to infringe one or more claims of the '864 Patent literally or under the doctrine of equivalents;

C.      Enter judgment that Defendant has infringed and continues to infringe one or more claims of the '192 Patent literally or under the doctrine of equivalents;

D.      Award Plaintiffs past damages, to be paid by Defendant, in an amount no less than a reasonable royalty and adequate to compensate Plaintiffs for such damages, together with pre-judgment and post-judgment interest for Defendant's infringement of the '678 Patent, the '864 Patent and the '192 Patent through the date that such judgment is entered in accordance with 35 U.S.C. §284, and increase such award by up to three times the amount found or assessed in accordance with 35 U.S.C. §284;

E.      Enjoin Defendant from continuing to infringe the '678 Patent, the '864 Patent, and the '192 Patent;

F.      Declare this case exceptional under 35 U.S.C. §285; and

G.      Award Plaintiffs their costs, disbursements, attorneys' fees, and such further and additional relief as is deemed appropriate by this Court.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  July 20, 2018                              Respectfully Submitted,

                                                   _/s/ Jeffrey G. Toler_____
                                                   Jeffrey G. Toler
                                                   Texas State Bar No. 24011201
                                                   jtoler@tlgiplaw.com
                                                   Aakash S. Parekh
                                                   Texas State Bar No. 24059133
                                                   aparekh@tlgiplaw.com
                                                   Benjamin R. Johnson
                                                   Texas State Bar No. 24065495
                                                   bjohnson@tlgiplaw.com


                                                   TOLER LAW GROUP, PC
                                                   8500 Bluffstone Cove, Suite A201
                                                   Austin, Texas 78759
                                                   Tel. (512) 327-5515
                                                   Fax (512) 327-5575

                                                   ATTORNEYS FOR PLAINTIFF
                                                   WAPP TECH LIMITED PARTNERSHIP AND
                                                   WAPP TECH CORP.

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

|  |  |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., <br><br> Plaintiffs, <br><br> v. <br><br> HEWLETT PACKARD ENTERPRISE COMPANY, <br><br> Defendant. | Case No. 4:18-cv-00468-ALM <br><br> **JURY TRIAL DEMANDED** |

<u>**DEFENDANT HEWLETT PACKARD ENTERPRISE COMPANY'S MOTION TO STAY**</u>

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................1

II. BACKGROUND .....................................................................................................3

    A.  ADM Software and the Seattle Transaction.................................................3

    B.  Wapp Litigation............................................................................................4

    C.  The Manufacturer Cases...............................................................................5

    D.  The Wells Fargo and Bank of America Cases ..............................................6

III. LEGAL STANDARDS ..........................................................................................8

IV. ARGUMENT.........................................................................................................10

    A.  Factor (1): A Stay Will Not Unduly Prejudice Wapp. ...............................10

    B.  Factor (2): A Stay Would Simplify the Issues in This Case. .....................12

    C.  Factor (3): Stage of the Litigation .............................................................13

V.  CONCLUSION......................................................................................................13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Mktg. Sys., LLC v. CVS Pharmacy, Inc.*,
  No. 6:15-CV-134-JRG-KNM, 2016 WL 3277258 (E.D. Tex. June 14, 2016) ......................11

*Cellular Commc'ns Equip., LLC v. Samsung Elecs. Co., Ltd.*,
  No. 6:14-cv-759, 2015 WL 11143485 (E.D. Tex. Dec. 16, 2015) .........................................11

*Colo. River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976).................................................................................................................8

*Crossroads Systems, Inc. v. Dot Hill Systems Corp.*,
  No. 13-CA-1025, 2015 WL 3773014 (W.D. Tex. June 16, 2015) .........................................11

*CyWee Grp. Ltd. v. Huawei Device Co.*,
  No. 2:17-CV-495-WCB, 2018 WL 4002776 (E.D. Tex. Aug. 22, 2018)..............2, 8, 9, 10, 13

*Glenayre Elecs., Inc. v. Jackson*,
  443 F.3d 851 (Fed. Cir. 2006)................................................................................................11

*In re Google Inc.*,
  588 F. App'x 988 (Fed. Cir. 2014) ...............................................................................1, 2, 8, 9

*Kahn v. Gen. Motors Corp.*,
  889 F.2d 1078 (Fed. Cir. 1989)..............................................................................................10

*Katz v. Lear Siegler, Inc.*,
  909 F.2d 1459 (Fed. Cir. 1990)................................................................................................9

*Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*,
  342 U.S. 180 (1952).................................................................................................................8

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936).................................................................................................................8

*NFC Tech. LLC v. HTC Am., Inc.*,
  No. 2:13-CV-1058, 2015 WL 1069111 (E.D. Tex. Mar. 11, 2015) .........................................8

*In re Nintendo of Am., Inc.*,
  756 F.3d 1363 (Fed. Cir. 2014)......................................................................................1, 2, 10

*Soverain Software LLC v. Amazon.com, Inc.*,
  356 F. Supp. 2d 660 (E.D. Tex. 2005).....................................................................................8

*Spread Spectrum Screening LLC v. Eastman Kodak Co.*,
  657 F.3d 1349 (Fed. Cir. 2011)..............................................................................................10

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Uniloc USA, Inc. v. Corbis Corp.*,
   No. 6:13-CV-942-RWS-KNM, 2015 WL 11199063 (E.D. Tex. July 6, 2015)......................10

*Vantage Point Tech., Inc. v. Amazon.com, Inc.*,
   No. 2:13-CV-909, 2015 WL 123593 (E.D. Tex. Jan. 6, 2015)...............................................10

*VirtualAgility Inc. v. Salesforce.com, Inc.*,
   759 F.3d 1307 (Fed. Cir. 2014)..........................................................................................9, 10

## I.      INTRODUCTION

Wapp Tech Limited Partnership and Wapp Tech Corp. (collectively, "Wapp") have filed four overlapping, and substantially identical, suits in this Court.  On July 2, 2018, Wapp filed a complaint against Micro Focus International plc, claiming infringement of three patents by software products and functionalities allegedly manufactured and sold by Micro Focus International plc.  Also on July 2, Wapp filed the present case against Hewlett Packard Enterprise Company ("HPE"), the former owner of the business that makes and sells the accused software, claiming infringement of the same three patents by the same software.  Later, on July 16 and then July 20, Wapp filed virtually identical complaints against Wells Fargo & Company and Bank of America Corporation, alleged customers of the accused software.  All four suits involve the same controversy—Wapp alleges direct infringement of the same patents, by the same products and functionalities, based on the same theory.  In fact, Wapp attaches identical claim charts directed only to products allegedly supplied by Micro Focus International plc to all four of its complaints.  Because of this substantial overlap, Wapp can identify no need to proceed with all of the actions, because one action—the action against the manufacturer[1] of the accused software—takes precedence.  *See In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1365 (Fed. Cir. 2014); *In re Google Inc.*, 588 F. App'x 988, 990 (Fed. Cir. 2014) (non-precedential).

That HPE formerly owned the business responsible for the accused software makes no difference.  As part of the transaction that transferred ownership of the business, Seattle SpinCo,

---

[1]  As explained below, Micro Focus International plc has moved to dismiss Wapp's case against it.  Micro Focus International plc asserts that it is a holding company that has no contacts with the State of Texas, nor is it involved in the design and sale of the accused software.  Indirect subsidiaries of Micro Focus International plc—Seattle SpinCo, Inc. and EntIT Software LLC—who are responsible for the accused software have filed a declaratory judgment action in Delaware that seeks declarations of non-infringement, invalidity, and subject matter ineligibility of the asserted patents.

Inc. ("Seattle SpinCo"), the company that acquired the business, assumed responsibility for all liability—past, present, and future—associated with allegations of patent infringement directed at the software accused in this case.  And Seattle SpinCo acknowledges that responsibility in support of this motion.  HPE, thus, has no role in this case.

Moreover, each of the factors that this Court considers in determining whether to stay a case supports staying Wapp's case against HPE in favor of Wapp's claims focused on the manufacturer.  Indeed, in cases similar to this, for example in cases involving customers, "to facilitate just, convenient, efficient, and less expensive determination[s]," "courts have developed a practice of" "staying claims against [the non-manufacturer] pending resolution of the suit against the manufacturer" where the actions involve at least the same "major" issues, such as infringement and invalidity.  *In re Nintendo*, 756 F.3d at 1365; *In re Google*, 588 F. App'x at 990; *CyWee Grp. Ltd. v. Huawei Device Co.*, No. 2:17-CV-495-WCB, 2018 WL 4002776, at *3–5 (E.D. Tex. Aug. 22, 2018) (Bryson, C.J.).  The touchstone for these cases, which applies with full force here, is whether substantial savings of litigation resources can be expected.  Here, the overlap with the manufacturer suit together with HPE's agreement to be bound by the infringement and invalidity findings of the manufacturer suit, should the Court stay this case, means that infringement and invalidity will need to be litigated at most once.  And HPE's divesture of all aspects of the business—including the assets, know-how, personnel and liability associated with the relevant business—eliminates any legitimate interest Wapp has in proceeding with this suit in parallel with the manufacturer suit.

Respectfully, therefore, the Court should stay this suit (and the Bank of America and Wells Fargo suits)[2] while Wapp litigates its claims against either Micro Focus International plc (in the

---

[2]  Wells Fargo and Bank of America have filed motions to stay in their respective cases.  *Wapp Tech Ltd. P'ship v. Wells Fargo & Co.*, No. 4:18-cv-00501-ALM-KPJ, Dkt. No. 11 (E.D. Tex.

suit in this Court involving the entity that Wapp alleges is the manufacturer) or Seattle SpinCo and

EntIT Software LLC (in the suit in Delaware involving the entities that claim to be the true man-

ufacturers).  Regardless of which of those two suits ultimately goes forward, at least one manufac-

turer suit involving the same allegations as in this suit against HPE will survive, and that suit will

be dispositive of at least any infringement and invalidity issues in this case.

## II.    BACKGROUND

### A.    ADM Software and the Seattle Transaction

Prior to September 1, 2017, HPE had a software business that included software products

and functionalities generally relating to computer hardware or software performance testing.  Some

of these software products and functionalities were in a grouping that HPE called "Application

Testing and Delivery Management" ("ADM"), which included, among other things, LoadRunner,

Performance Center, StormRunner Load, Mobile Center, and Network Virtualization (the "Ac-

cused Software").  Ex. 1 (Letelier Decl.), ¶ 3.

On September 7, 2016, HPE entered into a series of agreements on the terms of a transac-

tion, called the "Seattle Transaction," as a result of which the ADM software would no longer be

part of HPE.  Ex. 2 (Evans Decl.), ¶ 5.  In particular, under the Seattle Transaction, HPE transferred

its ADM software business, including the Accused Software, to its then-subsidiary, Seattle SpinCo

(and/or one or more of Seattle SpinCo's subsidiaries).  Ex. 1 (Letelier Decl.), ¶¶ 4–6; Ex. 2 (Evans

Decl.), ¶¶ 7–9.  Seattle SpinCo then separated from HPE.  Ex. 1 (Letelier Decl.), ¶ 4; Ex. 2 (Evans

Decl.), ¶ 8.

Thus, since the completion of the Seattle Transaction, Seattle SpinCo (and/or one or more

---

Oct. 17, 2018); *Wapp Tech Ltd. P'ship v. Bank of Am. Corp.*, No. 4:18-cv-00519-ALM, Dkt. No.
12 (E.D. Tex. Oct. 17, 2018).

of its subsidiaries) has assumed all responsibilities for making, using, importing, selling or offering

to sell the ADM software, and HPE has not had any role in such activities.  Ex. 1 (Letelier Decl.),

¶ 6; Ex. 2 (Evans Decl.), ¶ 13.  Moreover, as a result of the Seattle Transaction, HPE divested itself

of any liability arising from past, present, and future patent infringement with respect to the ADM

software business's making, selling, offering to sell, and/or importing of the ADM software, as

any such liability was transferred to Seattle SpinCo.  Ex. 1 (Letelier Decl.), ¶¶ 7–13; Ex. 2 (Evans

Decl.), ¶¶ 10–13.  And, since the Seattle Transaction, to the extent HPE has used the Accused

Software, such use has been "off-the-shelf," with no input into the design, development or mainte-

nance of the software, nor with any ability to modify the software.  Ex. 1 (Letelier Decl.), ¶ 6.

### B.    Wapp Litigation

On July 2, 2018, Wapp filed the Complaint in this case, alleging direct infringement by

HPE of U.S. Patent Nos. 9,971,678 ("the '678 patent"), 9,298,864 ("the '864 patent"), and

8,924,192 ("the '192 patent") (collectively, the "Patents-in-Suit") in connection with the Accused

Software.  Compl. ¶¶ 71, 89, 109.  According to Wapp, the '678 and '192 patents describe systems

that "address technical problems related to simulating network systems to determine performance

of the mobile device" and the '864 patent describes systems that "enable the performance engineer

to interact with the virtual users by providing scripts to record and replay user interactions on the

mobile device to emulate real world networks during load tests."  *Id.* ¶¶ 72, 92, 110.  The Com-

plaint attaches claim charts purporting to support Wapp's allegations of infringement for certain

claims of the Patents-in-Suit.  *See id.*, Exs. 4–6.

Wapp acknowledges that the Seattle Transaction took place, as its Complaint references

the Seattle Transaction as a "spin-out merger" by HPE.  *See, e.g.*, *id.* ¶¶ 17–18; 43.  Specifically,

the Complaint alleges that "HPE completed a spin-out merger of its software group with Micro

Focus on September 1, 2017."  *Id.* ¶ 17.  Wapp also alleges that the "functionality of [the] relevant

4

software products remained consistent following the spin-out merger." *Id.* ¶ 18.

Wapp's Complaint does not seek injunctive relief. *See id.* at 34–35, ¶¶ A–F.  In addition, the Complaint limits Wapp's request for damages from HPE to "past damages." *Id.* at 34–35, ¶ D.[3]

HPE filed an answer to the Complaint on October 17, 2018.  Dkt. 11 (the "Answer").  In the Answer, HPE denied Wapp's allegations of infringement of the Patents-in-Suit. *See, e.g.*, *id.* ¶¶ 71, 89, 109.  HPE also asserted various affirmative defenses, including that the asserted claims of the Patents-in-Suit are invalid and are directed to patent-ineligible subject matter. *Id.* ¶¶ 125–133.

### C.      The Manufacturer Cases

Wapp filed a complaint in this Court against defendant Micro Focus International plc the same day that it filed the Complaint in this case.  In that complaint, Wapp alleges that Micro Focus International plc has directly infringed the same patents (*i.e.*, the Patents-in-Suit here) by making, using, offering to sell, and/or selling the same Accused Software. *Wapp Tech Ltd. P'ship v. Micro Focus Int'l Plc*, No. 4:18-cv-00469-ALM (E.D. Tex. July 2, 2018), Dkt. No. 1 (the "MF plc Complaint"), ¶¶ 22–29, 59, 76, 95.  Wapp attached to the MF plc Complaint several claim charts purporting to support the alleged infringement by Micro Focus International plc; those claim charts are identical to the aforementioned claim charts attached to the Complaint against HPE. *Compare id.*, Exs. 4–6 *to* Dkt. 1, Exs. 4–6.

The MF plc Complaint also references the Seattle Transaction.  Specifically, Wapp alleges in the MF plc Complaint that "Micro Focus [International plc] acquired a division of [HPE] in

---

[3] The "RELIEF REQUESTED" Section of Wapp's Complaint has two paragraphs labelled "D"; HPE is referring to the second such paragraph here.

September 2017 that includes various software products, including LoadRunner." MF plc Complaint, ¶ 7. The MF plc Complaint refers to this transaction as the "spin-out merger" from HPE. *Id.* ¶¶ 18, 20–21. The MF plc Complaint also acknowledges the transfer of the ADM products and functionalities out of HPE; namely, the MF plc Complaint alleges that "HPE LoadRunner became Micro Focus LoadRunner, HPE Performance Center became Micro Focus Performance Center, etc." *Id.* ¶ 18. The MF plc Complaint further alleges that a "Separation and Distribution Agreement . . . dated September 7, 2016 govern[s] the spin-out merger." *Id.* ¶ 20. Contrary to Wapp's allegation, the Separation and Distribution Agreement was not between HPE and Micro Focus International plc; rather, HPE and Seattle SpinCo executed that agreement.

On October 17, 2018, Micro Focus International plc filed a motion to dismiss Wapp's complaint against it on various grounds, including that Micro Focus International plc does not make the Accused Software and is not subject to personal jurisdiction in Texas. *Id.*, Dkt. No. 12. That motion to dismiss remains pending.

Meanwhile, on October 15, 2018, Seattle SpinCo and EntIT Software LLC ("EntIT Software"), which claims to be a subsidiary of Seattle SpinCo, jointly filed a declaratory judgment action against Wapp in the District of Delaware (the "Delaware Action"). *See Seattle SpinCo, Inc. v. Wapp Tech Ltd. P'ship*, No. 1:18-cv-01585-UNA, Dkt. No. 1 (D. Del. Oct. 15, 2018). In that action, Seattle SpinCo and EntIT Software allege that they make and sell the Accused Software, and they seek a declaratory judgment of non-infringement, invalidity, and subject-matter ineligibility with respect to the same Patents-in-Suit asserted here against HPE. *See, e.g., id.* ¶ 1. Thus, there are currently two pending suits involving the manufacturer or alleged manufacturer of the Accused Software—one in this Court and another in Delaware.

### D.    The Wells Fargo and Bank of America Cases

On July 16 and 20, 2018, Wapp filed complaints against Wells Fargo & Company and

Bank of America Corporation, respectively.  *Wapp Tech Ltd. P'ship v. Wells Fargo & Co.*, No. 4:18-cv-00501-ALM-KPJ, Dkt. No. 1 (E.D. Tex. July 16, 2018) (the "Wells Fargo Complaint"); *Wapp Tech Ltd. P'ship v. Bank of Am. Corp.*, No. 4:18-cv-00519-ALM, Dkt. No. 1 (E.D. Tex. filed July 20, 2018) (the "Bank of America Complaint").  In each of these cases, Wapp alleges that the respective defendant "has been making and/or using (including for testing purposes) and continues to make and/or use (including for testing purposes) . . . including and not limited to the Micro Focus Software Suite and LoadRunner."  Wells Fargo Complaint ¶ 26; Bank of America Complaint ¶ 26.  As with Wapp's allegations against HPE, Wapp alleges only direct infringement of the Patents-in-Suit against Wells Fargo and Bank of America.  Wells Fargo Complaint ¶¶ 58, 76, 96; Bank of America Complaint ¶¶ 58, 76, 96.  The substance of Wapp's allegations of infringement against Wells Fargo and Bank of America is identical to that against Micro Focus International plc and HPE.  In particular, Wapp attaches the same claim charts to its complaints against Wells Fargo and Bank of America as it did to its complaints against Micro Focus International plc and HPE.  *Compare* MF plc Complaint, Exs. 4–6 *to* Wells Fargo Complaint, Exs. 4–6 *and* Bank of America Complaint, Exs. 4–6.

Wells Fargo and Bank of America filed answers to Wapp's respective complaints against them on October 16, 2018.  *Wapp Tech Ltd. P'ship v. Wells Fargo & Co.*, No. 4:18-cv-00501-ALM-KPJ, Dkt. No. 8 (E.D. Tex. Oct. 16, 2018); *Wapp Tech Ltd. P'ship v. Bank of Am. Corp.*, No. 4:18-cv-00519-ALM, Dkt. No. 9 (E.D. Tex. Oct. 16, 2018).  In their answers, Wells Fargo and Bank of America deny Wapp's allegations of infringement of the Patents-in-Suit.  Wells Fargo and Bank of America also assert several affirmative defenses, including that the asserted claims of the Patents-in-Suit are invalid and cover patent-ineligible subject matter.  No. 4:18-cv-00501-ALM, Dkt. No. 8 ¶¶ 112–20; No. 4:18-cv-00519-ALM, Dkt. No. 9 ¶¶ 112–20.

## III.    LEGAL STANDARDS

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  As the Federal Circuit has explained, "[t]he Supreme Court has repeatedly observed that under the doctrine of comity, when cases involving substantially overlapping issues are pending before two federal district courts, there is a strong preference to avoid duplicative litigation."  *In re Google*, 588 F. App'x at 990 (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)).  In determining whether to stay one case in view of another, courts should apply a "flexible approach, including staying proceedings if the other suit is so closely related that substantial savings of litigation resources can be expected."  588 F. App'x at 991.

In assessing whether to stay one case in view of another, a court may consider the following three factors: "(1) whether a stay will unduly prejudice or present a clear tactical disadvantage to the nonmoving party; (2) whether a stay will simplify the issue in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set."  *CyWee*, 2018 WL 4002776, at *3 (quoting *Soverain Software LLC v. Amazon.com*, Inc., 356 F. Supp. 2d 660, 662 (E.D. Tex. 2005)).

With respect to the first factor, while patentees have an "interest in the prompt enforcement of its patent rights," that "interest in timely enforcement is 'present in every case in which a patentee resists a stay, and it is therefore not sufficient, standing alone, to defeat a stay motion.'" 2018 WL 4002776, at *3 (quoting *NFC Tech. LLC v. HTC Am., Inc.*, No. 2:13-CV-1058, 2015 WL 1069111, at *2 (E.D. Tex. Mar. 11, 2015)).  Rather, "whether the patentee will be unduly prejudiced by a stay . . . , like the irreparable harm-type inquiry, focuses on the patentee's need for

an expeditious resolution of its claim." *VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307, 1318 (Fed. Cir. 2014). "A stay will not diminish the monetary damages to which VA will be entitled if it succeeds in its infringement suit—it only delays realization of those damages . . . ." *Id.*

 With respect to the second factor, courts have consistently emphasized the importance of simplification of issues (and the attendant savings in resources) in determining whether to stay a case. For example, under the customer suit doctrine, a "primary question" is "whether the issues and parties are such that the disposition of one case would be dispositive of the other." *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1463 (Fed. Cir. 1990). As such, both the Federal Circuit and courts in this District have applied the customer suit doctrine in cases not involving a mere "re-seller," as long as the accused functionality in the customer's product is identical (or nearly identical) to the functionality made by the manufacturer—thereby ensuring overlap between the manufacturer and customer suits. For example, in *In re Google*, the Federal Circuit specifically rejected the argument that the customer suit doctrine should not apply merely because the defendants were not mere "resellers." 588 F. App'x at 990. Instead, the court applied the customer suit doctrine because the plaintiffs' infringement contentions to all of the defendants were "nearly identical," relying "almost exclusively on the underlying functionalities" provided by the same software provider (Google). *Id*. Applying *In re Google*, the court in *CyWee* similarly held that although the defendant was not a reseller *per se*, the customer suit doctrine should nevertheless apply to a case in which "a device manufacturer installs software central to an infringement inquiry made by a third party." *CyWee*, 2018 WL 4002776, at *6.

 Additionally, in customer suits the courts consider whether the customer-defendant agrees to be bound by any decision in the later-filed case that is in favor of the patent owner; and whether

9

the manufacturer is the only source of the infringing product.  *Id.* (quoting *Vantage Point Tech., Inc. v. Amazon.com, Inc.*, No. 2:13-CV-909, 2015 WL 123593, at *2 (E.D. Tex. Jan. 6, 2015)). The Federal Circuit has explained that this doctrine "is based on the manufacturer's presumed greater interest in defending its actions against charges of patent infringement . . . and to guard against possibility of abuse," and is intended "to facilitate just, convenient, efficient, and less expensive determination[s]."  *See In re Nintendo*, 756 F.3d at 1365; *Spread Spectrum Screening LLC v. Eastman Kodak Co.*, 657 F.3d 1349, 1357 (Fed. Cir. 2011) (quoting *Kahn v. Gen. Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989)).

## IV.   ARGUMENT

Whether considered in the context of the customer suit doctrine or outside of that doctrine, this case against HPE should be stayed pending a final resolution of the action involving the manufacturer of the software products at issue.  A stay would cause no undue prejudice to Wapp; it would resolve major issues such as infringement and invalidity; this case is in its infancy; the manufacturer is the only source of the alleged infringing software; and HPE has agreed to be bound by the results of the manufacturer suit should this case be stayed.  Thus, viewed from all angles, each factor favors staying this case.

### A.   Factor (1): A Stay Will Not Unduly Prejudice Wapp.

Apart from Wapp's generic interest in prompt enforcement, which will occur in any event through the manufacturer suit, Wapp cannot establish any "need" for expeditious resolution of its claims in this case.  *See VirtualAgility*, 759 F.3d at 1318.  First, Wapp has not alleged, nor can it, that it competes in any respect with HPE.  As explained above in Section II.A, *supra*, HPE no longer makes, uses, or sells the Accused Software.  And the Complaint does not even allege that Wapp produces any products at all.  Thus, Wapp has no "risk [of] losing market share" as a result of HPE's alleged infringement.  *Uniloc USA, Inc. v. Corbis Corp.*, No. 6:13-CV-942-RWS-KNM,

2015 WL 11199063, at *4 (E.D. Tex. July 6, 2015).  Indeed, Wapp does not even request an injunction in this case.  *See* Compl., pp. 34–35, ¶¶ A–F.  Monetary damages are therefore sufficient to compensate Wapp for any alleged infringement, and a "mere delay in collecting those damages does not constitute undue prejudice."  *See Cellular Commc'ns Equip., LLC v. Samsung Elecs. Co., Ltd.*, No. 6:14-cv-759, 2015 WL 11143485, at *2 (E.D. Tex. Dec. 16, 2015)  (quoting *Crossroads Systems, Inc. v. Dot Hill Systems Corp.*, No. 13-CA-1025, 2015 WL 3773014, at *2 (W.D. Tex. June 16, 2015)).  For this reason alone, "a stay will not cause any undu[e] prejudice."  *See Advanced Mktg. Sys., LLC v. CVS Pharmacy, Inc.*, No. 6:15-CV-134-JRG-KNM, 2016 WL 3277258, at *2 (E.D. Tex. June 14, 2016).

Second, the monetary relief that Wapp seeks is available in the manufacturer action.  As explained in Section II.A, *supra*, while HPE used to make and sell the ADM software (including the Accused Software) prior to the Seattle Transaction, HPE no longer does so; those activities have been transferred to Seattle SpinCo (and/or its subsidiaries), which are the only source of the Accused Software.  And Seattle SpinCo is no longer a corporate affiliate of HPE—they are unrelated, distinct entities.  Further, Seattle SpinCo assumed from HPE any past, present, and future liability for patent infringement by the Accused Software—including liability based on HPE's sales prior to the Seattle Transaction.  And, in support of this motion, Seattle SpinCo has acknowledged the assumption of that liability.  Ex. 2 (Evans Decl.), ¶¶ 10–13.

Even with this case stayed, one of the cases against the manufacturer or alleged manufacturer of the accused software—whether in Delaware or in this Court—will go forward.  A "party is precluded from suing to collect damages for direct infringement by a buyer and user of a product when actual damages covering that very use have already been collected from the maker and seller of that product."  *Glenayre Elecs., Inc. v.  Jackson*, 443 F.3d 851, 864 (Fed. Cir. 2006).  Any

11

damages award against the manufacturer would therefore preclude recovery against HPE. Thus, staying this case would not cause Wapp any delay in collecting money damages, as those damages are available from the manufacturer.

Third, as explained in Section II.A above, HPE divested itself of the entirety of its ADM software business—including the assets, employees, know-how, and liability. Thus, any information about how the products previously operated will be obtained through the manufacturer suit, not from HPE. And, again, Wapp's past damages claims would also be resolved by the manufacturer suit either via exhaustion of Wapp's patent rights (in the event of a settlement) or a damages award at trial (because if Wapp recovers from the manufacturers, it cannot recover from HPE).

As a result, there is no basis for Wapp to have this case against HPE go forward at the same time as a case against the manufacturer of the Accused Software.

**B.     Factor (2): A Stay Would Simplify the Issues in This Case.**

The controversy in this case substantially overlaps with that of the manufacturer suit—the patents and the products at issue are identical. *See* Sections II.B and II.C. Indeed, in its Complaint, Wapp asserts that the "functionality of [the] relevant software products remained consistent following the spin-out merger," and thus "where Micro Focus [International plc] documentation is cited, it is to be understood that, on information and belief, the referenced functionality existed in the corresponding HPE software products." Compl. ¶ 18. Additionally, as noted, Wapp attached *identical* infringement charts to its complaints against HPE and Micro Focus International plc. *Compare* Compl., Exs. 4–6, *with* No. 4:18-cv-00469-ALM, Dkt. No. 1, Exs. 4–6. Nor has Wapp raised any separate claims unique to either HPE or the alleged manufacturer, Micro Focus International plc (*e.g.*, claims of indirect infringement). *See* Compl. ¶¶ 58, 76, 96; No. 4:18-cv-00469-ALM, Dkt. No. 1 ¶¶ 59, 76, 95. And, as explained, to the extent HPE uses the Accused Software, that use is "off-the-shelf" and without input into the design or development thereby evidencing the

substantial overlap between Wapp's claims in this case against HPE and Wapp's claims against the manufacturer of the Accused Software.  Ex. 1 (Letelier Decl.), ¶ 6.

Moreover, in the event of a stay, HPE has agreed to be bound by infringement and invalidity findings in the manufacturer action.  Thus, once the manufacturer action is resolved, "there presumably will be nothing left for this Court to adjudicate" with respect to infringement and invalidity.  *See CyWee*, 2018 WL 4002776, at *4.  For that reason alone, "[t]his factor thus weighs heavily in [HPE's] favor."  *See id.*

### C.      Factor (3): Stage of the Litigation

This case is in its infancy—HPE has concurrently filed its answer.  Discovery has not yet begun, and the Court has yet to hold a scheduling conference or enter a scheduling order.  Accordingly, the early stage of the litigation weighs in favor of a stay.

## V.      CONCLUSION

For the forgoing reasons, HPE respectfully requests that the Court grant this motion and stay this case pending final resolution of the manufacturer litigation involving Seattle SpinCo and EntIT Software, or MF plc, whichever of those two suits ultimately goes forward.

Dated:  October 17, 2018                    Respectfully submitted,

                                       By:  */s/ Mark N. Reiter*
                                             Mark N. Reiter
                                             Lead Counsel
                                             State Bar No. 16759900
                                             mreiter@gibsondunn.com
                                             GIBSON, DUNN & CRUTCHER LLP
                                             2100 McKinney Avenue, Suite 1100
                                             Dallas, Texas  75201-6912
                                             Telephone:  214.698.3360
                                             Facsimile:  214.571.2907

                                             Neema Jalali
                                             California State Bar No. 245424
                                             njalali@gibsondunn.com
                                             GIBSON, DUNN & CRUTCHER LLP
                                             555 Mission Street
                                             San Francisco, CA 94105-0921
                                             Tel: 415.393-8224
                                             Fax: 415. 374-8436

                                             *Attorneys for Hewlett Packard Enterprise Company*

## CERTIFICATE OF CONFERENCE

Counsel for the parties conferred by telephone on October 15, 2018.  I attended on behalf of HPE, and Jeffrey Toler attended on behalf of Wapp.  Counsel discussed the issues related to this motion, and Mr. Reiter referred Mr. Toler to the case law supporting that the instant action should be stayed in view of the manufacturer cases.  Despite that case law, Mr. Toler disagreed that this action should be stayed.  These discussions have ended in an impasse, which leaves the stay issue open for the Court to resolve.

*/s/  Mark N. Reiter*
Mark N. Reiter

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2018, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to CM/ECF participants in this case.

*/s/ Mark N. Reiter*
Mark N. Reiter

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., | Case No. 4:18-cv-00501-ALM-KPJ |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| WELLS FARGO & COMPANY, | |
| Defendant. | |

**<u>DEFENDANT WELLS FARGO & COMPANY'S MOTION TO STAY</u>**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ...........................................................................................................1

II.     BACKGROUND .............................................................................................................2

III.    THIS CUSTOMER SUIT AGAINST WELLS FARGO SHOULD BE STAYED
        PENDING FINAL RESOLUTION OF THE MANUFACTURER CASES.......................5

        A.      Legal Standard:  The Customer Suit Doctrine ........................................................5

        B.      The Customer Suit Doctrine Warrants a Stay of This Case ....................................8

        C.      Additional Factors Weigh in Favor of a Stay........................................................11

IV.     CONCLUSION..............................................................................................................13

## __TABLE OF AUTHORITIES__

__Pages(s)__

**Cases**

*Belfer Cosmetics, LLC v. Nordstrom, Inc.*,
   No. H-15-683, 2016 WL 8792318 (S.D. Tex. Feb. 26, 2016).................................................7

*Capital Sec. Sys., Inc. v. NCR Corp.*,
   No. 1:14-cv-1516-WSD et al., 2015 WL 3819336 (N.D. Ga. June 18, 2015) .........................7

*Cellular Commc'ns Equipment LLC v. Apple, Inc.*,
   No. 6:14-cv-251-KNM, 2016 WL 6884648 (E.D. Tex. Aug. 26, 2016) ....................6, 7, 8, 10

*Collaborative Agreements, LLC v. Adobe Sys. Inc.*,
   No. 1:14-cv-356-LY, 2015 WL 10818739 (W.D. Tex. Aug. 21, 2015)..............................7, 10

*Glenayre Elecs., Inc. v. Jackson*,
   443 F.3d 851 (Fed. Cir. 2006)................................................................................................12

*Kahn v. Gen. Motors Corp.*,
   889 F.2d 1078 (Fed. Cir. 1989)................................................................................................5

*Katz v. Lear Siegler, Inc.*,
   909 F.2d 1459 (Fed. Cir. 1990)...................................................................................6, 10, 11

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936)..................................................................................................................5

*Mantissa Corp. v. Old Second Bancorp, Inc.*,
   No. 17-cv-9175, 2018 WL 3059604 (N.D. Ill. June 20, 2018)..................................................6

*In re Nintendo of Am., Inc.*,
   756 F.3d 1363 (Fed. Cir. 2014).......................................................................1, 2, 5, 6, 10, 12

*Opticurrent, LLC v. Power Integrations, Inc.*,
   No. 2:16-cv-325-JRG, 2016 WL 9275395 (E.D. Tex. Oct. 19, 2016) .................................7, 9

*Saint Lawrence Commc'ns LLC v. Apple Inc.*,
   No. 2:16-cv-82-JRG, 2017 WL 3712912 (E.D. Tex. July 12, 2017)..........1, 6, 7, 9, 10, 11, 12

*Spread Spectrum Screening LLC v. Eastman Kodak Co.*,
   657 F.3d 1349 (Fed. Cir. 2011)............................................................................................5, 6

*T.J. Smith & Nephew Ltd. v. Ferris Corp.*,
   No. 86- C 5461, 1987 WL 7496 (N.D. Ill. Feb. 27, 1987) .....................................................12

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Telebrands Corp. v. Nat'l Exp., Inc.*,
    No. 12-cv-6671 et al., 2014 WL 4930897 (D.N.J. Oct. 2, 2014) .......................................7, 10

*Terrell v. DeConna*,
    877 F.2d 1267 (5th Cir. 1989) ...............................................................................................11

*Thermolife Int'l, LLC v. Vitamin Shoppe, Inc.*,
    No. 0:16-cv-60693-UU, 2016 WL 6678525 (S.D. Fla. June 8, 2016)....................................6

*Tile Tech, Inc. v. Appian Way Sales, Inc.*,
    No. C17-1660JLR, 2018 WL 2113958 (W.D. Wash. May 8, 2018)........................................7

*UltimatePointer, L.L.C. v. Nintendo Co.*,
    No. 6:11-cv-496-LED et al., 2014 WL 12515338 (E.D. Tex. June 17, 2014) ..................9, 11

*WP Banquet, LLC v. Target Corp.*,
    No. 16-cv-02082-JAK(JPRx), 2016 WL 9450448 (C.D. Cal. Dec. 15, 2016)........................7

## I.   INTRODUCTION

Wapp Tech Limited Partnership and Wapp Tech Corp. (collectively, "Wapp") allege that "[c]ertain Micro Focus software products that are used by [Wells Fargo & Company ("Wells Fargo")] infringe the Patents-in-Suit."[1] Dkt. No. 1 ¶ 15.  Wapp has not limited its lawsuit to Wells Fargo, but also sued Bank of America and Hewlett Packard Enterprise Company ("Hewlett Packard Enterprise") in this Court, alleging infringement of the same patents based on the same products and functionalities.  More significant, however, Wapp filed yet another suit in this Court against the alleged manufacturer of the "Micro Focus software products," Micro Focus International plc.  In that suit against Micro Focus International plc, Wapp asserts infringement of the same patents, by the same accused products and functionalities, using the same theories of infringement, as it does in this suit against Wells Fargo.  In fact, demonstrative of the uniformity of its allegations, Wapp attached identical "infringement" charts to its complaints against Wells Fargo and Micro Focus International plc, as well as Bank of America and Hewlett Packard Enterprise. That Wapp's complaints against the alleged manufacturer of the accused software and that manufacturer's customers are essentially indistinguishable, strongly supports the relief requested herein by Wells Fargo:  stay this (and the other) suits while Wapp litigates its claims against the manufacturer.

"[T]o facilitate just, convenient, efficient, and less expensive determination[s]" in circumstances such as this, "courts have developed a practice of" applying the "customer suit doctrine" to "stay[] claims against customers pending resolution of the suit against the manufacturer" where the actions involve at least the same "major" issues, such as infringement and invalidity.  *In re*

---

[1]    Wells Fargo & Company is a holding company that provides no products or services in this District, unlike its wholly owned subsidiary, Wells Fargo Bank, N.A.

*Nintendo of Am., Inc.*, 756 F.3d 1363, 1365 (Fed. Cir. 2014); *Saint Lawrence Commc'ns LLC v. Apple Inc.*, No. 2:16-cv-82-JRG, 2017 WL 3712912, at *2 (E.D. Tex. July 12, 2017).  Resolution of such issues in an action against the manufacturer—the "'true defendant' in the dispute"—will also resolve those same issues in the customer suit.  *Nintendo*, 756 F.3d at 1366.  That is the situation here, and thus any final judgment as to infringement and invalidity in the manufacturer suits will resolve the same issues as to Wells Fargo.  And any damages award that Wapp could obtain against the manufacturer would preclude a double recovery against Wells Fargo.

While Micro Focus International plc has filed a motion to dismiss the case against it for lack of personal jurisdiction and failed service of process, Wapp will have a party against whom it can seek redress for the infringement alleged.  Indeed, the two subsidiaries of Micro Focus International plc that actually market and license the accused software, Seattle SpinCo, Inc. ("Seattle SpinCo") and EntIT Software LLC ("EntIT Software"), recently brought an action for declaratory judgment against Wapp for non-infringement and invalidity of the same Wapp patents in view of the same products and functionalities.  Accordingly, Seattle SpinCo and EntIT Software are the proper defendants, not Micro Focus International plc.  Nevertheless, regardless of which of these two suits goes forward, at least one manufacturer suit involving the same allegations as in this suit against Wells Fargo will survive.

Additionally, in the event of a stay, Wells Fargo agrees to be bound by any final judgment in the appropriate manufacturer suit.  Thus, the customer suit doctrine warrants a stay of this case pending final resolution of the manufacturer litigation.

## II.     BACKGROUND

**The Manufacturer Actions.**  On July 2, 2018, Wapp filed a complaint in this Court against Micro Focus International plc.  In that complaint, Wapp alleges that Micro Focus International plc directly infringed U.S. Patent Nos. 9,971,678, 9,298,864, and 8,924,192 (the "Patents-in-Suit") by

making, using, offering to sell, and/or selling the following software products and functionalities: specifically, in its complaint against Micro Focus International plc, Wapp alleges that Micro Focus International plc "has directly infringed at least Claim 1 of the [asserted patents], including making, using (including for testing purposes), selling, and offering for sale . . . including and not limited to the LoadRunner, Performance Center, StormRunner and Mobile Center software products ('Micro Focus Software Suite')." *Wapp Tech Ltd. v. Micro Focus Int'l plc*, No. 4:18-cv-00469-ALM (E.D. Tex. filed July 2, 2018), Dkt. No. 1, ¶¶ 59, 76 and 95.  Attached to Wapp's complaint against Micro Focus International plc are several claim charts purporting to support Wapp's allegations of infringement for certain claims of each Patent-in-Suit, on an element-by-element basis. *See id.*, Dkt. No. 1, Exs. 4–6.  Today, on October 17, 2018, Micro Focus International plc moved to dismiss Wapp's complaint against it on various grounds, including that Micro Focus International plc does not make the accused software, is not subject to personal jurisdiction in the state of Texas, and has not been served. *Id.*, Dkt. No. 12.  Micro Focus International plc's motion to dismiss remains pending.

Meanwhile, also on October 15, 2018, Seattle SpinCo and EntIT Software, which claim to be indirect wholly owned subsidiaries of Micro Focus International plc, jointly filed a declaratory judgment action against Wapp in the District of Delaware. *Seattle SpinCo, Inc. v. Wapp Tech Ltd. P'ship*, No. 1:18-cv-01585-UNA, Dkt. No 1 ¶ 4 (D. Del.).  In that action, Seattle SpinCo and EntIT Software assert that they make and sell the accused software, and they seek a declaratory judgment of non-infringement and invalidity with respect to the same Patents-in-Suit asserted against Micro Focus International plc. *Id.* ¶¶ 21–26.

**The Wells Fargo Action.**[2]  On July 16, 2018, Wapp filed its Complaint in this action against Wells Fargo.  Dkt. No. 1.  In its Complaint in this case, Wapp alleges that Wells Fargo "has been making and/or using (including for testing purposes) and continues to make and/or use (including for testing purposes) . . . including and not limited to the Micro Focus Software Suite and LoadRunner."  *Id.* ¶ 26.  As with Wapp's allegations against Micro Focus International plc, Wapp alleges only direct infringement of the Patents-in-Suit against Wells Fargo.  Dkt. No. 1 ¶¶ 58, 76, 96.  Likewise, the substance of Wapp's allegations of infringement against Wells Fargo are identical to those against Micro Focus International plc.  *Compare* Dkt. No. 1 ¶¶ 35–109, *with* No. 4:18-cv-00469-ALM, Dkt. No. 1 ¶¶ 30–107.  In particular, Wapp attaches the same alleged infringement charts to its Complaint against Wells Fargo as it did to its complaint against Micro Focus International plc.  *Compare* Dkt. Nos. 1-4, 1-5, and 1-6, *with* No. 4:18-cv-00469-ALM, Dkt. Nos. 1-4, 1-5, and 1-6.  And the charts are directed solely to the accused products and functionalities allegedly made and sold by Micro Focus International plc.  Wapp makes no other claims against Wells Fargo in this case.

Despite Wapp's allegations, Wells Fargo, which is a holding company, does not actually use the accused software.  But to the extent any subsidiary of Wells Fargo does use any of the accused software, such subsidiary is merely a customer that uses the software "off the shelf."  Ex. A ¶ 5; *see also* Dkt. No. 1 ¶¶ 24, 28, 30.  More specifically, to the extent a subsidiary of Wells Fargo uses the accused products and functionalities, they are used for their intended purpose.  Ex. A ¶ 5.  Neither Wells Fargo, nor any subsidiary, has ever had a role in designing, developing,

---

[2]  As noted, Wapp also filed cases against Bank of America, *Wapp Tech Ltd. v. Bank of America Corp.*, No. 4:18-cv-00519-ALM (E.D. Tex. filed July 20, 2018) and Hewlett Packard Enterprise, *Wapp Tech Ltd. v. Hewlett Packard Enterprise Co.*, No. 4:18-cv-00468-ALM (E.D. Tex. filed July 2, 2018).  Both Bank of America and Hewlett Packard Enterprise have filed motions to stay in their respective cases.

producing, or maintaining any of the accused software.  *Id.* ¶ 4.  Neither Wells Fargo, nor any subsidiary, modifies the accused software in any way.  *Id.* ¶ 5.  Indeed, Wells Fargo is not aware of any way to modify the code in the accused software; neither would such modifications be permitted to be made even if it were possible to do so.  *Id.*

Wells Fargo filed an answer to Wapp's Complaint on October 16, 2018.  Dkt. No. 8.  In its answer, Wells Fargo denies Wapp's allegations of infringement of the Patents-in-Suit.  Wells Fargo also asserts several affirmative defenses, including that the asserted claims of the Patents-in-Suit are invalid.  *Id.* ¶¶ 110–24.

## III.  THIS CUSTOMER SUIT AGAINST WELLS FARGO SHOULD BE STAYED PENDING FINAL RESOLUTION OF THE MANUFACTURER CASES

### A.  Legal Standard:  The Customer Suit Doctrine

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

As such, where the customer of a product has been sued for alleged patent infringement based on the customer's use of the product, courts have applied the "customer suit doctrine" to stay the litigation against the customer so that a co-pending action based on similar claims against the product's manufacturer can first proceed to conclusion.  *See, e.g.*, *Nintendo*, 756 F.3d at 1365. The Federal Circuit has explained that this doctrine "is based on the manufacturer's presumed greater interest in defending its actions against charges of patent infringement . . . and to guard against possibility of abuse," and is intended "to facilitate just, convenient, efficient, and less expensive determination[s]."  *See id.* at 1365; *Spread Spectrum Screening LLC v. Eastman Kodak Co.*, 657 F.3d 1349, 1357 (Fed. Cir. 2011) (quoting *Kahn v. Gen. Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989)).

Accordingly, where the customer and manufacturer suits share the same "major issues," such as infringement and invalidity, and thus resolution of those issues in the manufacturer suit will resolve the same issues in the customer suit, the doctrine "exists to avoid . . . imposing the burdens of trial on the customer, for it is the manufacturer who is generally the 'true defendant' in the dispute." *See Nintendo*, 756 F.3d at 1366; *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990). This is true even if there "may be additional issues involving the defendant[] in [the customer suit]," as the customer suit nevertheless "will be advanced if [the plaintiff] is successful on the major premises being litigated in [the manufacturer litigation], and may well be mooted if [the plaintiff] is unsuccessful." *Nintendo*, 756 F.3d at 1366 (quoting *Katz*, 909 F.2d at 1464) (internal quotation marks omitted); *Spread Spectrum*, 657 F.3d at 1358.

In *Nintendo*, the Federal Circuit directed a district court to stay infringement suits against eleven customer defendants, finding that the "case against [the manufacturer] must proceed first, in any forum." 756 F.3d at 1366. The court reasoned that "the issues of infringement and validity [we]re common" to the manufacturer and the customer suits, and "that if [the plaintiff] were to collect royalties from [the manufacturer], this would preclude suit against the [customers]." *Id.* Thus, the court held that "[s]ince [the manufacturer's] liability is predicate to recovery from any of the defendants, the case against [the manufacturer] must proceed first." *Id.*

After *Nintendo*, a court in this District has recognized that "courts have developed a practice of . . . staying claims against customers pending resolution of the suit against the manufacturer." *Saint Lawrence*, 2017 WL 3712912, at *2 (citing *Cellular Commc'ns Equipment LLC v. Apple, Inc.*, No. 6:14-cv-251-KNM, 2016 WL 6884648 (E.D. Tex. Aug. 26, 2016)); *see also Mantissa Corp. v. Old Second Bancorp, Inc.*, No. 17-cv-9175, 2018 WL 3059604, at *3 (N.D. Ill. June 20, 2018) ("District courts . . . have routinely applied this [customer suit] doctrine to stay patent

6

infringement claims against customers in favor of resolving the patentee's claims against the up-stream manufacturer first."); *Thermolife Int'l, LLC v. Vitamin Shoppe, Inc.*, No. 0:16-cv-60693-UU, 2016 WL 6678525, at *4 (S.D. Fla. June 8, 2016) ("Courts often stay patent litigation brought against resellers of allegedly infringing products under the customer suit doctrine pending resolution of claims against the product's manufacturer.").  Specifically, courts in this District and others have applied this doctrine to stay a customer suit where, as in this case, there are co-pending claims of infringement against the manufacturer based on the same patents and products.[3]

In *Saint Lawrence*, for example, a court in this District stayed a customer suit in favor of a manufacturer suit based on the same products and patents, where "the infringement contentions . . . served on" the manufacturer and customers "were identical."  2017 WL 3712912, at *1.  The court held that the claims against the customer defendants were "peripheral" to those against the manu-facturer, noting that the customer defendants "play[ed] no role in the development, design, or im-plementation of the relevant software code."  *Id.* at *2.  The court further relied on the fact that the customer defendants had "agree[d] to be bound by the invalidity and infringement rulings in [the manufacturer] case."  *Id.*  The court held that "infringement and invalidity—two of the biggest issues in any patent case—[would therefore] be resolved by the first trial against" the manufac-turer.  *Id.*; *see also Collaborative Agreements*, 2015 WL 10818739, at *2 (staying a customer suit

---

[3]  *See, e.g.*, *Saint Lawrence*, 2017 WL 3712912, at *1–2; *Opticurrent, LLC v. Power Inte-grations, Inc.*, No. 2:16-cv-325-JRG, 2016 WL 9275395, at *4–5 (E.D. Tex. Oct. 19, 2016); *Cel-lular Commc'ns*, 2016 WL 6884648, at *1; *Collaborative Agreements, LLC v. Adobe Sys. Inc.*, No. 1:14-cv-356-LY, 2015 WL 10818739, at *1–3 (W.D. Tex. Aug. 21, 2015); *Belfer Cosmetics, LLC v. Nordstrom, Inc.*, No. H-15-683, 2016 WL 8792318, at *1–3 (S.D. Tex. Feb. 26, 2016); *Tile Tech, Inc. v. Appian Way Sales, Inc.*, No. C17-1660JLR, 2018 WL 2113958, at *1–3 (W.D. Wash. May 8, 2018); *WP Banquet, LLC v. Target Corp.*, No. 16-cv-02082-JAK(JPRx), 2016 WL 9450448, at *1, 5–6 (C.D. Cal. Dec. 15, 2016); *Capital Sec. Sys., Inc. v. NCR Corp.*, No. 1:14-cv-1516-WSD et al., 2015 WL 3819336, at *1–3 (N.D. Ga. June 18, 2015).

where the customer defendants agreed to "be bound by any infringement rulings against [the man-ufacturer]"); *cf. Telebrands Corp. v. Nat'l Exp., Inc.*, No. 12-cv-6671 et al., 2014 WL 4930897, at *4–5 (D.N.J. Oct. 2, 2014) (staying a customer suit *even though* the customer defendants had *not* "agreed to be bound by the judgments in the manufacturer cases").

In *Cellular Communications*, another court in this District stayed a customer suit in favor of a similar manufacturer suit.  As in *Saint Lawrence*, the district court in *Cellular Communications* based its decision in part on the fact that the plaintiff had "drafted a single set of identical infringe-ment contentions for" the manufacturer and the customer defendants, and thus the "infringement claims" against the customers were "substantively identical to the infringement claims against" the manufacturer.  2016 WL 6884648, at *2.  The court rejected the plaintiff's argument that the customers were required to "configure" the accused phones and tablets "in a way that [was] com-patible with their network" and that the customers "t[ook] the extra step of bundling" the accused software "with service plans and imposing standards which must be maintained in order to use the device."  *Id.*  The court reasoned that any such differences did not change the identical "infringe-ment allegations" against the customer and manufacturer defendants, as the differences "d[id] not change the fact that" the customers "d[id] not modify or alter the patented technology at issue."  *Id.*

### B.     The Customer Suit Doctrine Warrants a Stay of This Case

Under the customer suit doctrine, this lawsuit should be stayed pending the final outcome of the current litigation against the manufacturer of the accused software.  While there are two pending suits involving the alleged manufacturer of the accused software—*i.e.*, the case brought by Wapp against Micro Focus International plc in this Court and the declaratory judgment action brought by Seattle SpinCo and EntIT Software against Wapp in Delaware—there can be no dispute among the parties to those cases that only one of the cases should move forward on the merits; the

parties may only disagree as to which of the two cases should be the one to proceed.  Regardless of which case ends up moving forward, that case will be the operative manufacturer suit.  And this action against Wells Fargo should be stayed in view of that operative manufacturer suit.

In particular, a stay of this case, as well as those against Bank of America and Hewlett Packard Enterprise, should be granted under the customer suit doctrine because these cases and the manufacturer suit involve the same Patents-in-Suit, the same accused products and functionalities, and the same allegations of infringement.  Thus, any final judgment in the manufacturer litigation will resolve at least the "major issues" of infringement and invalidity in this case.  Accordingly, a stay of this customer suit against Wells Fargo will best "facilitate [a] just, convenient, efficient, and less expensive determination" and "avoid" unnecessarily "imposing the burdens of" litigation on Wells Fargo.  *See Nintendo*, 756 F.3d at 1365–66.  Likewise, a stay of all of the other non-manufacturer cases, *i.e.,* those against Bank of America and Hewlett Packard Enterprise, will provide enhanced efficiencies and decrease the burdens on the courts.

First, the accused products and functionalities are the same in this case as in the manufacturer suits.  As a customer, Wells Fargo is at most a mere user of the accused software.  As with the customer defendant in *Saint Lawrence*, Wells Fargo "play[s] no role in the development, design, or implementation of the relevant software code" or any other aspect of the accused software.  *See* 2017 WL 3712912, at *2; Ex. A ¶ 4; *see also Opticurrent*, 2016 WL 9275395, at *5 (granting a stay of the customer suit where the customer was "merely a 'distributor or reseller of the accused products'").  To the extent Wells Fargo, or any subsidiary, uses any of the accused software, such use is "off the shelf," meaning that no modifications are made to the software.  Ex. A ¶ 5.  In fact, Wells Fargo is not aware of any modifications that it could make to the accused software, nor would any such modifications be permitted even if it were possible to make them.  *Id.*  Thus, to

9

the extent there is such use, the products and functionalities are used for their intended purpose. *Id.*

Second, this case and the manufacturer suits involve the same Patents-in-Suit and infringement allegations. Moreover, just as the plaintiffs did in *Saint Lawrence* and *Cellular Communications*, Wapp attached *identical* infringement charts to its complaints against Wells Fargo and Micro Focus International plc, and the charts are directed solely to the accused products and functionalities allegedly made and sold by Micro Focus International plc. *Compare* Dkt. No. 1, Exs. 4–6, *with* No. 4:18-cv-00469-ALM, Dkt. No. 1, Exs. 4–6; *Saint Lawrence*, 2017 WL 3712912, at *1; *Cellular Communications*, 2016 WL 6884648, at *2. Wapp alleges only direct infringement against each defendant, and has not raised any separate claims unique to either defendant. Dkt. No. 1 ¶¶ 58, 76, 96; No. 4:18-cv-00469-ALM, Dkt. No. 1 ¶¶ 59, 76, 95. Because the basis for alleged infringement is the same for Wells Fargo as for the product manufacturer, the outcome of Wapp's infringement claims against the manufacturer will dispose of the infringement question as to Wells Fargo here.

Third, although a customer defendant's agreement "to be bound by the judgments in the manufacturer cases" is "not require[d]" for a stay under the customer suit doctrine, in the event of a stay, Wells Fargo hereby agrees to be bound by any final judgment of liability in the manufacturer litigation, including as to infringement and invalidity. *See Telebrands*, 2014 WL 4930897, at *4; *see also Katz*, 909 F.2d at 1464. Like the customer defendants' agreements to be bound in *Collaborative Agreements* and *Saint Lawrence*, Wells Fargo's agreement to be bound only further "reinforce[s]" that Wapp's claims against Wells Fargo are "peripheral to the central infringement dispute" against the alleged manufacturer of the accused software. *See Collaborative Agreements*, 2015 WL 10818739, at *2; *Saint Lawrence*, 2017 WL 3712912, at *2.

10

Fourth, any payment of a royalty by the manufacturer of the accused software—whether from a settlement or an adverse judgment in one of the pending cases—will exhaust Wapp's claims against Wells Fargo. *Nintendo*, 756 F.3d at 1366. That also would render this lawsuit moot, since Wells Fargo would not owe any damages for infringement. *Id.*

Thus, because this case and the manufacturer suits share at least the same infringement and invalidity questions—"two of the biggest issues in any patent case"—and particularly because Wells Fargo agrees to be bound by any final judgment of liability in the manufacturer litigation in the event of a stay, allowing the manufacturer suit to proceed first will resolve those same issues in this case and potentially moot others. *Saint Lawrence*, 2017 WL 3712912, at *2. Indeed, issue preclusion also will bar Wapp from relitigating against Wells Fargo any issues on which Wapp loses in the manufacturer litigation. *Terrell v. DeConna*, 877 F.2d 1267, 1270 (5th Cir. 1989). Here, the manufacturer (whether Seattle SpinCo and EntIT Software, or Micro Focus International plc) is the "'true defendant' in the dispute" with a significant interest in proceeding first in this litigation, not only to "protect [its alleged] customers" "as a matter of contract" and "good business," but also "to avoid the damaging impact of an adverse ruling against [its products]." *Katz*, 909 F.2d at 1464 (citation omitted). The instant action against Wells Fargo, which is merely "peripheral" to that dispute, therefore should be stayed pending final resolution of the manufacturer litigation.

## C.     Additional Factors Weigh in Favor of a Stay

Although this litigation can and should be stayed based on the customer suit doctrine alone, the following three factors further weigh in favor of a stay:

(1)  This case is in its infancy, where Wells Fargo filed its answer to the complaint just yesterday, discovery has not begun, and no trial date has been set;

(2)  As discussed above, a stay of this case "will simplify the issues in question and trial of

the case," based on resolution of at least the same "major" issues in the manufacturer litigation and Wells Fargo's agreement to be bound in the event of a stay by any final judgment as to such issues (*supra*, Section III(B)); and

(3)  Wapp will suffer no "prejudice" or "clear tactical disadvantage" from a stay.  *UltimatePointer, L.L.C. v. Nintendo Co.*, No. 6:11-cv-496-LED et al., 2014 WL 12515338, at *9 (E.D. Tex. June 17, 2014) (citation and internal quotation marks omitted).

As to the third factor, Wapp will suffer no prejudice from a stay of this case because Wapp will still be able to proceed with the manufacturer litigation which, as demonstrated by Wapp's identical infringement charts as to Wells Fargo and Micro Focus International plc, involves the same infringement allegations as in this case.  And it is the alleged manufacturers—not Wells Fargo, a mere customer—that would be the primary source of relevant information.  *See T.J. Smith & Nephew Ltd. v. Ferris Corp.*, No. 86- C 5461, 1987 WL 7496, at *2 (N.D. Ill. Feb. 27, 1987) ("The manufacturer is clearly in the best position to either defend against a claim of infringement or to affirmatively assert invalidity of the holder's patent," and "[presumably]" "has the more detailed knowledge regarding the claim of infringement, the expertise in the area, and the primary interest in the outcome of the litigation.") (citation and internal quotation marks omitted).  Furthermore, it has been well established that a "party is precluded from suing to collect damages for direct infringement by a buyer and user of a product when actual damages covering that very use have already been collected from the maker and seller of that product."  *Glenayre Elecs., Inc. v. Jackson*, 443 F.3d 851, 864 (Fed. Cir. 2006); *Nintendo*, 756 F.3d at 1366.  Consequently, as discussed above, if the claims of the Patents-in-Suit are found to be not invalid and infringed in the manufacturer litigation, Wapp's award of any damages against the manufacturers would preclude any "double recovery" against Wells Fargo.  *Saint Lawrence*, 2017 WL 3712912, at *2.

Accordingly, these three factors only further weigh in favor of staying this case against Wells Fargo.

## IV.    CONCLUSION

Based on the foregoing, Wells Fargo respectfully requests that the Court grant this motion and stay this action pending final resolution of the manufacturer litigation involving Seattle SpinCo and EntIT Software or Micro Focus International plc, whichever is the suit to go forward.

Dated:  October 17, 2018                          Respectfully submitted,

                                    By:   */s/ Mark N. Reiter*
                                          Mark Reiter
                                          Lead Counsel
                                          State Bar No. 16759900
                                          mreiter@gibsondunn.com
                                          GIBSON, DUNN & CRUTCHER LLP
                                          2100 McKinney Avenue, Suite 1100
                                          Dallas, Texas  75201-6912
                                          Telephone:  214.698.3360
                                          Facsimile:  214.571.2907

                                          Neema Jalali
                                          California State Bar No. 245424
                                          njalali@gibsondunn.com
                                          GIBSON, DUNN & CRUTCHER LLP
                                          555 Mission Street
                                          San Francisco, CA 94105-0921
                                          Tel:  415.393-8224
                                          Fax:  415.374-8436

                                          *Attorneys for Wells Fargo & Company*

## <u>CERTIFICATE OF CONFERENCE</u>

Counsel for the parties conferred by telephone on October 15, 2018.  I attended on behalf of Wells Fargo, and Jeffrey Toler attended on behalf of Wapp.  Counsel discussed the issues related to this motion, and Mr. Reiter referred Mr. Toler to the case law supporting that the instant action should be stayed in view of the manufacturer cases.  Despite that case law, Mr. Toler disagreed that this action should be stayed.  These discussions have ended in an impasse, which leaves the stay issue open for the Court to resolve.

*/s/ Mark N. Reiter*
Mark N. Reiter

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2018, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to CM/ECF participants in this case.

*/s/ Mark N. Reiter*
Mark N. Reiter

# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., | Case No. 4:18-cv-00519-ALM-KPJ |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| BANK OF AMERICA CORPORATION, | |
| Defendant. | |

**<u>DEFENDANT BANK OF AMERICA CORPORATION'S MOTION TO STAY</u>**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ....................................................................................................2

III.   THIS CUSTOMER SUIT AGAINST BANK OF AMERICA SHOULD BE
       STAYED PENDING FINAL RESOLUTION OF THE MANUFACTURER
       CASES ...................................................................................................................5

       A.    Legal Standard:  The Customer Suit Doctrine ..........................................5

       B.    The Customer Suit Doctrine Warrants a Stay of This Case .....................8

       C.    Additional Factors Weigh in Favor of a Stay.........................................11

IV.    CONCLUSION....................................................................................................13

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*Belfer Cosmetics, LLC v. Nordstrom, Inc.*,
No. H-15-683, 2016 WL 8792318 (S.D. Tex. Feb. 26, 2016) ....................................................7

*Capital Sec. Sys., Inc. v. NCR Corp.*,
No. 1:14-cv-1516-WSD et al., 2015 WL 3819336 (N.D. Ga. June 18, 2015) ........................7

*Cellular Commc'ns Equipment LLC v. Apple, Inc.*,
No. 6:14-cv-251-KNM, 2016 WL 6884648 (E.D. Tex. Aug. 26, 2016) ....................6, 7, 8, 10

*Collaborative Agreements, LLC v. Adobe Sys. Inc.*,
No. 1:14-cv-356-LY, 2015 WL 10818739 (W.D. Tex. Aug. 21, 2015)............................7, 10

*Glenayre Elecs., Inc. v. Jackson*,
443 F.3d 851 (Fed. Cir. 2006)................................................................................................12

*Kahn v. Gen. Motors Corp.*,
889 F.2d 1078 (Fed. Cir. 1989)................................................................................................5

*Katz v. Lear Siegler, Inc.*,
909 F.2d 1459 (Fed. Cir. 1990)....................................................................................6, 10, 11

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936)..................................................................................................................5

*Mantissa Corp. v. Old Second Bancorp, Inc.*,
No. 17-cv-9175, 2018 WL 3059604 (N.D. Ill. June 20, 2018)................................................6

*In re Nintendo of Am., Inc.*,
756 F.3d 1363 (Fed. Cir. 2014)...................................................................1, 2, 5, 6, 10, 12

*Opticurrent, LLC v. Power Integrations, Inc.*,
No. 2:16-cv-325-JRG, 2016 WL 9275395 (E.D. Tex. Oct. 19, 2016) ................................7, 9

*Saint Lawrence Commc'ns LLC v. Apple Inc.*,
No. 2:16-cv-82-JRG, 2017 WL 3712912 (E.D. Tex. July 12, 2017)...........1, 6, 7, 9, 10, 11, 12

*Spread Spectrum Screening LLC v. Eastman Kodak Co.*,
657 F.3d 1349 (Fed. Cir. 2011).............................................................................................5, 6

*T.J. Smith & Nephew Ltd. v. Ferris Corp.*,
No. 86- C 5461, 1987 WL 7496 (N.D. Ill. Feb. 27, 1987) ....................................................12

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Telebrands Corp. v. Nat'l Exp., Inc.*,
 No. 12-cv-6671 et al., 2014 WL 4930897 (D.N.J. Oct. 2, 2014) .......................................7, 10

*Terrell v. DeConna*,
 877 F.2d 1267 (5th Cir. 1989) ..............................................................................................11

*Thermolife Int'l, LLC v. Vitamin Shoppe, Inc.*,
 No. 0:16-cv-60693-UU, 2016 WL 6678525 (S.D. Fla. June 8, 2016).....................................6

*Tile Tech, Inc. v. Appian Way Sales, Inc.*,
 No. C17-1660JLR, 2018 WL 2113958 (W.D. Wash. May 8, 2018).........................................7

*UltimatePointer, L.L.C. v. Nintendo Co.*,
 No. 6:11-cv-496-LED et al., 2014 WL 12515338 (E.D. Tex. June 17, 2014) ...................9, 11

*WP Banquet, LLC v. Target Corp.*,
 No. 16-cv-02082-JAK(JPRx), 2016 WL 9450448 (C.D. Cal. Dec. 15, 2016).........................7

## I.    INTRODUCTION

Wapp Tech Limited Partnership and Wapp Tech Corp. (collectively, "Wapp") allege that "[c]ertain Micro Focus software products that are used by [Bank of America Corporation ("Bank of America")] infringe the Patents-in-Suit."[1]   Dkt. No. 1 ¶ 15.   Wapp has not limited its lawsuit to Bank of America, but also sued Wells Fargo & Co. and Hewlett Packard Enterprise Company ("Hewlett Packard Enterprise") in this Court, alleging infringement of the same patents based on the same products and functionalities.   More significant, however, Wapp filed yet another suit in this Court against the alleged manufacturer of the "Micro Focus software products," Micro Focus International plc.   In that suit against Micro Focus International plc, Wapp asserts infringement of the same patents, by the same accused products and functionalities, using the same theories of infringement, as it does in this suit against Bank of America.   In fact, demonstrative of the uniformity of its allegations, Wapp attached identical "infringement" charts to its complaints against Bank of America and Micro Focus International plc, as well as Wells Fargo and Hewlett Packard Enterprise.   That Wapp's complaints against the alleged manufacturer of the accused software and that manufacturer's customers are essentially indistinguishable, strongly supports the relief requested herein by Bank of America:   stay this (and the other) customer suits while Wapp litigates its claims against the manufacturer.

"[T]o facilitate just, convenient, efficient, and less expensive determination[s]" in circumstances such as this, "courts have developed a practice of" applying the "customer suit doctrine" to "stay[] claims against customers pending resolution of the suit against the manufacturer" where the actions involve at least the same "major" issues, such as infringement and invalidity.   *In re*

---

[1]       Bank of America Corporation is a holding company that provides no products or services in this District, unlike its wholly owned subsidiary, Bank of America, N.A.

*Nintendo of Am., Inc.*, 756 F.3d 1363, 1365 (Fed. Cir. 2014); *Saint Lawrence Commc'ns LLC v. Apple Inc.*, No. 2:16-cv-82-JRG, 2017 WL 3712912, at *2 (E.D. Tex. July 12, 2017).  Resolution of such issues in an action against the manufacturer—the "'true defendant' in the dispute"—will also resolve those same issues in the customer suit.  *Nintendo*, 756 F.3d at 1366.  That is the situation here, and thus any final judgment as to infringement and invalidity in the manufacturer suits will resolve the same issues as to Bank of America.  And any damages award that Wapp could obtain against the manufacturer would preclude a double recovery against Bank of America.

While Micro Focus International plc has filed a motion to dismiss the case against it for lack of personal jurisdiction and failed service of process, Wapp will have a party against whom it can seek redress for the infringement alleged.  Indeed, the two subsidiaries of Micro Focus International plc that actually market and license the accused software, Seattle SpinCo, Inc. ("Seattle SpinCo") and EntIT Software LLC ("EntIT Software"), recently brought an action for declaratory judgment against Wapp for non-infringement and invalidity of the same Wapp patents in view of the same products and functionalities.  Accordingly, Seattle SpinCo and EntIT Software are the proper defendants, not Micro Focus International plc.  Nevertheless, regardless of which of these two suits goes forward, at least one manufacturer suit involving the same allegations as in this suit against Bank of America will survive.

Additionally, in the event of a stay, Bank of America agrees to be bound by any final judgment in the appropriate manufacturer suit.  Thus, the customer suit doctrine warrants a stay of this case pending final resolution of the manufacturer litigation.

## II.   BACKGROUND

**The Manufacturer Actions.**  On July 2, 2018, Wapp filed a complaint in this Court against Micro Focus International plc.  In that complaint, Wapp alleges that Micro Focus International plc directly infringed U.S. Patent Nos. 9,971,678, 9,298,864, and 8,924,192 (the "Patents-in-Suit") by

making, using, offering to sell, and/or selling the following software products and functionalities: specifically, in its complaint against Micro Focus International plc, Wapp alleges that Micro Focus International plc "has directly infringed at least Claim 1 of the [asserted patents], including making, using (including for testing purposes), selling, and offering for sale . . . including and not limited to the LoadRunner, Performance Center, StormRunner and Mobile Center software products ('Micro Focus Software Suite')." *Wapp Tech Ltd. v. Micro Focus Int'l plc*, No. 4:18-cv-00469-ALM (E.D. Tex. filed July 2, 2018), Dkt. No. 1, ¶¶ 59, 76 and 95.  Attached to Wapp's complaint against Micro Focus International plc are several claim charts purporting to support Wapp's allegations of infringement for certain claims of each Patent-in-Suit, on an element-by-element basis. *See id.*, Dkt. No. 1, Exs. 4–6.  Today, on October 17, 2018, Micro Focus International plc moved to dismiss Wapp's complaint against it on various grounds, including that Micro Focus International plc does not make the accused software, is not subject to personal jurisdiction in the state of Texas, and has not been served. *Id.*, Dkt. No. 12.  Micro Focus International plc's motion to dismiss remains pending.

Meanwhile, also on October 15, 2018, Seattle SpinCo and EntIT Software, which claim to be indirect wholly owned subsidiaries of Micro Focus International plc, jointly filed a declaratory judgment action against Wapp in the District of Delaware. *Seattle SpinCo, Inc. v. Wapp Tech Ltd. P'ship*, No. 1:18-cv-01585-UNA, Dkt. No. 1 ¶ 4 (D. Del.).  In that action, Seattle SpinCo and EntIT Software assert that they make and sell the accused software, and they seek a declaratory judgment of non-infringement and invalidity with respect to the same Patents-in-Suit asserted against Micro Focus International plc. *Id.* ¶¶ 21–26.

**The Bank of America Action.**[2]  On July 16, 2018, Wapp filed its Complaint in this action against Bank of America.  Dkt. No. 1.  In its Complaint in this case, Wapp alleges that Bank of America "has been making and/or using (including for testing purposes) and continues to make and/or use (including for testing purposes) . . . including and not limited to the Micro Focus Software Suite and LoadRunner."  *Id.* ¶ 26.  As with Wapp's allegations against Micro Focus International plc, Wapp alleges only direct infringement of the Patents-in-Suit against Bank of America.  Dkt. No. 1 ¶¶ 58, 76, 96.  Likewise, the substance of Wapp's allegations of infringement against Bank of America are identical to those against Micro Focus International plc.  *Compare* Dkt. No. 1 ¶¶ 35–109, *with* No. 4:18-cv-00469-ALM, Dkt. No. 1 ¶¶ 30–107.  In particular, Wapp attaches the same alleged infringement charts to its Complaint against Bank of America as it did to its complaint against Micro Focus International plc.  *Compare* Dkt. Nos. 1-14, 1-15, and 1-16, *with* No. 4:18-cv-00469-ALM, Dkt. Nos. 1-4, 1-5, and 1-6.  And the charts are directed solely to the accused products and functionalities allegedly made and sold by Micro Focus International plc.  Wapp makes no other claims against Bank of America in this case.

Despite Wapp's allegations, Bank of America, which is a holding company, does not actually use the accused software.  But to the extent any subsidiary of Bank of America does use any of the accused software, such subsidiary is merely a customer that uses the software "off the shelf."  Ex. A ¶ 5; *see also* Dkt. No. 1 ¶¶ 24, 28, 30.  More specifically, to the extent a subsidiary of Bank of America uses the accused products and functionalities, they are used for their intended purpose.

---

[2]     As noted, Wapp also filed cases against Wells Fargo, *Wapp Tech Ltd. v. Wells Fargo & Co.*, No. 4:18-cv-00501-ALM (E.D. Tex. filed July 16, 2018) and Hewlett Packard Enterprise, *Wapp Tech Ltd. v. Hewlett Packard Enterprise Co.*, No. 4:18-cv-00468-ALM (E.D. Tex. filed July 2, 2018).  Both Wells Fargo and Hewlett Packard Enterprise have filed motions to stay in their respective cases.

Ex. A ¶ 5.  Neither Bank of America, nor any subsidiary, has ever had a role in designing, developing, producing, or maintaining any of the accused software.  *Id.* ¶ 4.  Neither Bank of America, nor any subsidiary, modifies the accused software in any way.  *Id.* ¶ 5.  Indeed, Bank of America is not aware of any way to modify the code in the accused software; neither would such modifications be permitted to be made even if it were possible to do so.  *Id.*

Bank of America filed an answer to Wapp's Complaint on October 16, 2018.  Dkt. No. 9. In its answer, Bank of America denies Wapp's allegations of infringement of the Patents-in-Suit. Bank of America also asserts several affirmative defenses, including that the asserted claims of the Patents-in-Suit are invalid.  *Id.* ¶¶ 110–24.

## III.   THIS CUSTOMER SUIT AGAINST BANK OF AMERICA SHOULD BE STAYED PENDING FINAL RESOLUTION OF THE MANUFACTURER CASES

### A.   Legal Standard:  The Customer Suit Doctrine

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

As such, where the customer of a product has been sued for alleged patent infringement based on the customer's use of the product, courts have applied the "customer suit doctrine" to stay the litigation against the customer so that a co-pending action based on similar claims against the product's manufacturer can first proceed to conclusion.  *See, e.g.*, *Nintendo*, 756 F.3d at 1365. The Federal Circuit has explained that this doctrine "is based on the manufacturer's presumed greater interest in defending its actions against charges of patent infringement . . . and to guard against possibility of abuse," and is intended "to facilitate just, convenient, efficient, and less expensive determination[s]."  *See id.* at 1365; *Spread Spectrum Screening LLC v. Eastman Kodak Co.*, 657 F.3d 1349, 1357 (Fed. Cir. 2011) (quoting *Kahn v. Gen. Motors Corp.*, 889 F.2d 1078,

1081 (Fed. Cir. 1989)).

Accordingly, where the customer and manufacturer suits share the same "major issues," such as infringement and invalidity, and thus resolution of those issues in the manufacturer suit will resolve the same issues in the customer suit, the doctrine "exists to avoid . . . imposing the burdens of trial on the customer, for it is the manufacturer who is generally the 'true defendant' in the dispute." *See Nintendo*, 756 F.3d at 1366; *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990). This is true even if there "may be additional issues involving the defendant[] in [the customer suit]," as the customer suit nevertheless "will be advanced if [the plaintiff] is successful on the major premises being litigated in [the manufacturer litigation], and may well be mooted if [the plaintiff] is unsuccessful." *Nintendo*, 756 F.3d at 1366 (quoting *Katz*, 909 F.2d at 1464) (internal quotation marks omitted); *Spread Spectrum*, 657 F.3d at 1358.

In *Nintendo*, the Federal Circuit directed a district court to stay infringement suits against eleven customer defendants, finding that the "case against [the manufacturer] must proceed first, in any forum." 756 F.3d at 1366. The court reasoned that "the issues of infringement and validity [we]re common" to the manufacturer and the customer suits, and "that if [the plaintiff] were to collect royalties from [the manufacturer], this would preclude suit against the [customers]." *Id.* Thus, the court held that "[s]ince [the manufacturer's] liability is predicate to recovery from any of the defendants, the case against [the manufacturer] must proceed first." *Id.*

After *Nintendo*, a court in this District has recognized that "courts have developed a practice of . . . staying claims against customers pending resolution of the suit against the manufacturer." *Saint Lawrence*, 2017 WL 3712912, at *2 (citing *Cellular Commc'ns Equipment LLC v. Apple, Inc.*, No. 6:14-cv-251-KNM, 2016 WL 6884648 (E.D. Tex. Aug. 26, 2016)); *see also Mantissa Corp. v. Old Second Bancorp, Inc.*, No. 17-cv-9175, 2018 WL 3059604, at *3 (N.D. Ill. June

20, 2018) ("District courts . . . have routinely applied this [customer suit] doctrine to stay patent infringement claims against customers in favor of resolving the patentee's claims against the upstream manufacturer first."); *Thermolife Int'l, LLC v. Vitamin Shoppe, Inc.*, No. 0:16-cv-60693-UU, 2016 WL 6678525, at *4 (S.D. Fla. June 8, 2016) ("Courts often stay patent litigation brought against resellers of allegedly infringing products under the customer suit doctrine pending resolution of claims against the product's manufacturer."). Specifically, courts in this District and others have applied this doctrine to stay a customer suit where, as in this case, there are co-pending claims of infringement against the manufacturer based on the same patents and products.[3]

In *Saint Lawrence*, for example, a court in this District stayed a customer suit in favor of a manufacturer suit based on the same products and patents, where "the infringement contentions . . . served on" the manufacturer and customers "were identical." 2017 WL 3712912, at *1. The court held that the claims against the customer defendants were "peripheral" to those against the manufacturer, noting that the customer defendants "play[ed] no role in the development, design, or implementation of the relevant software code." *Id.* at *2. The court further relied on the fact that the customer defendants had "agree[d] to be bound by the invalidity and infringement rulings in [the manufacturer] case." *Id.* The court held that "infringement and invalidity—two of the biggest issues in any patent case—[would therefore] be resolved by the first trial against" the manufacturer. *Id.*; *see also Collaborative Agreements*, 2015 WL 10818739, at *2 (staying a customer suit

---

[3]        *See, e.g.*, *Saint Lawrence*, 2017 WL 3712912, at *1–2; *Opticurrent, LLC v. Power Integrations, Inc.*, No. 2:16-cv-325-JRG, 2016 WL 9275395, at *4–5 (E.D. Tex. Oct. 19, 2016); *Cellular Commc'ns*, 2016 WL 6884648, at *1; *Collaborative Agreements, LLC v. Adobe Sys. Inc.*, No. 1:14-cv-356-LY, 2015 WL 10818739, at *1–3 (W.D. Tex. Aug. 21, 2015); *Belfer Cosmetics, LLC v. Nordstrom, Inc.*, No. H-15-683, 2016 WL 8792318, at *1–3 (S.D. Tex. Feb. 26, 2016); *Tile Tech, Inc. v. Appian Way Sales, Inc.*, No. C17-1660JLR, 2018 WL 2113958, at *1–3 (W.D. Wash. May 8, 2018); *WP Banquet, LLC v. Target Corp.*, No. 16-cv-02082-JAK(JPRx), 2016 WL 9450448, at *1, 5–6 (C.D. Cal. Dec. 15, 2016); *Capital Sec. Sys., Inc. v. NCR Corp.*, No. 1:14-cv-1516-WSD et al., 2015 WL 3819336, at *1–3 (N.D. Ga. June 18, 2015).

where the customer defendants agreed to "be bound by any infringement rulings against [the man-ufacturer]"); *cf. Telebrands Corp. v. Nat'l Exp., Inc.*, No. 12-cv-6671 et al., 2014 WL 4930897, at *4–5 (D.N.J. Oct. 2, 2014) (staying a customer suit *even though* the customer defendants had *not* "agreed to be bound by the judgments in the manufacturer cases").

In *Cellular Communications*, another court in this District stayed a customer suit in favor of a similar manufacturer suit.  As in *Saint Lawrence*, the district court in *Cellular Communications* based its decision in part on the fact that the plaintiff had "drafted a single set of identical infringe-ment contentions for" the manufacturer and the customer defendants, and thus the "infringement claims" against the customers were "substantively identical to the infringement claims against" the manufacturer.  2016 WL 6884648, at *2.  The court rejected the plaintiff's argument that the customers were required to "configure" the accused phones and tablets "in a way that [was] com-patible with their network" and that the customers "t[ook] the extra step of bundling" the accused software "with service plans and imposing standards which must be maintained in order to use the device."  *Id.*  The court reasoned that any such differences did not change the identical "infringe-ment allegations" against the customer and manufacturer defendants, as the differences "d[id] not change the fact that" the customers "d[id] not modify or alter the patented technology at issue."  *Id.*

### B.     The Customer Suit Doctrine Warrants a Stay of This Case

Under the customer suit doctrine, this lawsuit should be stayed pending the final outcome of the current litigation against the manufacturer of the accused software.  While there are two pending suits involving the alleged manufacturer of the accused software—*i.e.*, the case brought by Wapp against Micro Focus International plc in this Court and the declaratory judgment action brought by Seattle SpinCo and EntIT Software against Wapp in Delaware—there can be no dispute among the parties to those cases that only one of the cases should move forward on the merits; the

8

parties may only disagree as to which of the two cases should be the one to proceed.  Regardless of which case ends up moving forward, that case will be the operative manufacturer suit.  And this action against Bank of America should be stayed in view of that operative manufacturer suit.

In particular, a stay of this case, as well as those against Wells Fargo and Hewlett Packard Enterprise, should be granted under the customer suit doctrine because these cases and the manufacturer suit involve the same Patents-in-Suit, the same accused products and functionalities, and the same allegations of infringement.  Thus, any final judgment in the manufacturer litigation will resolve at least the "major issues" of infringement and invalidity in this case.  Accordingly, a stay of this customer suit against Bank of America will best "facilitate [a] just, convenient, efficient, and less expensive determination" and "avoid" unnecessarily "imposing the burdens of" litigation on Bank of America.  *See Nintendo*, 756 F.3d at 1365–66.  Likewise, a stay of all of the other non-manufacturer cases, *i.e.,* those against Wells Fargo and Hewlett Packard Enterprise, will provide enhanced efficiencies and decrease the burdens on the courts.

First, the accused products and functionalities are the same in this case as in the manufacturer suits.  As an alleged customer, Bank of America is at most a mere user of the accused software.  As with the customer defendant in *Saint Lawrence*, Bank of America "play[s] no role in the development, design, or implementation of the relevant software code" or any other aspect of the accused software.  *See* 2017 WL 3712912, at *2; Ex. A ¶ 4; *see also Opticurrent*, 2016 WL 9275395, at *5 (granting a stay of the customer suit where the customer was "merely a 'distributor or reseller of the accused products'").  To the extent Bank of America, or any subsidiary, uses any of the accused software, such use is "off the shelf," meaning that no modifications are made to the software. Ex. A ¶ 5.  In fact, Bank of America is not aware of any modifications that it could make to the accused software, nor would any such modifications be permitted even if it were possible to

9

make them.  *Id.*  Thus, to the extent there is such use, the products and functionalities are used for their intended purpose.  *Id.*

Second, this case and the manufacturer suits involve the same Patents-in-Suit and infringement allegations.  Moreover, just as the plaintiffs did in *Saint Lawrence* and *Cellular Communications*, Wapp attached *identical* infringement charts to its complaints against Bank of America and Micro Focus International plc, and the charts are directed solely to the accused products and functionalities allegedly made and sold by Micro Focus International plc.  *Compare* Dkt. No. 1, Exs. 4–6, *with* No. 4:18-cv-00469-ALM, Dkt. No. 1, Exs. 4–6; *Saint Lawrence*, 2017 WL 3712912, at *1; *Cellular Communications*, 2016 WL 6884648, at *2.  Wapp alleges only direct infringement against each defendant, and has not raised any separate claims unique to either defendant.  Dkt. No. 1 ¶¶ 58, 76, 96; No. 4:18-cv-00469-ALM, Dkt. No. 1 ¶¶ 59, 76, 95.  Because the basis for alleged infringement is the same for Bank of America as for the product manufacturer, the outcome of Wapp's infringement claims against the manufacturer will dispose of the infringement question as to Bank of America here.

Third, although a customer defendant's agreement "to be bound by the judgments in the manufacturer cases" is "not require[d]" for a stay under the customer suit doctrine, Bank of America hereby agrees in the event of a stay to be bound by any final judgment of liability in the manufacturer litigation, including as to infringement and invalidity.  *See Telebrands*, 2014 WL 4930897, at *4; *see also Katz*, 909 F.2d at 1464.  Like the customer defendants' agreements to be bound in *Collaborative Agreements* and *Saint Lawrence*, Bank of America's agreement to be bound only further "reinforce[s]" that Wapp's claims against Bank of America are "peripheral to the central infringement dispute" against the alleged manufacturer of the accused software.  *See Collaborative Agreements*, 2015 WL 10818739, at *2; *Saint Lawrence*, 2017 WL 3712912, at *2.

10

Fourth, any payment of a royalty by the manufacturer of the accused software—whether from a settlement or an adverse judgment in one of the pending cases—will exhaust Wapp's claims against Bank of America. *Nintendo*, 756 F.3d at 1366. That also would render this lawsuit moot, since Bank of America would not owe any damages for infringement. *Id.*

Thus, because this case and the manufacturer suits share at least the same infringement and invalidity questions—"two of the biggest issues in any patent case"—and particularly because Bank of America agrees to be bound in the event of a stay by any final judgment of liability in the manufacturer litigation, allowing the manufacturer suit to proceed first will resolve those same issues in this case and potentially moot others. *Saint Lawrence*, 2017 WL 3712912, at *2. Indeed, issue preclusion also will bar Wapp from relitigating against Bank of America any issues on which Wapp loses in the manufacturer litigation. *Terrell v. DeConna*, 877 F.2d 1267, 1270 (5th Cir. 1989). Here, the manufacturer (whether Seattle SpinCo and EntIT Software, or Micro Focus International plc) is the "'true defendant' in the dispute" with a significant interest in proceeding first in this litigation, not only to "protect [its alleged] customers" "as a matter of contract" and "good business," but also "to avoid the damaging impact of an adverse ruling against [its products]." *Katz*, 909 F.2d at 1464 (citation omitted). The instant action against Bank of America, which is merely "peripheral" to that dispute, therefore should be stayed pending final resolution of the manufacturer litigation.

### C.      Additional Factors Weigh in Favor of a Stay

Although this litigation can and should be stayed based on the customer suit doctrine alone, the following three factors further weigh in favor of a stay:

(1)  This case is in its infancy, where Bank of America filed its answer to the complaint just yesterday, discovery has not begun, and no trial date has been set;

(2) As discussed above, a stay of this case "will simplify the issues in question and trial of

the case," based on resolution of at least the same "major" issues in the manufacturer litigation and Bank of America's agreement to be bound in the event of a stay by any final judgment as to such issues (*supra*, Section III(B)); and

(3)  Wapp will suffer no "prejudice" or "clear tactical disadvantage" from a stay.  *UltimatePointer, L.L.C. v. Nintendo Co.*, No. 6:11-cv-496-LED et al., 2014 WL 12515338, at *9 (E.D. Tex. June 17, 2014) (citation and internal quotation marks omitted).

As to the third factor, Wapp will suffer no prejudice from a stay of this case because Wapp will still be able to proceed with the manufacturer litigation which, as demonstrated by Wapp's identical infringement charts as to Bank of America and Micro Focus International plc, involves the same infringement allegations as in this case.  And it is the alleged manufacturers—not Bank of America, a mere customer—that would be the primary source of relevant information.  *See T.J. Smith & Nephew Ltd. v. Ferris Corp.*, No. 86- C 5461, 1987 WL 7496, at *2 (N.D. Ill. Feb. 27, 1987) ("The manufacturer is clearly in the best position to either defend against a claim of infringement or to affirmatively assert invalidity of the holder's patent," and "[presumably]" "has the more detailed knowledge regarding the claim of infringement, the expertise in the area, and the primary interest in the outcome of the litigation.") (citation and internal quotation marks omitted). Furthermore, it has been well established that a "party is precluded from suing to collect damages for direct infringement by a buyer and user of a product when actual damages covering that very use have already been collected from the maker and seller of that product."  *Glenayre Elecs., Inc. v. Jackson*, 443 F.3d 851, 864 (Fed. Cir. 2006); *Nintendo*, 756 F.3d at 1366.  Consequently, as discussed above, if the claims of the Patents-in-Suit are found to be not invalid and infringed in the manufacturer litigation, Wapp's award of any damages against the manufacturers would preclude any "double recovery" against Bank of America.  *Saint Lawrence*, 2017 WL 3712912, at *2.

12

Accordingly, these three factors only further weigh in favor of staying this case against Bank of America.

## IV.    CONCLUSION

Based on the foregoing, Bank of America respectfully requests that the Court grant this motion and stay this action pending final resolution of the manufacturer litigation involving Seattle SpinCo and EntIT Software or Micro Focus International plc, whichever is the suit to go forward.

Dated:  October 17, 2018                          Respectfully submitted,

                                            By:   */s/ Mark N. Reiter*
                                                  Mark Reiter
                                                  Lead Counsel
                                                  State Bar No. 16759900
                                                  mreiter@gibsondunn.com
                                                  GIBSON, DUNN & CRUTCHER LLP
                                                  2100 McKinney Avenue, Suite 1100
                                                  Dallas, Texas  75201-6912
                                                  Telephone:  214.698.3360
                                                  Facsimile:  214.571.2907

                                                  Neema Jalali
                                                  California State Bar No. 245424
                                                  njalali@gibsondunn.com
                                                  GIBSON, DUNN & CRUTCHER LLP
                                                  555 Mission Street
                                                  San Francisco, CA 94105-0921
                                                  Tel:  415.393-8224
                                                  Fax:  415.374-8436

                                                  *Attorney for Bank of America Corporation*

## <u>CERTIFICATE OF CONFERENCE</u>

Counsel for the parties conferred by telephone on October 15, 2018.  I attended on behalf of Bank of America, and Jeffrey Toler attended on behalf of Wapp.  Counsel discussed the issues related to this motion, and Mr. Reiter referred Mr. Toler to the case law supporting that the instant action should be stayed in view of the manufacturer cases.  Despite that case law, Mr. Toler disagreed that this action should be stayed.  These discussions have ended in an impasse, which leaves the stay issue open for the Court to resolve.

*/s/ Mark N. Reiter*
Mark Reiter

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2018, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to CM/ECF participants in this case.

*/s/ Mark N. Reiter*
Mark Reiter

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| WAPP TECH LIMITED PARTNERSHIP | § | |
| and WAPP TECH CORP., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 4:18-cv-00469-ALM |
| v. | § | |
| | § | |
| MICRO FOCUS INTERNATIONAL PLC, | § | <u>JURY TRIAL DEMANDED</u> |
| | § | |
| Defendant. | § | |

**PLAINTIFFS WAPP TECH LIMITED PARTNERSHIP AND WAPP TECH CORP.'S
OPPOSITION TO DEFENDANT MICRO FOCUS INTERNATIONAL PLC'S MOTION
<u>TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 1

III.  ARGUMENT ........................................................................................................ 4

    A.    Micro Focus Holds Itself Out as Having Continuous and Systematic Contacts Within the Eastern District of Texas ......................................................................... 4

    B.    Service of the Complaint ............................................................................... 7

    1.   Micro Focus Waived Service of the Complaint ............................................. 7

    2.   Factual Disputes Exist Around Service of Process ........................................ 8

IV.  CONCLUSION .................................................................................................... 9

## <u>**TABLE OF AUTHORITIES**</u>

**CASES**

*Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*,
   566 F.3d 1012, 1017 (Fed. Cir. 2009) ........................................................................ 6

*Cray Inc.*,
   871 F.3d 1355 (Fed. Cir. 2017) ................................................................................. 7

*HTC Corp.*,
   889 F.3d 1349, 1360 (Fed. Cir. 2018) ....................................................................... 6

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
   581 U.S. ___ (2017), 137 S. Ct. 1514, 1520 n. 2 (2017) ......................................... 6

## I.  INTRODUCTION

Defendant Micro Focus International Plc ("Micro Focus") filed a Motion to Dismiss

("Motion" or "Mot.")[1] the Complaint for lack of personal jurisdiction, failure to serve, and

improper service of the Complaint. The Motion alleges this Court does not have personal

jurisdiction over Micro Focus and that Plaintiffs Wapp Tech Limited Partnership and Wapp Tech

Corp. (collectively "Wapp") failed to serve the Complaint on Micro Focus. The Motion should

be denied for numerous reasons. As Wapp shows below, the Court has jurisdiction over Micro

Focus at least because Micro Focus holds itself out as having sufficient contacts with Texas and

this District. At the very least, Wapp should be allowed jurisdictional discovery to determine

whether Micro Focus does indeed have sufficient contacts with the Eastern District of Texas.

Further, whether Wapp properly served Micro Focus is inapposite as Micro Focus waived

service of the Complaint.

## II.  BACKGROUND

Wapp filed a complaint against Micro Focus on July 2, 2018, alleging infringement of

U.S. Patent Nos. 9,971,678 ("the '678 Patent"), 9,298,864 ("the '864 Patent"), and 8,024,192

("the '192 Patent") (collectively, the "Patents"). In its Complaint, Wapp noted the extensive

work done by the principal inventor of the Patents in developing various "Performance

Engineering Innovations," which led to several awards for the patented work. Complaint ¶ 14. In

addition to the research and development work behind the Performance Engineering Innovations,

the principal inventor also licensed the Performance Engineering Innovations and the Patents to a

Fortune 500 leader in enterprise software. Complaint ¶ 15.

---

[1] Mot. to Dismiss for Lack of Personal Jurisdiction, Failure to Serve, and Improper Service of the Complaint, *Wapp Tech L.P. et al. v. Micro Focus Int'l Plc*, 4:18-cv-00469-ALM (E.D. Tex. Oct. 17, 2018).

Wapp's goal has been to democratize app development for a new generation of developers by migrating performance risks and reducing application development cycles from months down to minutes by virtue of new performance engineering modeling. In an effort to protect the further marketing and development of the Performance Engineering Innovations, Wapp filed complaints against Micro Focus, Hewlett Packard Enterprise Co. ("HPE"), Bank of America, and Wells Fargo, alleging infringement of the Patents by various systems that test mobile device applications.[2] The Accused System includes systems that incorporate various products that once belonged to HPE but now belong to Micro Focus. Complaint ¶¶ 17–29. In addition to the HPE/Micro Focus products, other parties (e.g., Wells Fargo and Bank of America) adapt and specialize those products into their own unique testing environments,[3] as well as adding their own proprietary software to its testing environment[4], and develop, test, and distribute mobile applications. Wapp therefore alleged direct infringement against Bank of America and Wells Fargo (users of the HPE/Micro Focus products). *Wapp Tech L.P. et al. v. Bank of America Corp.*, 4:18-cv-00519-ALM, Docket No. 1 at ¶¶ 58, 76 (E.D. Tex. Oct. 17, 2018); *Wapp Tech L.P. et al. v. Wells Fargo & Co.*, 4:18-cv-00501-ALM, Docket No. 1 at ¶¶ 58, 76 (E.D. Tex. Oct. 16, 2018).

---

[2] *Wapp Tech L.P. et al. v. Bank of America Corp.*, 4:18-cv-00519-ALM, Docket No. 1 (E.D. Tex. Oct. 17, 2018); *Wapp Tech L.P. et al. v. Wells Fargo & Co.*, 4:18-cv-00501-ALM, Docket No. 1 (E.D. Tex. Oct. 16, 2018); *Wapp Tech L.P. et al. v. Micro Focus Int'l PLC*, 4:18-cv-00469-ALM, Docket No. 1 (E.D. Tex. Oct. 17, 2018); *Wapp Tech L.P. et al. v. Hewlett-Packard Enterprise Co.*, 4:18-cv-00468-ALM, Docket No. 1 (E.D. Tex. Oct. 17, 2018).

[3] For example, on information and belief each customer using the HPE/Micro Focus products creates a unique series of scripts that are required for the HPE/Micro Focus products to be used in a given testing environment.

[4] For example, on information and belief Bank of America incorporates a "UI TestRunner" software product that is "proprietary" to Bank of America into its app testing environment. (Ex. A.)

Soon after filing suit, Wapp conferred with Micro Focus based on a representation from Mr. Reiter that he represented HPE and Micro Focus. Shortly after those discussions ended, two new entities began an unnecessary litigation assault on the Patents. *Seattle SpinCo, Inc. et al. v. Wapp Tech L.P. et al.*, 1:18-cv-01585 (D. Del. Oct. 26, 2018). More specifically, Seattle SpinCo, Inc. and EntIT Software LLC brought a declaratory judgment action against Wapp in the District of Delaware on October 15, 2018. *Id.* These entities allege that they should be the properly-named parties in any suit regarding the HPE/Micro Focus products. Rather than moving to intervene in the present case (if they are the properly-named parties) and then requesting to transfer the present case to Delaware (if they believe that is the correct and most convenient venue), Micro Focus brought this present Motion, and HPE, Bank of America, and Wells Fargo each moved to stay their individual actions pending the outcome of the Seattle SpinCo/EntIT Software declaratory judgment action in Delaware. *Wapp Tech L.P. et al. v. Bank of America Corp.*, 4:18-cv-00519-ALM, Docket No. 12 (E.D. Tex. Oct. 17, 2018); *Wapp Tech L.P. et al. v. Wells Fargo & Co.*, 4:18-cv-00501-ALM, Docket No. 11 (E.D. Tex. Oct. 16, 2018); *Wapp Tech L.P. et al. v. Micro Focus Int'l PLC*, 4:18-cv-00469-ALM, Docket No. 12 (E.D. Tex. Oct. 17, 2018); *Wapp Tech L.P. et al. v. Hewlett-Packard Enterprise Co.*, 4:18-cv-00468-ALM, Docket No. 13 (E.D. Tex. Oct. 17, 2018).

Citing "judicial efficiency," these four entities burdened the Court with four separate motions rather than bringing a single motion to intervene and transfer. The Delaware plaintiffs did not bring such a motion (i.e., to substitute parties in this District and to request transfer to Delaware) because there is no reason to transfer this case to Delaware. The vast majority of the relevant documents and witnesses are located within the Eastern District of Texas, as Wapp alleged in its Complaint. Complaint ¶¶ 4–12. For example, Micro Focus hires Sales Engineers

and Sales Managers in Plano, Texas. (Ex. J, *Search our Job Opportunities at Micro Focus*, Micro Focus, https://jobs.microfocus.com/search-jobs/Plano%2C%20TX/840/4/6252001-4736286-4682500-4719457/33x01984/-96x69889/5/2 (last visited Oct. 31, 2018).) As an additional example, Micro Focus operates a place of business at 5400 Legacy in Plano, Texas. (Ex. E, *Contact Micro Focus*, Micro Focus, https://www.microfocus.com/about/contact/ (last visited Oct. 31, 2018).)

Micro Focus's Motion to Dismiss is particularly burdensome, as it fails on the merits. As detailed below, Micro Focus holds itself out as having multiple systemic contacts within the Eastern District of Texas. At the very least, Wapp should be allowed jurisdictional discovery from Micro Focus to determine the nature of those contacts. Further, Micro Focus's lengthy argument about Wapp's failure to serve is inapposite because Micro Focus waived service and factual disputes exist as to the service of process.

### III. ARGUMENT

#### A. Micro Focus Holds Itself Out as Having Continuous and Systematic Contacts Within the Eastern District of Texas

Micro Focus alleges it has no contacts with Texas because the space Wapp identified in Wapp's Complaint is "used by EntIT Software LLC, a subsidiary of Seattle SpinCo, Inc." Mot. at 10. Both EntIT Software and Seattle SpinCo are wholly-owned subsidiaries of Micro Focus. *Id.* Micro Focus also asserts it does not conduct business in Texas and none of its "employees work or reside in Texas." *Id.* at 9–10.

Contrary to these assertions, however, Micro Focus repeatedly holds itself out as conducting business in Texas and having employees that work or reside in Texas. For example, the Micro Focus website, under the heading "Contact Micro Focus," lists three separate Texas "Office Locations," including 5400 Legacy, Plano, TX 75024; 14231 Tandem Boulevard, Austin,

TX 78728; and 515 Post Oak Boulevard, Suite 1200, Houston, TX 77027. (Ex. E.) 5400 Legacy

Drive in Plano is a 1.6 million-square-foot property, including two eight-story office buildings.

(Ex. F, Korri Kezar, *Former Perot Company Headquarters on the Market*, Dallas Business Journal

(June 21, 2018).) 14231 Tandem Boulevard in Austin is a 700,000 square-foot property, including

179,000 square feet of industrial space. (Ex. G, *Property Search Results for 277889 Hewlett*

*Packard    Enterprise    Company*,    Travis    County    Central    Appraisal    District,

https://www.traviscad.org/ (last visited Oct. 31, 2018).) 515 Post Oak Boulevard in Houston is a

136,000 square-foot property, including 273,000 square feet of rentable area. (Ex. H, *Harris*

*County Appraisal District Real Property Account Information*, Harris County Appraisal District,

http://hcad.org/property-search/real-property/ (last visited Oct. 31, 2018).)

      As an additional example, the Micro Focus website allows job seekers to search for "Plano

Jobs," in addition to "Austin Jobs," "Carrollton Jobs," "Dallas Jobs," and "Houston Jobs." (Ex. I,

*Working at Micro Focus*, Micro Focus, https://jobs.microfocus.com/ (last visited Oct. 31, 2018).)

As of October 26, 2018, the "Jobs and Careers at Micro Focus" available in Plano include Sales

Engineer and Sales Manager. (Ex. J.) Further, LinkedIn lists 200 individuals who name their

employer as "Micro Focus" and their location as the "Dallas/Forth Worth Area." (Ex. K, *Micro*

*Focus Dallas/Fort Worth Area*, LinkedIn, http://www.linkedin.com (last visited Oct. 31, 2018).)

Moreover, Micro Focus currently has over a dozen job postings for Plano, Texas (all posted within

the last 30 days) including Senior Sales Operational Analyst, PR Manager, Associate Account

Representative, ITOM Presales Director—Americas, and Sales Engineer—DevOps. (Ex. M,

*Micro    Focus    Jobs    in    Plano    TX*,    LinkedIn,    https://www.linkedin.com/

jobs/search/?currentJobId=934747588&keywords=micro%20focus&location=plano%20tx   (last

visited Oct. 31, 2018).)

In addition, Micro Focus employees posted pictures on the website Glassdoor, the picture featuring employees in Plano, Texas posing with a Micro Focus-branded picture frame with the hashtags "#OwnTheNew," "#MicroFocus," "#Cheerio," and "#AllInYall." The employees appear to be celebrating the launch of their new operations, titled "Welcome to Day #1!" (*See* Ex. L, *Micro Focus Office Photos*, Glassdoor.com, https://www.glassdoor.co.in/Photos/Micro-Focus-Office-Photos-IMG1648171.htm (last visited Oct. 31, 2018). Micro Focus is building a team in Plano, Texas to promote and market the Accused Products in contrast to Micro Focus's claims that it does not conduct business in the district.

In its own Motion, Micro Focus acknowledges that an individual that works on the ground of the Plano Legacy Drive location believes that "Micro Focus did have offices in that facility." Mot. at 12–13 (*citing* Parker Decl. ¶¶ 2–4). "In the procedural posture of a motion to dismiss, a district court must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor." *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1017 (Fed. Cir. 2009) (emphasis, internal citations omitted). Micro Focus's allegations made in various affidavits are at odds with the facts Micro Focus holds out to the public. These factual conflicts should be resolved in Wapp's favor, and Micro Focus's Motion to Dismiss for lack of personal jurisdiction should be denied.

With regard to venue, the Federal Circuit has stated that the general venue statute, rather than the patent venue statue, applies to foreign defendants, and thus foreign defendants may be sued in any District. *In re HTC Corp.*, 889 F.3d 1349, 1360 (Fed. Cir. 2018). However, even if the patent venue statute applies,[5] venue is proper in the Eastern District of Texas. The Federal Circuit

---

[5] The Supreme Court specifically declined to opine on whether its holding in *TC Heartland* extended to foreign defendants. *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. ___ (2017), 137 S. Ct. 1514, 1520 n. 2 (2017).

has outline three general requirements to demonstrate a "regular and established place of business" for purposes of the patent venue statute. 28 U.S.C. § 1400(b); *In re Cray Inc.*, 871 F.3d 1355 (Fed. Cir. 2017). These requirements are: (1) a "physical place in the district," (2) the "place" is a "regular and established place of business," and (3) the regular and established place of business must be "the place of the defendant." *Cray*, 871 F.3d at 1362–63. The Eastern District of Texas is the proper venue for Micro Focus under all of these factors.

First, Micro Focus maintains a physical place in the district. As detailed above, Micro Focus maintains operations at 5400 Legacy in Plano, Texas. (Ex. E.) Second, Micro Focus also currently has a dozen job postings for Plano, Texas (all posted within the last 3 months) including Sales Engineer – DevOps, illustrating that Plano is a "regular and established place of business." (Ex. I.) Finally, Micro Focus posted "Office Photos" for their Plano, Texas location further demonstrating that they are building an office and culture here, fully satisfying all three factors. (Ex. L.)

While Wapp has a good faith belief that Micro Focus has continuous and systematic contacts within Texas and this District, Wapp certainly wants to be reasonable. If, after jurisdiction discovery, evidence reveals that Micro Focus does not have continuous and systematic contacts with Texas, Wapp does not wish to burden this Court. Thus, Wapp requests leave from the Court to conduct discovery for the limited purpose of determining whether the Court does indeed have personal jurisdiction over Micro Focus.

### B.  Service of the Complaint

#### 1. Micro Focus Waived Service of the Complaint

Micro Focus argues for several pages that Wapp's service of the Complaint was deficient for various reasons. Mot. at 12–14. Mr. Reiter alleges in his Declaration that he "offer[ed] to waive service," which "Wapp did not accept." This is inaccurate. Mr. Reiter did not "offer to waive

service," Mr. Reiter waived service. Reiter Decl ¶ 2 (Exhibit B to Motion). To the extent any "offer" was made and "not accept[ed]," Wapp told Mr. Reiter that service on HPE, Bank of America, and Wells Fargo had already begun.

However, noting that reasonable people may remember the same event differently, Wapp notes that Federal Rule of Civil Procedure 4(m) instructs the court to "dismiss the action without prejudice against that defendant *or order that service be made within a specified time*" if the defendant "is not served within 90 days after the complaint is filed." Fed. R. Civ. P. 4(m). Therefore, should the Court find that, despite its efforts, Wapp failed to properly serve Micro Focus, Wapp requests the Court provide Wapp a reasonable time to either properly serve Micro Focus or obtain Micro Focus's unambiguous waiver or acceptance of service.

### 2. Factual Disputes Exist Around Service of Process

Micro Focus argues Wapp's service was deficient because, among other reasons, "Wapp's process server, Gean Smith, while inside a car and without identifying himself, handed the summons to an individual, Charlie Parker, who was walking outside from the parking garage, returning to work from his lunch break." Mot. at 5. Mr. Smith, whose declaration is attached to this Opposition, remembers the service as follows:

> I arrived at 5400 Legacy Drive and went to the main office, but I could not get into the lobby door. A man on an upper floor balcony directed me to a different building. The entrance to the second building was downstairs. The receptionist at the second building told me that the papers needed to go around back to the dock. I drove around back to the docks. As I approached the docks, I saw a man walking towards me. I told the man, who later identified himself as Charlie Parker, that I had legal documents to deliver to Micro Focus and asked which dock I needed to take them to. Mr. Parker stated that normally the documents would go to a different dock, but the documents would just be routed to him, so he would take them. I gave the documents to Mr. Parker and asked his name to complete the proof of service documents.

(Ex. N, Declaration of Gean Smith.) Because factual disputes exist as to the service of process, Micro Focus's Motion should be denied.

## IV. CONCLUSION

Micro Focus unduly burdens this Court with a Motion to Dismiss that should have been resolved by the parties. In its Motion, Micro Focus alleges facts contrary with the public face of Micro Focus to argue the Court has no personal jurisdiction over Micro Focus. Micro Focus also argues Wapp failed to properly serve Micro Focus. Both arguments are at least subject to factual disputes and must thus be resolved in Wapp's favor. However, should the Court disagree that any factual disputes exist, Wapp requests jurisdiction discovery to resolve the first question (personal jurisdiction) and requests leave to properly serve Micro Focus to resolve the second (service of Micro Focus).

Respectfully submitted,

Dated: <u>October 31, 2018</u>      By: <u>*/Jeffrey G. Toler/*</u>
                                       Jeffrey G. Toler
                                       Texas State Bar No. 24011201
                                       Aakash S. Parekh
                                       Texas State Bar No. 24059133
                                       Benjamin R. Johnson
                                       Texas State Bar No. 24065495
                                       TOLER LAW GROUP, PC
                                       8500 Bluffstone Cove
                                       Suite A201
                                       Austin, TX 78759
                                       (512) 327-5515
                                       E-mail: <u>jtoler@tlgiplaw.com</u>
                                       E-mail: <u>aparekh@tlgiplaw.com</u>
                                       E-mail: <u>bjohnson@tlgiplaw.com</u>

                                       *ATTORNEYS FOR PLAINTIFFS*
                                       *WAPP TECH LIMITED PARTNERSHIP AND*
                                       *WAPP TECH CORP.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 31, 2018 the foregoing was filed via the Court's

CM/ECF filing system, to be served electronically on all counsel of record in this matter.

<u>*/Angie Blazek/*</u>
Angie Blazek

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

|  |  |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., | Case No. 4:18-cv-00469-ALM |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| MICRO FOCUS INTERNATIONAL PLC, | |
| Defendant. | |

**<u>DEFENDANT MICRO FOCUS INTERNATIONAL PLC'S REPLY BRIEF IN SUPPORT
OF ITS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION,
FAILURE TO SERVE, AND IMPROPER SERVICE OF THE COMPLAINT</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION ...............................................................................................1

II.    THIS CASE SHOULD BE DISMISSED BECAUSE THIS COURT LACKS
       PERSONAL JURISDICTION OVER MF PLC..............................................................2

       A.    Wapp Provides No Basis to Establish Personal Jurisdiction over MF plc ...............2

       B.    The Alleged "Continuous and Systematic Contacts" With Texas Are At Most
             Attributable to MF plc's Subsidiaries, Not MF plc Itself..........................................4

       C.    Wapp's Request for Jurisdictional Discovery Should Be Denied............................6

III.   THIS CASE SHOULD BE DISMISSED FOR FAILURE TO SERVE AND
       IMPROPER SERVICE .......................................................................................7

       A.    There Can Be No Dispute that MF plc Did Not Waive Service of Process.............8

       B.    Wapp's Alleged Factual Disputes About the Declarations Regarding Service Are
             Unidentified and Irrelevant .......................................................................9

IV.    CONCLUSION...............................................................................................10

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*,
566 F.3d 1012 (Fed. Cir. 2009) ................................................................3, 6

*Avocent Huntsville Corp. v. Aten Int'l. Co.*,
552 F.3d 1324 (Fed. Cir. 2008) ................................................................2

*Celgard, LLC v. SK Innovation Co., Ltd.*,
792 F.3d 1373 (Fed. Cir. 2015) ................................................................2

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ................................................................2, 3

*Dalton v. R & W Marine, Inc.*,
897 F.2d 1359 (5th Cir. 1990) ................................................................4

*Fletcher v. Atex, Inc.*,
68 F.3d 1451 (2d Cir. 1995) ................................................................5

*Green Ice Tech., LLC v. Ice Cold 2, LLC*,
Civil Action No. 4:17-CV-00341, 2018 WL 3656476 (E.D. Tex. Aug. 1,
2018) ................................................................2

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984) ................................................................2

*Johnston v. Multidata Systems Int'l Corp.*,
523 F.3d 602 (5th Cir. 2008) ................................................................2

*Kelly v. Syria Shell Petro. Dev. B.V.*,
213 F.3d 841 (5th Cir. 2000) ................................................................6

*Lozano v. Bosdet*,
693 F.3d 485 (5th Cir. 2012) ................................................................8

*Miles Bramwell USA, LLC v. Weight Watcher Int'l, Inc.*,
No. 4:12-CV-292, 2013 WL 1797031 (E.D. Tex. Mar. 27, 2013) ................................................................6

*Negron-Torres v. Verizon Commc'ns, Inc.*,
478 F.3d 19 (1st Cir. 2007) ................................................................5

*Patterson v. Home Depot, USA, Inc.*,
684 F. Supp. 2d 1170 (D. Ariz. 2010) ................................................................5

## <u>TABLE OF AUTHORITIES</u>

*Phonometrics, Inc. v. N. Telecom Inc.*,
    133 F.3d 1459 (Fed. Cir. 1998)........................................................................4

*Price v. Waste Management, Inc.*,
    Civil Action No. ELH-13-02535, 2014 WL 1764722 (D. Maryland Apr. 30,
    2014) ...............................................................................................................5

*Quick Techs., Inc. v. Sage Group PLC*,
    313 F.3d 338 (5th Cir. 2002) ..........................................................................5

*Special Indus. Inc. v. Zamil Grp. Holding Co.*,
    No. 4:11-CV-3207, 2013 WL 1345612 (S.D. Tex. Mar. 29, 2013), aff'd, 578
    F. App'x 325 (5th Cir. 2014) ..........................................................................5

*Von Grabe v. Sprint PCS*,
    312 F. Supp. 2d 1285 (S.D. Cal. 2003)...........................................................5

*Walden v. Fiore*,
    571 U.S. 277 (2014)........................................................................................4

*Wyatt v. Kaplan*,
    686 F.2d 276 (5th Cir. 1982) ..........................................................................6

**Rules**

Fed. R. Civ. P. 4.................................................................................................2, 8

## I.       INTRODUCTION

Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp. (together, "Wapp") have failed to carry their burden of establishing that this Court has personal jurisdiction over the sole named defendant, Micro Focus International plc ("MF plc").   Likewise, Wapp has failed to demonstrate that it properly served MF plc or exercised reasonable diligence in attempting to serve MF plc.   For each of these reasons, Wapp's complaint against MF plc should be dismissed.

Rather than confront the facts presented by MF plc through the Declaration of Philip Horner (Dkt. No. 12-1) ("Horner Decl."), which Wapp fails even once to address, Wapp attempts to confuse the matter by conflating MF plc with MF plc's U.S.-based subsidiaries given their shared use of the tradename "Micro Focus."   Specifically, Wapp renames Defendant MF plc as "Micro Focus" for purposes of its briefing, and then attempts to leverage the ambiguity created by this shorthand name to ascribe various Texas-based activities of MF plc's subsidiaries, including keeping employees and offices in Texas, to MF plc.   But this sleight of hand does not establish personal jurisdiction over MF plc.   Indeed, none of the exhibits Wapp submits with its Opposition suggest that MF plc, as opposed to its subsidiaries, conducts any of the identified activities.   As explained below, courts, including the Fifth Circuit, have rejected plaintiffs' efforts to fabricate personal jurisdiction over a foreign parent based on a subsidiary's use of a common trade name. And that is all Wapp argues.   In short, Wapp has failed to carry the heavy burden it bears of establishing personal jurisdiction, and that failure warrants dismissal of Wapp's Complaint.

Wapp's Complaint should also be dismissed because Wapp's attempted service on MF plc was improper, and Wapp has yet to serve MF plc.   Notably, Wapp does not dispute any of this. Wapp instead asserts, without any support, and contrary to the sworn declaration of Mark Reiter (Dkt. No. 12-2) ("Reiter Decl."), that MF plc waived service.   Wapp provides no support for this assertion because none exists:   MF plc did not waive service.   To the contrary, Wapp's only

1

evidence concerning service—Wapp's alleged proof of service filed with this Court—demonstrates that there was no waiver of service.  If service were indeed waived, Wapp would not have needed to file any proof of service.  *See* Fed. R. Civ. P. 4(l).  Nor did Wapp file any waiver. *See* Fed. R. Civ. P. 4(d)(4).  Likewise, because actual service would not have been required had MF plc waived service, Wapp's assertion that factual "disputes," albeit unidentified disputes, exist regarding its alleged actual service also conflicts with its assertion that MF plc waived service.  Wapp has failed to serve MF plc, which provides an independent basis for dismissing Wapp's Complaint.

## II.  THIS CASE SHOULD BE DISMISSED BECAUSE THIS COURT LACKS PERSONAL JURISDICTION OVER MF PLC

### A.  Wapp Provides No Basis to Establish Personal Jurisdiction over MF plc

Wapp bears the burden of establishing personal jurisdiction.  *Celgard, LLC v. SK Innovation Co., Ltd.*, 792 F.3d 1373, 1378 (Fed. Cir. 2015); *see also Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) ("[P]laintiff bears the burden of establishing a district court's jurisdiction over a non-resident.").  Wapp attempts to carry that burden by arguing only that MF plc has "continuous and systematic contacts within the Eastern District of Texas."  *See* Dkt. No. 15 ("Opp.") § III.A.  Thus, Wapp's sole contention is that MF plc is subject to *general* personal jurisdiction in this Court.[1]  *See, e.g.*, *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1330 (Fed. Cir. 2008) (explaining that for general jurisdiction "[w]e . . . must explore the nature of [the defendant's] contacts with the [forum State] to determine whether they constitute . . . *continuous and systematic* general business contacts") (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16 (1984)).  The Supreme Court recently confirmed

---

[1] Even if Wapp had argued that this Court has specific personal jurisdiction over MF plc (which Wapp did not do), such argument would have failed.  *See infra* pp. 3–6; Dkt. No. 12 at 7–8, 10.

that a plaintiff bears a significant burden to establish general personal jurisdiction; indeed, the plaintiff must show more than "continuous and systemic contacts." *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014).  Rather, the plaintiff must show that the alleged continuous and systemic contacts are so pervasive that they "render [the defendant] essentially at home in the forum State." *Id.* (citation omitted).  This is a "difficult standard to meet and requires extensive contacts between a defendant and the forum." *Green Ice Tech., LLC v. Ice Cold 2, LLC*, Civil Action No. 4:17-CV-00341, 2018 WL 3656476, at *5 (E.D. Tex. Aug. 1, 2018).  Wapp fails to meet this burden.[2]

The exhibits Wapp appended to its Opposition do not change that conclusion.  Although the Court must resolve factual conflicts in Wapp's favor, Wapp "is entitled to only those inferences that are reasonable." *See Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1018 (Fed. Cir. 2009).  As explained below, Wapp either fails entirely to present a factual conflict, or, to the extent it attempts to create an inference of general personal jurisdiction, that inference conflicts with both the law and facts and is, therefore, not reasonable.

Indeed, Wapp's Opposition does not even attempt to address the facts presented by MF plc that unambiguously demonstrate that MF plc is not subject to jurisdiction in this Court.  *See* Dkt. No. 12 ("Mot.") at 3–4, 9–11.  For example, Wapp provides no response to the Declaration of Philip Horner, thereby leaving uncontroverted the following dispositive facts:

- MF plc is a foreign holding company organized under the laws of England and Wales, with its principal place of business in England.  Horner Decl. ¶¶ 2–3.

- MF plc does not carry out any business operations whatsoever, including developing, manufacturing, marketing, selling, or distributing the accused products or any other product. Horner Decl. ¶¶ 3–5.

---

[2] Wapp spends a page of its Opposition addressing the issue of venue, but those arguments are irrelevant to MF plc's Motion.  Opp. at 6–7.  MF plc's Motion seeks dismissal based on lack of personal jurisdiction, a failure to serve, and improper service.

- MF plc does not own, lease, or rent any office space, real property, residence, or place of business in Texas, nor do any MF plc employees or board members reside or work in Texas.  Horner Decl. ¶ 6.

- MF plc is separate and distinct from its subsidiaries, and the corporate form is respected. Horner Decl. ¶ 7.

These unrebutted facts conclusively demonstrate that this Court does not have personal jurisdiction, general or specific, over MF plc.  *See Daimler*, 571 U.S. at 138–39 (setting forth standard for general jurisdiction); *Autogenomics*, 566 F.3d at 1018 (setting for standard for specific jurisdiction).

**B.     The Alleged "Continuous and Systematic Contacts" With Texas Are At Most Attributable to MF plc's Subsidiaries, Not MF plc Itself**

Wapp spends pages of briefing arguing that "Micro Focus repeatedly holds itself out as conducting business in Texas and having employees that work or reside in Texas."  Opp. at 4.  As support for this assertion, Wapp relies upon various sources, such as the "Micro Focus" website and third-party webpages, *e.g.*, LinkedIn and Glassdoor, in hopes of establishing an inference that MF plc has extensive connections—*e.g.*, offices, job openings, and employees—with the State of Texas.  Opp. at 4–7.  Because Wapp does not even attempt to tie any of these activities expressly to MF plc, they are irrelevant.

At most, Wapp's allegations demonstrate that MF plc and its subsidiaries operate under a single tradename—*i.e.*, "Micro Focus"—and that certain subsidiaries of MF plc have employees, jobs, and/or offices based in Texas.[3]  Notably, *none* of the exhibits presented by Wapp suggests

---

[3] In addition to having no factual support, Wapp's conflates the activities of MF plc with those of its subsidiaries, but this is contrary to Supreme Court authority.  As the Supreme Court has explained, when analyzing personal jurisdiction, the relationship with the state "must arise out of contacts that the defendant *himself* creates with the forum State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis in original, citation omitted).  It follows that a subsidiary's contacts with a state do not create personal jurisdiction over the parent; it is the parent's own contacts with the

that MF plc itself owns or leases the office space, has job openings, or has employees in Texas. Nor would they, given the uncontroverted facts presented in Mr. Horner's declaration.

To the contrary, even beyond Mr. Horner's declaration, publicly available information confirms that these alleged contacts with Texas are not attributable to MF plc. The Micro Focus website (www.microfocus.com), upon which Wapp relies so heavily, is registered to one of MF plc's subsidiaries, "Micro Focus (IP) Limited." *See* ICANN Registration (Ex. D) at 1. The trademark "Micro Focus" is registered to another subsidiary, "Micro Focus IP Development LLC." *See* Micro Focus Trademark Registration (Ex. E) at 1–2. Additionally, a pair of subsidiaries that also use the tradename "Micro Focus"—Micro Focus Software Inc. and Micro Focus (U.S.), Inc.— are registered to do business in the State of Texas, but MF plc is not. *See* Tex. Registration Search (Ex. F). All of this information was available to, but ignored by, Wapp.

Based on these facts, the law precludes this Court from drawing the unreasonable inference Wapp desires. Indeed, numerous courts, including the Fifth Circuit, have rejected the argument that the use of a common tradename by separate corporate entities in a single corporate family can be used to establish personal jurisdiction. *See, e.g., Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 345 (5th Cir. 2002) (no personal jurisdiction over foreign defendant, despite common usage of trade name by foreign defendant and local subsidiary); *Negron-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 16 (1st Cir. 2007) ("[M]ere use of a trademark or logo" by a subsidiary "does not suffice to demonstrate the existence of requisite minimum contacts" of the parent).[4]

---

state that matter. *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998); *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1363 (5th Cir. 1990).

[4] *See also Special Indus. Inc. v. Zamil Grp. Holding Co.*, No. 4:11-CV-3207, 2013 WL 1345612, at *4 (S.D. Tex. Mar. 29, 2013), *aff'd*, 578 F. App'x 325 (5th Cir. 2014) (refusing to find

In short, Wapp's allegation that *MF plc* "holds itself out" as conducting business in Texas fails as a matter of fact and law.  Wapp identifies not a single statement by MF plc (or any of its subsidiaries) that suggests MF plc itself, as opposed to one of its subsidiaries, conducts business in Texas.  Given the uncontroverted facts in Mr. Horner's sworn declaration, confirmed by the publicly available information Wapp ignores, this comes as no surprise.  MF plc has no employees in the State of Texas, and it does not own, lease, operate, or rent any real property in the state. Mot. at 9–10.

That Wapp was able to collect the Internet excerpts is of no matter; again, the inferences Wapp asks the Court to draw from the excerpts must be reasonable, and here they are not.  *See Autogenomics*, 566 F.3d at 1018.  This Court lacks personal jurisdiction over MF plc and should, on that basis alone, dismiss Wapp's Complaint.

### C.     Wapp's Request for Jurisdictional Discovery Should Be Denied

Wapp's cryptic request for jurisdictional discovery rings of desperation and should be denied.  "When the lack of personal jurisdiction is clear, discovery would serve no purpose and should not be permitted."  *Wyatt v. Kaplan*, 686 F.2d 276, 284 (5th Cir. 1982).  For the reasons discussed above, Wapp's briefing does not raise disputed issues of fact and thereby underscores the futility of discovery.  For example, Wapp has not reasonably disputed *any* fact relevant to

---

personal jurisdiction over parent for actions of subsidiary because "references on its subsidiaries' websites to common systems, such as the 'Vallourec Management System,' are merely examples of a standard parent-subsidiary relationship"); *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1301 (S.D. Cal. 2003) (common usage of a trade name not sufficient basis for establishing personal jurisdiction over parent corporation); *Patterson v. Home Depot, USA, Inc.*, 684 F. Supp. 2d 1170, 1179 (D. Ariz. 2010) (recognizing that "common trade name and logo, without more, is not a sufficient basis for establishing personal jurisdiction"); *Price v. Waste Mgmt., Inc.*, Civil Action No. ELH-13-02535, 2014 WL 1764722, at *12 (D. Maryland Apr. 30, 2014) (subsidiary's use of common logo insufficient to confer personal jurisdiction over parent corporation); *c.f. Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1461–62 (2d Cir. 1995) (usage of common logo insufficient to pierce veil or create agency relationship).

personal jurisdiction, and Wapp has failed to produce *any* evidence tending to show that MF plc— as opposed to its subsidiaries—has contacts with Texas. As a result, this Court's lack of personal jurisdiction over MF plc is "clear," and jurisdictional discovery therefore "should not be permitted." *See id.*

Additionally, even if Wapp were entitled to any jurisdictional discovery (which it is not), Wapp would have to describe the specific discovery it seeks, identify what facts it expects the discovery to reveal, and explain how those facts would support a finding of jurisdiction. *See Autogenomics*, 566 F.3d at 1022–23 (affirming district court's denial of the requested jurisdictional discovery because the defendant had entered "declarations into evidence specifically denying certain jurisdictional allegations" and the plaintiff "did not make, either in its opposition brief or at the motion hearing, a showing that further discovery would elucidate the facts necessary to prove that the court had personal jurisdiction"); *see also Kelly v. Syria Shell Petro. Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (similar); *Miles Bramwell USA, LLC v. Weight Watchers Int'l, Inc.*, No. 4:12-CV-292, 2013 WL 1797031, at *4 (E.D. Tex. Mar. 27, 2013) (recommending similar, adopted at Dkt. No. 50). Wapp has done none of this. Rather, Wapp generically requests leave to "conduct discovery for the limited purpose of determining whether the Court does indeed have personal jurisdiction over Micro Focus." Opp. at 7. The Court has no way to test the reasonableness of Wapp's request, which is simply an undefined fishing expedition.

In sum, Wapp's request for jurisdictional discovery is legally, procedurally, and factually flawed and should be denied.

## III.   THIS CASE SHOULD BE DISMISSED FOR FAILURE TO SERVE AND IMPROPER SERVICE

As detailed in MF plc's motion to dismiss, Wapp's attempted service of MF plc was deficient, and MF plc has yet to be served. *See* Mot. at 12–13. MF plc further explained that

ninety days had passed since Wapp filed its Complaint, and Wapp had not exercised reasonable diligence in attempting service on MF plc.  As such, the Complaint should be dismissed.  *Id.* at 13–14.

Tellingly, Wapp does *not* contend in its Opposition that Wapp ever properly served MF plc, or that Wapp has exercised reasonable diligence in seeking to serve MF plc.  *See generally* Opp. at 7–8.  Instead, Wapp argues that MF plc waived service.  Wapp also alleges that "factual disputes exist" concerning its attempted service of process, but Wapp does not identify what those factual disputes are.  *Id.* at 8.  As explained below, Wapp's arguments fail.

### A.      There Can Be No Dispute that MF plc Did Not Waive Service of Process

With respect to MF plc's alleged waiver of service, Wapp asserts that Mark Reiter, counsel for MF plc, "did not 'offer to waive service,' Mr. Reiter waived service."  Opp. at 7–8.  Wapp also contends that the statement in Mr. Reiter's sworn declaration that Wapp did not accept his offer to waive service was "inaccurate."  Put simply, *all* of the evidence before this Court demonstrates that Wapp is wrong.  Mr. Reiter made an offer to waive service, Wapp did not accept that offer, and Wapp sought to serve the summons directly on MF plc (but did so improperly).  Mot. at 12–14.

That Wapp did not submit a sworn declaration or any other evidence of an agreement to waive service is telling—no such document exists, because MF plc never waived service.  As Wapp is well aware, and as the unrebutted Reiter Declaration explains, Mr. Reiter *offered* to waive service in exchange for Wapp's agreement that MF plc and the other three Defendants separately sued by Wapp (*i.e.*, Bank of America Corporation, Wells Fargo & Company, and Hewlett Packard Enterprise Company) would have a common deadline of October 30, 2018 to respond to Wapp's respective complaints against them, but Wapp never accepted that offer.  Reiter Decl. ¶ 2.

As further evidence of the lack of any waiver, the Court needs only to look to Wapp's subsequent conduct. The day after receiving Mr. Reiter's offer, Wapp's process server sought to serve MF plc directly through Mr. Parker in Plano. Mot. at 5–6, 12–13. After its purported service through Mr. Parker, Wapp filed with the Court an executed summons, which is required under Federal Rule of Civil Procedure 4(l) only when service is *not* waived. *See* Summons Returned (Dkt. No. 8) at 1–2. Wapp, moreover, did not comply with Federal Rules of Civil Procedure 4(d)(1)(C), (D) or (F): Wapp never provided to MF plc the waiver forms appended to Rule 4; MF plc never executed the forms appended to Rule 4, and, thus, Wapp never filed those forms with the Court. These facts, coupled with the additional fact that none of the Defendants filed responses to Wapp's complaints on October 30 as Mr. Reiter requested, demonstrate that no party believed MF plc had waived service.

Wapp's request for additional time to serve MF plc comes too late, and, contrary to Rule 4(m), Wapp has failed to provide any showing of good cause for its failure, particularly since Wapp does not, nor can it, dispute that public records demonstrate that MF plc has no registered agent in Texas. Tex. Registration Search (Ex. F). To the contrary, Wapp's conduct demonstrates a complete lack of diligence, not the reasonable diligence required by law. *See Lozano v. Bosdet*, 693 F.3d 485, 488–89 (5th Cir. 2012) (requiring the plaintiff to exercise reasonable diligence in serving a foreign defendant to avoid dismissal). The time for Wapp to take appropriate steps expired nearly six weeks ago; respectfully, the Court should therefore dismiss Wapp's Complaint.

### B.   Wapp's Alleged Factual Disputes About the Declarations Regarding Service Are Unidentified and Irrelevant

Wapp's Opposition cites the declaration of Mr. Smith, the process server. *See* Opp. at 8. The Opposition includes Mr. Smith's version of events and declares that "factual disputes exist as to the service of process." Yet, Wapp never actually identifies any points of factual disagreement.

In truth, the two declarations are consistent in all relevant respects.  Both declarations agree that Mr. Smith provided Mr. Parker with copies of Wapp's complaint and summons, and Mr. Smith does not dispute the manner in which he handed Mr. Parker the documents.  *Compare* Smith Decl. (Dkt. No. 15-13) with Parker Decl. (Dkt. No. 12-3).  Importantly, Mr. Smith does not allege that Mr. Parker held himself out to be an authorized agent to accept service of process for MF plc, nor does Mr. Smith challenge Mr. Parker's statement that Mr. Smith failed to mention Micro Focus International plc.

## IV.    CONCLUSION

For the foregoing reasons, the Complaint against MF plc should be dismissed.


Dated:  November 8, 2018           By:   */s/ Mark N. Reiter*
                                         Mark N. Reiter
                                         Lead Attorney
                                         Texas State Bar No. 16759900
                                         mreiter@gibsondunn.com
                                         **GIBSON, DUNN & CRUTCHER LLP**
                                         2100 McKinney Avenue, Suite 1100
                                         Dallas, TX  75201-6912
                                         Telephone:  214.698.3360
                                         Facsimile:  214.571.2907

                                         Neema Jalali
                                         CA State Bar No. 245424
                                         njalali@gibsondunn.com
                                         **GIBSON, DUNN & CRUTCHER LLP**
                                         555 Mission Street, Suite 3000
                                         San Francisco, CA  94105
                                         Telephone:  415.393.8200
                                         Facsimile:  415.374.8409

                                         *Attorneys for Defendant Micro Focus*
                                         *International plc*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2018, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to CM/ECF participants in this case.

*/s/ Mark N. Reiter*
Mark N. Reiter

# EXHIBIT 12



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sun Nov 4 04:51:02 EST 2018*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [＿＿＿] OR   Jump   to record: [＿＿＿]   **Record 3 out of 16**

TSDR   ASSIGN Status   TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | **MICRO FOCUS** |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: Computer software and computer programs, namely, compilers, assemblers, visual development software, software tools and utilities for use in creating, modeling, monitoring, controlling, administering and managing applications and other programs and for providing secure communications and data exchange between programs and computers in a distributed or networked environment; program and application development software, software tools and utilities for use in designing, developing, writing, tracking changes in and implementing user-specific applications, secure communications applications, digital certificate implementation and verification, and general purpose applications programs; object-oriented and client/server programming development software, software tools and utilities; development software, software tools and utilities for use in designing and implementing programs for secure and/or encrypted access to and for exchange of secure communications and data in environments containing local area networks, enterprise networks, internal networks, extranets, corporate information networks, wide area networks, the Internet and globally interconnected computer networks linked by common or diverse protocols; programming software tools for use in developing, maintaining, enhancing, providing security for and operating computer programs and computer systems, and computer utility programs, and user manuals sold therewith as a unit. FIRST USE: 20031222. FIRST USE IN COMMERCE: 20031222

IC 041. US 100 101 107. G & S: Educational services and training services, namely, conducting seminars and courses relating to computers, computer software, computer networking, computer software applications, software development and implementation, and business process automation in the field of software application development, software and application development life cycle management, software modernization, programming languages, software testing tools, software requirements management; organizing and presenting conferences, seminars and user group meetings on computers, computer software and computer networking; conducting training classes, seminars, conferences, and workshops in the field of business opportunities and strategies in electronic commerce; conducting training classes, seminars, conferences, and workshops featuring the development of business models for use in an electronic environment; computer education training in the transformation, adaptation and use of existing software application programs for use on web sites and in electronic commerce and use of computer software, and use, configuration and implementation of local area and other computer communications networks; publishing and editing of books, newspapers and periodicals in the field of software application development, software and application development life cycle management, |

software modernization, programming languages, software testing tools, software requirements management. FIRST USE: 20031222. FIRST USE IN COMMERCE: 20031222

IC 042. US 100 101. G & S: Design and development of computer software for others; software engineering and compatibility testing services; software programming services; professional and technical consulting services in relation to computers, computer software, networking, programming and application development, user interfaces, client/server and remote computing applications, computer systems operations tools and utilities, global computer information network, enterprise, wide area and local area networking access, operations and systems management, development tools and utilities, and monitoring, control and management of computer systems; maintenance and support services for computer software, namely, telephone consultation, debugging computer software, updating computer software, providing on-line database of electronic reference information, and web sites, all in the fields of software application development, software and application development life cycle management, software modernization, programming languages, software testing tools, software requirements management; consulting services regarding configuration and implementation of computer systems, reengineering of computer systems, and enhancing, transforming, integrating, and maintaining software applications in the field of software application development, software and application development life cycle management, software modernization, programming languages, software testing tools, software requirements management; providing services relating to infrastructure-as-a-service technology, namely, developing software to enable infrastructure-as-a-service technology and providing maintenance and technical support for such software; providing services relating to cloud computing, namely, consulting services related to implementation of cloud computing services; Computer software consultancy, namely, providing systematic strategy approaches to customers for service-oriented architecture (SOA) deployments; consulting services regarding use, configuration and implementation of local area and other computer and communications networks. FIRST USE: 20031222. FIRST USE IN COMMERCE: 20031222

| | |
|---|---|
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 26.09.03 - Incomplete squares; Squares, incomplete |
| **Serial Number** | 85903885 |
| **Filing Date** | April 15, 2013 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | December 24, 2013 |
| **Registration Number** | 4591168 |
| **International Registration Number** | 1195661 |
| **Registration Date** | August 26, 2014 |
| **Owner** | (REGISTRANT) Micro Focus IP Development Limited limited company UNITED KINGDOM The Lawn 22-30 Old Bath Road Newbury, Berkshire UNITED KINGDOM RG141QN |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | James A. Larson |
| **Prior Registrations** | 1461698;3431389;3431390 |
| **Description of Mark** | Color is not claimed as a feature of the mark. The mark consists of the wording "MICRO FOCUS" and two vertical and horizontal lines which form an incomplete square. |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL-2(F)-IN PART |
| **Live/Dead Indicator** | LIVE |
| **Distinctiveness Limitation Statement** | as to "Micro Focus" |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST
FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

| .HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT 13

简体中文    English    Français    Русский    Español    العربية    Portuguese

# ICANN WHOIS

www.microfocus.com        Lookup

By submitting any personal data, I agree that any the personal data will be processed in accordance with the ICANN Privacy Policy, and agree to abide by the website Terms of Service.

*Showing results for: microfocus.com*

Original Query: www.microfocus.com

## Contact Information

### Registrant Contact
Name: Web Development Services Team
Organization: Micro Focus (IP) Limited
Mailing Address: The Lawn 22-30 Old Bath Road, Newbury Berkshire RG14 1QN GB
Phone: +44.1635565432
Ext:
Fax: +44.1635565570
Fax Ext:
Email:domain.admin@microfocus.com

### Admin Contact
Name: Web Development Services Team
Organization: Micro Focus (IP) Limited
Mailing Address: The Lawn 22-30 Old Bath Road, Newbury Berkshire RG14 1QN GB
Phone: +44.1635565432
Ext:
Fax: +44.1635565570
Fax Ext:
Email:domain.admin@microfocus.com

### Tech Contact

Name: Registrar Domain
Organization: Corporation Service Company
Mailing Address: PO Box 597, Yarmouth NS B5A 4B4 CA
Phone: +1.9027465201
Ext:
Fax: +1.9027465252
Fax Ext:
Email:admin@internationaladmin.com

## Registrar

WHOIS Server: whois.corporatedomains.com
URL: www.cscprotectsbrands.com
Registrar: CSC CORPORATE DOMAINS, INC.
IANA ID: 299
Abuse Contact Email:domainabuse@cscglobal.com
Abuse Contact Phone: +1.8887802723

## Status

Domain Status:clientTransferProhibited http://www.icann.org/epp#clientTransferProhibited

## Important Dates

Updated Date: 2016-12-03
Created Date: 1995-07-28
Registrar Expiration Date: 2022-07-27

## Name Servers

pdns2.cscdns.net
pdns1.cscdns.net

## Raw WHOIS Record

```
Domain Name: microfocus.com
Registry Domain ID: 834318_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.corporatedomains.com
Registrar URL: www.cscprotectsbrands.com
Updated Date: 2016-12-03T14:39:15Z
Creation Date: 1995-07-28T04:00:00Z
Registrar Registration Expiration Date: 2022-07-27T04:00:00Z
Registrar: CSC CORPORATE DOMAINS, INC.
Registrar IANA ID: 299
Registrar Abuse Contact Email: domainabuse@cscglobal.com
Registrar Abuse Contact Phone: +1.8887802723
Domain Status: clientTransferProhibited
http://www.icann.org/epp#clientTransferProhibited
Registry Registrant ID:
Registrant Name: Web Development Services Team
Registrant Organization: Micro Focus (IP) Limited
Registrant Street: The Lawn 22-30 Old Bath Road
Registrant City: Newbury
Registrant State/Province: Berkshire
Registrant Postal Code: RG14 1QN
Registrant Country: GB
Registrant Phone: +44.1635565432
Registrant Phone Ext:
Registrant Fax: +44.1635565570
Registrant Fax Ext:
Registrant Email: domain.admin@microfocus.com
Registry Admin ID:
Admin Name: Web Development Services Team
Admin Organization: Micro Focus (IP) Limited
Admin Street: The Lawn 22-30 Old Bath Road
Admin City: Newbury
Admin State/Province: Berkshire
Admin Postal Code: RG14 1QN
Admin Country: GB
Admin Phone: +44.1635565432
Admin Phone Ext:
Admin Fax: +44.1635565570
Admin Fax Ext:
Admin Email: domain.admin@microfocus.com
Registry Tech ID:
Tech Name: Registrar Domain
Tech Organization: Corporation Service Company
Tech Street: PO Box 597
Tech City: Yarmouth
Tech State/Province: NS
Tech Postal Code: B5A 4B4
```

Tech Country: CA
Tech Phone: +1.9027465201
Tech Phone Ext:
Tech Fax: +1.9027465252
Tech Fax Ext:
Tech Email: admin@internationaladmin.com
Name Server: pdns2.cscdns.net
Name Server: pdns1.cscdns.net
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System:
http://wdprs.internic.net/
>>> Last update of WHOIS database: 2016-12-03T14:39:15Z <<<

For more information on Whois status codes, please visit
https://icann.org/epp

Corporation Service Company(c) (CSC)  The Trusted Partner of More than
50% of the 100 Best Global Brands.

Contact us to learn more about our enterprise solutions for Global
Domain Name Registration and Management, Trademark Research and
Watching, Brand, Logo and Auction Monitoring, as well SSL Certificate
Services and DNS Hosting.

NOTICE: You are not authorized to access or query our WHOIS database
through the use of high-volume, automated, electronic processes or for
the purpose or purposes of using the data in any manner that violates
these terms of use. The Data in the CSC WHOIS database is provided by
CSC for information purposes only, and to assist persons in obtaining
information about or related to a domain name registration record. CSC
does not guarantee its accuracy. By submitting a WHOIS query, you agree
to abide by the following terms of use: you agree that you may use this
Data only for lawful purposes and that under no circumstances will you
use this Data to: (1) allow, enable, or otherwise support the
transmission of mass unsolicited, commercial advertising or
solicitations via direct mail, e-mail, telephone, or facsimile; or (2)
enable high volume, automated, electronic processes that apply to CSC
(or its computer systems). CSC reserves the right to terminate your
access to the WHOIS database in its sole discretion for any violations
by you of these terms of use. CSC reserves the right to modify these
terms at any time.

Register your domain name at http://www.cscglobal.com

**Submit a Complaint for WHOIS**
WHOIS Inaccuracy Complaint Form
WHOIS Service Complaint Form

WHOIS Compliance FAQs

NOTICE, DISCLAIMERS AND TERMS OF USE:

On 17 May 2018 the ICANN Board adopted a Temporary Specification for gTLD Registration Data. This page is under review and will be updated to address the Temporary Specification.

---

All results shown are captured from registries and/or registrars and are framed in real-time.  ICANN does not generate, collect, retain or store the results shown other than for the transitory duration necessary to show these results in response to real-time queries.*  These results are shown for the sole purpose of assisting you in obtaining information about domain name registration records and for no other purpose. You agree to use this data only for lawful purposes and further agree not to use this data (i) to allow, enable, or otherwise support the transmission by email, telephone, or facsimile of mass unsolicited, commercial advertising, or (ii) to enable high volume, automated, electronic processes to collect or compile this data for any purpose, including without limitation mining this data for your own personal or commercial purposes.  ICANN reserves the right to restrict or terminate your access to the data if you fail to abide by these terms of use. ICANN reserves the right to modify these terms at any time.  By submitting a query, you agree to abide by these terms.

*  There is one exception:  ICANN acts as the registry operator for the .int TLD, and in that capacity it does collect, generate, retain and store information regarding registrations in the .int TLD.

© 2018 Internet Corporation for Assigned Names and Numbers     Privacy Policy     Terms of Service     Cookies Policy